## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 1:24-cv-21929-Bloom

ZACHARY GRIFFIN          |

      Plaintiff.        |

v.                   |

MOTORSPORTS GAMES INC.,    |

      Defendant      |

_____|

### DECLARATION OF ZACHARY GRIFFIN IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Zachary Griffin, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.     I am over 18 years of age, of sound mind, and competent to make this Declaration. The facts set out in this Declaration are based on my personal knowledge, and if called as a witness I could, and would, testify competently to those facts.

2.     In March 2021, MSG acquired the rights to the game *KartKraft* from Black Delta, an Australian company where I was a shareholder. Prior to the close of the acquisition, MSG set up a local entity named Motorsport Games Australia Pty Ltd ("MSG-Aus"). On March 16, 2021, I was hired by MSG as Director of Studio of MSG-Aus.

3.     My employment contract with MSG-Aus allowed termination by MSG-Aus with only eight weeks' notice for "ordinary and customary turnover of business or other operational requirements of the Employer's business." *See* **Exhibit A**, MSG-Aus Employment Agreement.

4.     MSG's employment agreements include clauses allowing termination by either the employee or the company "at any time and without notice, for any lawful reason." *See* **Exhibit B**, MSG Employment Agreement.

5.     On August 9, 2021, I traveled to Miami, at the request of MSG's CEO, Dmitry Kozko ("Mr. Kozko"). *See* **Exhibit C**, 8/9 Airline Ticket.

6.     On or about August 18, 2021, while in Miami, Mr. Kozko requested that I relocate from Australia to Miami, Florida to work in MSG's Miami office.

7.     On September 8, 2021, Mr. Kozko and I orally agreed to the terms of my relocation to MSG's Miami office (the "Relocation Agreement").

8.     The terms of the Relocation Agreement included a promotion to Director of Technology, a base salary of $240,000 per year, an annual bonus of $70,000, and visa sponsorship for me and my wife.

9.      On January 5, 2022, Mr. Kozko forwarded me a text conversation between Mr. Kozko and then MSG President, Stephen Hood, discussed my relocation to Miami, where Mr. Kozko stated that he had "asked [me] to come and…mov[e] here permanently." *See* **Exhibit D**, Forwarded Text.

10.    On February 7, 2022, MSG's Director of Human Resources, Dara Malavolta (Ms. Malavolta"), sent an email to ADP, copying me, informing ADP that "one of [MSG's] Directors, is moving to the US from Australia with his wife in March."

11.    On March 12, 2022, Mr. Kozko sent an email to Anne Dongois, Andy Stack, and me, introducing me as the new "Global Director of Technology" who is "on his way to relocate to Miami." *See* **Exhibit E,** Kozko 3/12/2022 email.

12.    On or around May 6, 2022, I requested from Mr. Kozko and MSG a letter that "states [Griffin] will be receiving a paycheck with your new move to Florida."

13.    On May 9, 2022, Ms. Malavolta, who works in MSG's United States operation out of the Miami office, sent me a revised employment agreement, including the revision to the bonus

and a cover letter to be submitted to HOA, which misrepresented the date of the relocation request as being May 6, 2022. *See* **Exhibit F**, Revised Employment Agreement Letter; **Exhibit G,** Cover Letter.

14.     On or around May 21, 2022, I secured a 15-month lease with The Bozzuto Group, aided by the cover letter provided by Ms. Malavolta and Mr. Kozko serving as guarantor, providing paystubs in support of me. *See* **Exhibit H** Lease; **Exhibit I** Kozko Guarantor Application.

15.     I selected a fifteen-month lease, rather than a twelve-month lease, because the fifteen-month lease was $1,000 cheaper than the twelve-month lease.

16.     Under the lease agreement, terminating the lease early would have cost me two month's rent, totaling nearly $20,000, and an additional $9,600 in a lease break fee.

17.     On June 8, 2022, Mr. Katsman, Ms. LeCheminant, Ms. Acker and I had a video call, where Mr. Katsman told me he did not know that the income years for tax purposes in Australia were different than in the United States.

18.     Mr. Katsman also told me, falsely, that my FY20/21 tax returns could not be submitted with the L-1 visa petition because it did not demonstrate 12 months of employment.

19.     Based on Mr. Katsman's statement, I believed I had no other choice than to wait to file the L-1 visa petition until he had his FY21/22 tax return.

20.     Mr. Katsman did not follow up, or otherwise communicate with, me following the June 8 call.

21.     On or around October 18, 2022, I shared a spreadsheet that detailed the losses I had suffered with Mr. Kozko. The costs of the wedding were deducted from the damage's calculation. *See* **Exhibit J,** Losses Spreadsheet; D.E. 42-1, Griffin Tr. 202:10-22.

22.     On or around October 19, 2022, I met with a second immigration attorney, Camissa Markel, who confirmed that Mr. Katsman was mistaken as to the requirement of my FY21/22 tax return for his L-1 visa petition.

23.     On October 21, 2022, Mr. Kozko and I met to review the spreadsheet, and Mr. Kozko instructed me to "submit the [losses] as expenses" so that MSG could cover them, through both reimbursement and a bonus due on release of one of the game updates. During this meeting, Kozko edited the spreadsheet.

24.     On November 3, 2022, I was asked if I was aware of anything that would have a material effect on MSG's financial condition, cash flows, or results of operation that would be of importance to MSG shareholders to which I responded it was highly likely that the release of *INDYCAR 23* would be pushed to at least September 2023.

25.     Mr. Kozko reprimanded me after being asked to meet with MSG's finance team due to my disclosure, stating: "You shouldn't say things like that to finance."

26.     On or about November 7, 2022, Mr. Kozko informed me that the company did not have enough cash to last to the end of the year.

27.     On or around November 28, 2022, I advised Mr. Kozko that because of salary delays and $428,000 in unpaid invoices, development across most MSG products was blocked.

28.     On or around December 7, 2022, I advised Mr. Kozko that the account for MSG in Australia had suspended all services due to unpaid invoices.

29.     On December 8, 2022, I emailed Mr. Kozko to inform him that MSG was at risk of trading insolvent in Australia due to its mounting debts.

30.     On or around December 13, 2022, Mr. Kozko expressed to me that the December 8, 2022, email had "caused some issues."

31.     On December 28, 2022, I asked Mr. Kozko for a timeframe on when I would receive the agreed-upon compensation for my losses.

32.     On January 11, 2023, Mr. Kozko reneged on his prior agreement for MSG to pay for my losses, stating "there's no way the company's going to have a half-million-dollar cost on you," referring to the estimated amount of my losses.

33.     On or around January 14, 2023, Mr. Kozko offered me a plan of three bonuses, totaling $250,000, to settle my losses. *See* **Exhibit K,** Kozko 1/14/23 Email.

34.     On or around February 27, 2023, I received an email from Ms. Malavolta offering an increase in my compensation, different from the offer made by Mr. Kozko on January 14, 2023. *See* **Exhibit L**, Malavolta 2/27/23 Email.

35.     While I made multiple attempts to finalize in good faith the conditions of the newly proposed bonuses, negotiations stalled following Ms. Malavolta's email.

36.     On November 3, 2023, I was relieved from my role as Director of Technology with MSG. *See* D.E. 42-49.

37.     I still hold the position of Director of Motorsport Games Australia Proprietary Limited, as the company has not been shut down in accordance with the notice of termination provided by MSG-Aus. *See* D.E. 42-1, Griffin Tr. 178:10-25, 180:21-181:6.

38.     Throughout all relevant times, me and my wife shared the costs of living, including rent.

39.     All the records attached to this Declaration are true and correct copies of documents created at or near the time of the described events by, or from information transmitted by, a person with knowledge of the described events. In addition, each of the documents as kept in the course

of a regularly conducted business activity, and it was the regular practice of that business activity

to make such documents.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

*Zach Griffin*
Zach Griffin (Apr 4, 2025 22:21 GMT+11)

**Zachary Griffin**

**Date:**  04/04/2025

# EXHIBIT A

# EMPLOYMENT AGREEMENT

BETWEEN:

## MOTORSPORT GAMES AUSTRALIA PTY LTD
## (A.C.N. 648 131 471)
(the **Employer**)

AND:

## THE PARTY described in Item 1 of the Schedule
(the **Employee**)

Employment Agreement
**Motorsport Games Australia Pty Ltd**

# Table of Contents

## Clause                                                                                      Page

**1.    FAIR WORK INFORMATION STATEMENT**                                                        **1**

**2.    JOB DESCRIPTION**                                                                        **1**

2.1    SUMMARY                                                                                    1
2.2    APPLICATION OF AWARD                                                                       1
2.3    PERFORMANCE EXPECTATIONS                                                                   1
2.4    WORK LOCATION AND HOURS                                                                    2
2.5    CONFLICTS OF INTEREST                                                                      2

**3.    REMUNERATION**                                                                           **2**

3.1    YOUR REMUNERATION                                                                          2
3.2    SUPERANNUATION PAYMENT                                                                     2
3.3    PAYMENT OF YOUR REMUNERATION                                                               2

**4.    TRAVEL AND EXPENSES**                                                                    **3**

**5.    OFFSET AGAINST OTHER ENTITLEMENTS**                                                      **3**

**6.    LEAVE ENTITLEMENTS**                                                                     **3**

6.1    ARRANGEMENTS REGARDING TAKING OF PLANNED LEAVE                                             3
6.2    ANNUAL LEAVE                                                                               3
6.3    PERSONAL/CARER'S LEAVE                                                                     4
6.4    COMPASSIONATE LEAVE                                                                        4

**7.    POLICIES AND PROCEDURES**                                                                **4**

**8.    SECURITY AND SAFETY**                                                                    **4**

**9.    WORK EQUIPMENT**                                                                         **5**

9.1    WORK COMPUTER                                                                              5
9.2    MOBILE PHONE                                                                               5

**10.   EMAIL COMMUNICATION**                                                                    **6**

**11.   BUSINESS CARDS**                                                                         **6**

**12.   EMPLOYER DOCUMENTS**                                                                     **6**

**13.   INTELLECTUAL PROPERTY AND MORAL RIGHTS**                                                 **7**

**14.   CONFIDENTIALITY**                                                                        **8**

**15.   FORCE MAJEURE AND STAND DOWN**                                                           **8**

**16.   TERMINATION OF EMPLOYMENT**                                                              **9**

16.1   TERMINATION BY EMPLOYER                                                                    9
16.2   TERMINATION BY EMPLOYEE                                                                    10
16.3   GARDEN LEAVE                                                                               10
16.4   CLAUSES SURVIVE EXPIRY OR TERMINATION                                                      10

**17.   POST-EMPLOYMENT RESTRAINT**                                                              **10**

**18.   PRIVACY – YOUR CONSENT TO DISCLOSURE**                                                   **11**

Liability limited by a Scheme approved under Professional Standards Legislation.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

**19.    GENERAL PROVISIONS**                                                            **11**

19.1    ANNOUNCEMENTS AND CONFIDENTIALITY                                      11
19.2    UNDERTAKING AS TO REASONABLENESS                                       11
19.3    AMENDMENTS                                                              11
19.4    SEVERANCE                                                               11
19.5    NOTICES                                                                 11
19.6    LEGAL EFFECT, REPRESENTATION AND ADVICE                                 12
19.7    COUNTERPARTS                                                            12
19.8    ENTIRE AGREEMENT                                                        12
19.9    GOVERNING LAW                                                           12

**20.    INTERPRETATION**                                                                **12**

**21.    DICTIONARY**                                                                    **13**

Employment Agreement
**Motorsport Games Australia Pty Ltd**

## EMPLOYMENT AGREEMENT

| | |
|---|---|
| Between: | **MOTORSPORT GAMES AUSTRALIA PTY LTD** (A.C.N. 648 131 471) of Level 1, 675 Victoria Street, Abbotsford, VIC 3067, |
| | (the **Employer**, **we**, **our**); |
| And: | **THE EMPLOYEE** whose details are set out in Item 1 of the Schedule |
| | (the **Employee**, **you** and **your**). |

## RECITALS

A.      The Employer wishes to employ you on the terms set out in this Agreement.

B.      You wish to accept employment with the Employer and you agree to be bound by the terms set out in this Agreement.

The parties **AGREE AS FOLLOWS**:

## 1.      FAIR WORK INFORMATION STATEMENT

You acknowledge receipt of the Fair Work Information Statement published by the Fair Work Ombudsman, which is attached to this Agreement at **Annexure A**.

## 2.      JOB DESCRIPTION

### 2.1   Summary

(a)      You will be employed by the Employer:

(i)      On the basis set out in Item 2 of the Schedule; and

(ii)     In the position set out in Item 3 of the Schedule.

(b)      You will report to the person or position set out in Item 3 of the Schedule, and to such other persons as the Employer nominates from time to time.

(c)      Your employment will commence on the date set out in Item 4 of the Schedule (the **Start Date**).

### 2.2   Application of Award

(a)      The Award (if any) set out in Item 5 of the Schedule applies to your employment.

(b)      If an Award applies, as at the Start Date you are classified under that Award on the basis set out in Item 5 of the Schedule.

### 2.3   Performance expectations

(a)      The main tasks of your role are contained in the position description attached to this Agreement at **Annexure B**.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

    (b)    You agree to faithfully and diligently perform the duties and exercise the powers consistent with your position. In addition, you are expected to perform the other duties the Employer may reasonably assign to you. You must also carry out the other instructions and directions reasonably and lawfully given to you by the Employer.

## 2.4   Work location and hours

    (a)    You will work from the location set out in Item 6 of the Schedule, and such other locations as the Employer may reasonably require you to work at from time to time.

    (b)    You must work the ordinary hours specified in Item 7 of the Schedule for each week.

    (c)    You may also be required to work reasonable additional hours in addition to these ordinary hours in order to fulfil your duties and responsibilities. Your remuneration in clause 3 of this Agreement is deemed to cover payment for your overall performance of the role, and overtime will not be payable in respect of work performed outside your ordinary hours, except to the extent that additional payment is permitted pursuant to any Applicable Industrial Instrument.

## 2.5   Conflicts of interest

You must use all reasonable endeavours to avoid any situation where your interests may conflict, or be inconsistent, with the interests of the Employer. If such a situation has arisen or may reasonably be expected to arise, you must notify the Employer immediately.

## 3.     REMUNERATION

## 3.1   Your remuneration

    (a)    The Employer guarantees to you that it will remunerate you the annual salary set out in Item 8 of the Schedule together with the other benefits (if any) set out in Item 9 of the Schedule.

    (b)    Your remuneration includes compensation for all hours you are required to work.

## 3.2   Superannuation payment

The Employer will make superannuation contributions equal to 9.5% of your superannuation-inclusive remuneration rate, or such other percentage as may be required by law from time to time, which will be paid to a superannuation fund nominated by you.

## 3.3   Payment of your remuneration

Your remuneration will be deposited into a bank account nominated by you in accordance with the Employer's usual payroll cycle as notified to you from time to time.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

## 4.   TRAVEL AND EXPENSES

4.1   Any work-related travel must be approved by the Employer in writing prior to bookings or other arrangements being made.

4.2   Any necessarily incurred (and approved) reasonable travel, accommodation or other expense reimbursement will be made after you provide to the Employer satisfactory evidence of the expense being incurred by you in the performance of your duties.

## 5.   OFFSET AGAINST OTHER ENTITLEMENTS

5.1   To the maximum extent permitted by law, on the termination of your employment the Employer may offset any amounts due by you to the Employer against any amounts due from the Employer to you.

5.2   Either you or the Employer (as relevant) must then pay the balance of any difference within 10 business days of the end of your employment, or any earlier date that may be required by law.

## 6.   LEAVE ENTITLEMENTS

### 6.1   Arrangements regarding taking of planned leave

(a)   You may take such leave as you are entitled to under the Fair Work Act, the Long Service Leave Act and any other law.

(b)   You must give the Employer reasonable notice of your intention to take annual leave or long service leave.

(c)   To the extent that the Employer is permitted to do so by law, it may reasonably:

(i)   Direct you to take some or all of any annual leave or long service leave that you have accrued at a time chosen by the Employer; and

(ii)   Refuse to allow you to take annual leave or long service leave at a particular time.

### 6.2   Annual leave

(a)   You are entitled to 4 weeks of paid annual leave during each complete year of employment with the Employer in accordance with the Fair Work Act (pro-rated for part-time employees).

(b)   You are required to take your full annual leave entitlement each year, unless otherwise agreed to in writing by the Employer.

(c)   On termination of your employment you will be paid for any accrued but untaken annual leave.

(d)   Subject to this clause 6.1, you are entitled to all public holidays which are proclaimed under the laws of the State.  However, you may be required to work on a public holiday.  If you are required to work on a public holiday,

Employment Agreement
**Motorsport Games Australia Pty Ltd**

you will be entitled to a day off in lieu, to be taken at such time as agreed with the Employer.

### 6.3 Personal/carer's leave

(a)   You are entitled to 10 days of paid personal/carer's leave during each year of employment with the Employer in accordance with the Fair Work Act (pro-rated for part-time employees).

(b)   The Employer will require you to provide a medical certificate or other satisfactory documentary evidence of your entitlement to personal/carer's leave.

(c)   Payment for any accrued but untaken personal/carer's leave will not be made at the end of the Maximum Term or on earlier termination of your employment.

### 6.4 Compassionate leave

During your employment with the Employer, you are entitled to 2 days of paid compassionate leave for each permissible occasion in accordance with the Fair Work Act.

## 7. POLICIES AND PROCEDURES

7.1   The Employer may, in its sole discretion, issue and amend policies and procedures from time to time.

7.2   You:

(a)   Are required to comply with all such policies and procedures issued and amended by the Employer;

(b)   Are required to familiarise yourself with all policies and procedures issued and amended by the Employer; and

(c)   Acknowledge that policies and procedures issued and amended by the Employer do not form part of this contract.

7.3   Failure to follow the Employer's policies and procedures (as amended from time to time) will result in disciplinary action and may result in termination of your employment.

## 8. SECURITY AND SAFETY

8.1   You and the Employer recognise the need to provide a safe and secure workplace in accordance with the requirements of all relevant work health and safety laws.

8.2   The Employer is committed to ensuring a safe and healthy working and learning environment for all staff and visitors in accordance with its legislative obligations. The Employer has the responsibility to:

(a)   As far as is practicable, provide a safe place of work and safe systems of work, tools and equipment;

Employment Agreement
**Motorsport Games Australia Pty Ltd**

     (b)    Investigate all accidents, the reporting of all hazards and the implementation of all practicable control measures to protect people and property; and

     (c)    Encourage staff to implement sound health and safety principles in all their activities.

8.3   You must at all times comply with the security and safety requirements notified or advised by the Employer.

8.4   You must not remove any property from the Employer's premises without the Employer's express permission.

8.5   You must not present for work or be at work while affected by any substance (whether or not prescribed by a medical practitioner) which inhibits or has the potential to inhibit your ability to perform your ordinary functions and your work duties.  Without limiting the generality of this clause, you must not consume alcohol or take non-prescription drugs during work hours or on work premises, without the Employer's express permission.

## 9.    WORK EQUIPMENT

### 9.1  Work computer

     (a)    The Employer may, from time to time, provide you with a work computer or lap-top.

     (b)    The work computer/lap-top must be used solely for work purposes.  You agree that you will not download or view any illegal or inappropriate content using the work computer/lap-top.

     (c)    You must return to the Employer the work computer/lap-top and all other equipment, tools and services provided to you by or on behalf of the Employer on demand by the Employer, or on termination of your employment

### 9.2  Mobile phone

     (a)    The Employer may, from time to time, provide you with a work mobile phone.  The work mobile phone must be used for all work phone calls. The work mobile phone may also be used for incidental personal phones calls, (acting reasonably and subject to fair use).

     (b)    The work mobile phone must be adequately charged and turned on during the ordinary business hours of the Employer (excluding public holidays observed in the State).  The message and diversion functions associated with the work mobile phone must be administered in accordance with the Employer's policies and directions.

     (c)    Internet usage on the work mobile phone is to be for work purposes only, and you agree that you will not download or view any illegal or inappropriate content using the work mobile phone.  Access to social media websites or applications on the work mobile phone is not permitted, other than for legitimate work-related purposes.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

> (d)   You must return to the Employer the work mobile phone and related equipment provided on demand by the Employer, or on termination of your employment.

## 10.   EMAIL COMMUNICATION

10.1   The Employer continues to implement a consistent brand and level of service across its business.   The maintenance of this brand requires control over the ability of the Employer's customers to communicate with the Employer in a reliable and consistent manner.

10.2   The Employer will establish a work email address in your name.   All electronic communications relating to the Employer's business must be transacted through this service (and no other service).

10.3   To the extent that you use any other email address or service for work-related correspondence (which should only occur in the event that you are unable to use the work email address assigned to you by the Employer), you must forward a copy of those work-related correspondence to your work email address or otherwise provide the Employer with an electronic or hard copy of the correspondence with 5 business days of the correspondence taking place.   This is to enable the Employer to monitor and maintain appropriate records of the Employer's communications.

10.4   You must not access or use your work email address after the termination of your employment, except with the Employer's prior express direction or consent.

## 11.   BUSINESS CARDS

11.1   You may be provided with a business card identifying you as an employee of the Employer and displaying your job title and contact details.   If provided with a business card, you must use this card in respect of all operational and promotional communications that you make with third parties in your role as an employee of the Employer.

11.2   All written communications with third parties associated with your role with the Employer must be in accordance with the Employer's accepted format.

11.3   Any communication you intend having with third parties of a strategic or financially significant nature should be approved by the Employer prior to the communication taking place.

11.4   As part of your reporting obligations to the Employer, you must provide to the Employer a written summary of all material communications to third parties, including customers, suppliers and competitors.

11.5   You must return to the Employer, dispose of or destroy (as requested by the Employer) all remaining business cards on the termination of your employment.

## 12.   EMPLOYER DOCUMENTS

12.1   All property, (including intellectual property, documents, records and computer software, and all copies of this property), made, acquired or which comes into your

Employment Agreement
**Motorsport Games Australia Pty Ltd**

possession in the course of your employment, vests in and remains the sole and exclusive property of the Employer.

12.2 On termination of your employment, and without any further demand, you must deliver to the Employer:

(a) All documents in your possession or control relating in any way to any Confidential Information, intellectual property or to the business or affairs of the Employer; and

(b) Any property belonging to the Employer, or to which the Employer has an entitlement to possession.

12.3 You must not retain a copy of a document referred to in this clause, and (subject to clause 12.2) you agree to:

(a) Delete or destroy all copies of all documents; and

(b) Confirm the deletion and destruction to the Employer,

within the earlier of 5 business days of being asked to do so by the Employer or termination of your employment.

## 13.   INTELLECTUAL PROPERTY AND MORAL RIGHTS

13.1 You agree that:

(a) Any Inventions that you Invent during your employment, and which arise in connection with your employment or with knowledge or information acquired during the course of your employment:

(i) Must be fully, freely and immediately communicated by you to the Employer; and

(ii) Vest in and become exclusively owned by the Employer;

(b) You will not at any time, whether during the course of your employment or after the end of your employment, apply for any patent, design, registration, copyright or other form of protection for any of those Inventions, other than as directed by the Employer, (either in Australia or elsewhere); and

(c) You will assign to the Employer any right you may have to a patent, design, registration, copyright or any other form of protection in respect of the Inventions, (in Australia and elsewhere).

13.2 You irrevocably consent to the Employer:

(a) Reproducing, publishing, copying, adapting, communicating, showing or exhibiting in or to the public;

(b) Materially distorting, destroying, mutilating, altering or in any other way changing; or

Employment Agreement
**Motorsport Games Australia Pty Ltd**

    (c)      Otherwise using your work, (or a substantial part or adaptation of such work),

with or without attribution of authorship, in any medium and context the Employer thinks fit.

## 14.   CONFIDENTIALITY

14.1   You agree that all Confidential Information to which you are exposed during your employment will remain the Employer's exclusive property.

14.2   You expressly agree that it is a condition of your employment that you will neither during nor after the period of your employment, except in the proper course of your duties or as permitted by the Employer or required by law, divulge to any person or use any Confidential Information concerning:

    (a)      The identity of (or other commercial information about) the clients and customers of the Employer;

    (b)      The identity of (or other commercial information about) the suppliers to the Employer;

    (c)      The extent or materiality of any dealings between the Employer and any of its clients, customers, and suppliers;

    (d)      Any intellectual property or strategies of the Employer, (or the nature of any intellectual property or strategies of the Employer);

    (e)      The business or financial arrangements or position of the Employer; or

    (f)      Any other dealings, transactions or affairs of the Employer.

14.3   You undertake and agree, during the period of your employment, to take all action necessary to maintain the confidential nature of the Confidential Information and to use your best endeavours to prevent the publication, use or disclosure of any Confidential Information.

1.1   On the termination of your employment, you will not represent yourself as being in any way connected with or interested in the business of the Employer.

14.4   You acknowledge that confidentiality is extremely important to the Employer and a breach of this clause may be grounds for termination of your employment, with or without notice.

14.5   You also acknowledge that the Employer may commence urgent legal proceedings against you to prevent or to stop a breach of the terms of this clause.

## 15.   FORCE MAJEURE AND STAND DOWN

15.1   To the maximum extent permitted by law, if any Force Majeure Event occurs the Employer:

    (a)      Will not be required to comply with its contractual obligations under this Agreement; and

Employment Agreement
**Motorsport Games Australia Pty Ltd**

    (b)    May stand you down from your work duties without pay for such period or periods as the Employer thinks fit.

15.2  If clause 15.1 is, or is deemed to be, wholly or partly unlawful, then that clause will be severed from this Agreement in accordance with clause 19.4, and the Employer will be entitled to utilise section 524 of the Fair Work Act as may be required by the Employer from time to time.

## 16. TERMINATION OF EMPLOYMENT

### 16.1 Termination by Employer

    (a)    The Employer may terminate your employment by giving you not less than 8 weeks' notice in writing.

    (b)    Without limiting any other statutory or contractual rights, the Employer will be entitled to terminate your employment with notice due to:

        (i)    A Force Majeure Event; or

        (ii)    Ordinary and customary turnover of business or other operational requirements of the Employer's business.

    (c)    The Employer may terminate your employment without notice for cause, which includes (but is not limited to):

        (i)    Misconduct, disobedience or incompetence;

        (ii)    Any matter which would justify summary dismissal at common law;

        (iii)    If you are charged with or commit a criminal offence or fraud, whether or not in the course of your employment;

        (iv)    Any act or omission that may void any current policy of insurance maintained by the Employer, or by you on behalf of the Employer; or

        (v)    Any act or omission that may bring the Employer into disrepute.

    (d)    If the Employer terminates your employment other than in accordance with clause 16.1(c) within the first three year of your employment, then you shall be entitled to receive one of the following payments in addition to any notice period, paid as a lump sum on cessation of your employment:

        (i)    During the first year of your employment, 12 weeks' remuneration;

        (ii)    During the second year of your employment, 8 weeks' remuneration; and

        (iii)    During the third year of your employment, 4 weeks' remuneration.

### 16.2 Termination by Employee

Employment Agreement
**Motorsport Games Australia Pty Ltd**

    (a)    You may terminate your employment by giving you not less than 8 weeks' notice in writing.

    (b)    In the event that you terminate your employment by giving notice in writing, you agree that the Employer may require you to perform your duties in accordance with the terms of this Agreement:

        (i)    For the duration of the notice period; or

        (ii)    For part of the notice period, as determined by the Employer in its sole and absolute discretion, with the Employer making a payment in lieu to you in respect of the balance.

## 16.3 Garden leave

    (a)    Without limiting any of the Employer's rights under this Agreement, you expressly agree that in all cases where notice of termination is required to be given, the Employer may require you not to perform any duties and not to attend for work for the duration of, or part of, the applicable notice period (i.e. the Employer may put you on 'garden leave' for the duration of, or part of, the applicable notice period).

    (b)    If the Employer exercises this option, the Employer will pay your remuneration for the duration of, or part of, the applicable notice period.

## 16.4 Clauses survive expiry or termination

Clauses 5, 9.1(a), 9.2(d), 10.3, 10.4, 11.4, 11.5, 12.2, 13, 14, 17, 18, 19.1, 19.2, 19.4, 19.5, 19.6, 19.8 and 19.9 survive expiry or earlier termination of your employment (as applicable).

## 17.    POST-EMPLOYMENT RESTRAINT

17.1  In consideration of your remuneration, you undertake to the Employer that, for a period of 12 months after the date that your employment ends (the **Restrained Period**), you must not, either directly or indirectly, as a principal, employee, consultant, agent, owners, partner or otherwise solicit or entice (or endeavour to solicit or entice) the custom of any person who:

    (a)    Was a client or business partner of the Employer during your employment; and

    (b)    Entice away (or endeavour to entice away) from the Employer any person who was a director, employee, consultant, agent, representative, associate or adviser to the Employer during your employment.

17.2  You acknowledge that the Employer has told you to obtain legal advice about this Agreement and, in particular, this clause, and that you have had the opportunity to receive separate and independent legal advice before entering into this Agreement. Having obtained or had the reasonable opportunity to obtain independent legal and professional advice, you acknowledge and agree that the undertakings contained in this clause are no more extensive than is reasonable to protect the genuine commercial interests of the Employer.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

17.3 If any of the prohibitions or restrictions contained in this clause 17 are judged to go beyond what is reasonable in the circumstances and necessary to protect the goodwill of the Employer but would be judged reasonable and necessary if the prohibitions or restrictions were reduced, then the prohibitions or restrictions apply with a reduction by the minimum amount necessary to ensure their validity.

## 18.    PRIVACY – YOUR CONSENT TO DISCLOSURE

18.1 You consent to the Employer collecting, using and disclosing your Personal Information for any purpose relating to your employment.  The Employer will keep your Personal Information in a secure location.

18.2 You consent to the Employer disclosing Personal Information about you to other persons.  You also consent to those persons collecting, using or disclosing your personal information for reasons relating to your employment.

## 19.    GENERAL PROVISIONS

### 1.1   Announcements and confidentiality

You must not make any announcement or disclosure relating to the subject matter of this Agreement, or any matter ancillary to this Agreement, without the Employer's prior written approval, except as required by law.

### 1.2   Undertaking as to reasonableness

You acknowledge that you consider all the covenants, obligations and restrictions contained in this Agreement to be reasonable in all the circumstances, and that the terms set out in this Agreement are in mutual consideration of this Agreement (including any remuneration).

### 1.3   Amendments

Any amendment, change or modification of this Agreement is void unless in writing and signed by both parties.

### 1.4   Severance

If any provision of this Agreement is held to be invalid in any way or unenforceable, it must be severed and the remaining provisions are not in any way affected or impaired.  This Agreement must be construed so as to most nearly give effect to the intent of the parties as it was originally executed.

### 1.5   Notices

Any notice required by or in relation to this Agreement must be in writing and delivered to the last notified physical address of the party or, with that party's prior consent, to the last notified email address of the party.

### 1.6   Legal effect, representation and advice

(a)      Each of the parties to this Agreement intends the provisions of this Agreement to be legally binding and enforceable.

Employment Agreement
**Motorsport Games Australia Pty Ltd**

(b)     The parties expressly acknowledge and agree that the solicitor who prepared this Agreement acted as legal counsel to the Employer only.

(c)     You acknowledge that you have had the opportunity to receive separate and independent legal advice before entering into this Agreement, and that if you have failed to obtain such advice you will not be entitled to rely upon such failure to exercise any non-compliance with this Agreement.

## 1.7     Counterparts

This Agreement may be executed in two or more counterparts and execution by each of the parties of any one of such counterparts will constitute due execution of this Agreement.

## 1.8     Entire agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes and prevails over any prior agreement covenant or understanding (if any) between the parties.

## 1.9     Governing law

This Agreement must be construed and will take effect according to the laws of the State.  The parties irrevocably and unconditionally submit themselves to the non-exclusive jurisdiction of the courts exercising jurisdiction in the State.

## 20.     INTERPRETATION

20.1   The Recitals are true and correct in every material particular and are deemed to form part of this Agreement, but any fact or matter referred to in those Recitals that is inconsistent with any term or provision appearing in this Agreement will be read as subject to that term or provision.

1.10   In this Agreement unless the context indicates a contrary intention:

(a)     Headings are for convenience only and do not affect interpretation;

(b)     The plural will include the singular and vice versa;

(c)     A reference to any gender will be taken to include every other gender;

(d)     A reference to a 'clause', 'Schedule' or 'Annexure' is a reference to a clause of, or a schedule or annexure to, this Agreement;

(a)     A reference to a 'month' means a calendar month;

(b)     A reference to a 'business day' means any day that banks are open for business in the capital city of the State, excluding weekends and public holidays;

(e)     A reference to 'this Agreement' will include a reference to any amendment, novation, variation, supplemental deed or replacement from time to time in existence;

Employment Agreement
**Motorsport Games Australia Pty Ltd**

(f)     A reference to an agreement or document (including this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document;

(g)     A reference to a party to this Agreement or another agreement or document includes the party's successors, permitted substitutes and permitted assigns (and, where applicable, the party's legal personal representatives);

(h)     A reference to any statute, or any subordinate legislation or instrument includes all statutes, subordinate legislation or instruments amending, modifying, consolidating, re-writing, re-enacting or replacing them and a reference to a statute includes all subordinate legislation and instruments made under that statute;

(i)     A reference to conduct includes, an omission, statement or undertaking, whether or not in writing;

(j)     A reference to dollars and $ is to Australian currency;

(k)     The meaning of general words is not limited by specific examples introduced by including, or for example, or similar expressions; and

(l)     Nothing in this Agreement is to be interpreted against a party solely on the ground that the party put forward this Agreement or any part of it.

## 21.     DICTIONARY

In this Agreement, unless the context clearly indicates otherwise, the following expressions have the following meanings:

(m)     **Applicable Industrial Instrument** means the Award or any applicable enterprise agreement;

(n)     **Confidential Information** means all information belonging to the Employer which is not generally known to the public, or to other persons who are not bound by any obligation to maintain its confidentiality, and which the Employer derives economic or strategic value, actual or potential, from it not being generally known, or has a character such that the Employer has a legitimate interest in preserving its confidential nature, including, but not limited to information which is:

(i)     By its nature confidential; or

(ii)     Designated by the Employer as confidential;

(o)     **Fair Work Act** means the *Fair Work Act 2009* (Cth);

(a)     **Force Majeure Event**:

(i)     Means any circumstance or delay beyond the reasonable control of the Employer which prevents it from performing or carrying out any obligation under this Agreement for at least 7 days; and

Employment Agreement
**Motorsport Games Australia Pty Ltd**

(ii)     Includes (but is not limited to) any circumstance or delay arising out of any industrial action, fire, war, terrorist act, explosion, civil commotion, change of government, malicious damage, storm, flood, tempest, earthquake, tidal wave, public health event, government order or legal enactment;

(p)     **Invent** means invent, conceive, make, develop or suggest;

(q)     **Inventions** means discovery, invention, creation, development, product, secret process, procedure, modification or improvement;

(r)     **Long Service Leave Act** means the long service leave legislation applying in the State;

(s)     **Personal Information** has the same meaning as in the *Privacy Act 1988* (Cth); and

(b)     **State** means the state or territory set out in Item 10 of the Schedule and the Commonwealth of Australia, as the context requires or permits.

- THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK -

Andreyev ©                                                                                     Page 17

Employment Agreement
**Motorsport Games Australia Pty Ltd**
**EXECUTED AS AN AGREEMENT** dated                                                              2021

**EXECUTED** by **MOTORSPORT**
**GAMES AUSTRALIA PTY LTD**
(A.C.N. 648 131 471) by its duly
authorised officer(s):

_____
**Zachary Nicholas Griffin**

_____
**Amanda Lorraine LeCheminant**

**EXECUTED** by **THE EMPLOYEE**
in the presence of:

_____
(Signature of witness)

_____
**The Employee**

_____
(Name of witness)

Andreyev ©                                                                                                    Page 18

Employment Agreement
**Motorsport Games Australia Pty Ltd**

## <u>THE SCHEDULE</u>

## Key information about your employment

| Item 1: | **Employee details** |
|---|---|
| Full name: | Zachary Nicholas Griffin |
| Address: | ███████████████████ |
| Phone: | |
| Email: | ███████████████ |

| Item 2: | **Basis of employment** |
|---|---|
| Basis: | Permanent full-time |

| Item 3: | **Position title** |
|---|---|
| Title: | Director of studio, Motorsports Games Australia |
| Reporting to: | Jack Griffin, Vice President of Studio, Motorsports Games Inc |

| Item 4: | **Start Date** |
|---|---|
| Date: | 16 March 2021 |

| Item 5: | **Award** |
|---|---|
| Award: | No Award |

| Item 6: | **Location** |
|---|---|
| Address: | Level 1, 675 Victoria Street, Abbotsford, VIC 3067 |

| Item 7: | **Hours of work** |
|---|---|
| Hours: | 38 hours per week, with such hours to be worked during weekdays (Monday to Friday) |

| Item 8: | **Remuneration** |
|---|---|
| Rate: | $170,000 USD per annum, inclusive of superannuation |

| Item 9: | **Other benefits** |
|---|---|
| Benefit 1: | Access to Motorsports Games Inc incentive stock option plans (or a sub-plan thereof), shared separately within 60 days of the Employee's Start Date |
| Benefit 2: | Bonuses of: |

Benefit 2:    Bonuses of:

    (a)    $70,000 USD on the date that is 12 calendar months from the Start Date;

    (b)    $70,000 USD on the date that is 24 calendar months from the Start Date; and

    (c)    $70,000 USD paid on the date that is 36 calendar months from the Start Date,

Andreyev ©

Employment Agreement
**Motorsport Games Australia Pty Ltd**

in each case, on the condition that the Employee remains employed by the Employer on the date the relevant bonus is to be paid, and subject to PAYD withholding and superannuation contributions.

| **Item 10:** | **State** |
|---|---|
| State: | Victoria |

**END OF SCHEDULE**

Andreyev ©

Employment Agreement
**Motorsport Games Australia Pty Ltd**

## <u>ANNEXURE A</u>

### Fair Work Information Statement

## <u>ANNEXURE B</u>

### Position Description

All leadership and management activities related to the Employer, including development of the video game known as *KartKraft*.

# EXHIBIT B

EX-10.11 26 ex10-11.htm

**Exhibit 10.11**

**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into to be effective as of January 1, 2020 (the "<u>Effective Date</u>"), by and between MOTORSPORT GAMING US LLC, a Florida limited liability company ("<u>Employer</u>"), and DMITRY KOZKO, an individual residing in the State of Florida ("<u>Executive</u>").

**R E C I T A L S**

WHEREAS, Employer and Executive desire to enter into this Agreement in order to set forth their full and complete understanding of the terms and conditions pursuant to which Executive will be employed by Employer.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, Employer and Executive, intending to be legally bound, hereby agree as follows.

**A G R E E M E N T**

1. **Recitals.** The recitals set forth above are true and correct and are incorporated herein by this reference.

2. **Employment.** Employer shall employ Executive as its Chief Executive Officer, reporting, prior to establishment of the Board (as hereinafter defined), to the Manager of Employer, and, after the establishment of the Board, to any future board of managers or directors, as applicable, of Employer (the "<u>Board</u>"), and Executive accepts such employment and shall devote all of his business time, efforts and skills to diligently performing the duties described herein for the benefit of Employer. If Employer forms a board of managers or directors, Executive will serve as a member of such board upon formation of such board. Upon termination of the Executive's employment by Employer or Executive for any reason, the Executive shall resign from such board.

3. **Term.** The term of Executive's employment hereunder shall commence on the Effective Date and shall terminate on December 31, 2024 (the "<u>Term</u>"). During the Term, this Agreement shall be subject to termination as hereafter specified. After the Term expires, it is contemplated that Executive will be employed as employee "at will."

4. **Authorities and Duties.**

4.1 **Service with Employer.** During the Term, Executive agrees to perform the duties of Chief Executive Officer of Employer and such other duties and on such basis as shall be assigned to him from time to time by, prior to the establishment of the Board, the Manager of Employer and, after the establishment of the Board, the Board, in each case consistent with CEO position.

4.2 **No Conflicting Duties.** During the Term, Executive shall not serve as an officer, director or executive of any other business enterprise of any kind or nature unless the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board), approves such other service in writing. Executive hereby confirms that he is under no contractual commitments inconsistent with his obligations set forth in this Agreement, and agrees that during the Term he will not render or perform services, or enter into any contract to do so, for any other corporation, firm, entity or person, which are inconsistent with the provisions of this Agreement. Notwithstanding the foregoing, nothing in this Agreement shall be construed as preventing Executive from (a) investing Executive's assets in any company or other entity, in a manner as shall not (i) impair Executive's ability to fulfill Executive's duties and responsibilities under this Agreement, or (ii) require any material activities on Executive's part in connection with the operations or affairs of the companies or other entities in which such investments are made; or (b) engaging in religious, charitable or other community or non-profit activities that do not impair Executive's ability to fulfill Executive's duties and responsibilities under this Agreement.

4.3 **Location.** During the Term, Executive shall work at Employer's offices in Miami, Florida.

1

5. **Compensation.**

5.1 **Salary.** As compensation for all services to be rendered by Executive under this Agreement, Employer shall pay to Executive for calendar year 2020 an annual salary of Five Hundred Thousand Dollars ($500,000) (the "Salary"), which shall be paid during the Term on a regular basis in accordance with Employer's generally applicable payroll procedures and policies, as established from time to time (currently, semi-monthly), and subject to applicable payroll deductions. The Salary will be increased annually by Employer on each January 1 occurring during the Term, to 103% of the Salary paid to Executive in the prior calendar year. The term "Salary" as used in this Agreement will refer to the Salary as it may be so increased.

5.2 **Participation in Benefit Plans and Equity Incentive Plans.**

(a) Executive shall be entitled to participate in all benefit plans (medical (PPO), dental, vision, life, disability insurance) or programs generally available to executive officers of Employer, to the extent that Executive's position, title, tenure, salary, age, health and other qualifications make him eligible to participate therein. Executive's participation in any such plan or program shall be subject to the provisions, rules and regulations thereof that are generally applicable to all participants therein. Executive understands that any such benefit plans may be terminated or amended from time to time by Employer in its discretion; provided, however, that Executive's medical PPO plan, to the extent terminated, will be replaced with substantially similar plan. In the event that sickness or disability payments under any insurance programs of Employer or otherwise shall become payable to Executive in respect of any period of Executive's employment under this Agreement, the salary installment payable to Executive hereunder on the next succeeding salary installment payment date shall be an amount computed by subtracting (a) the amount of such sickness or disability payments that shall have become payable during the period between such date and the immediately preceding salary installment date from (b) the salary installment otherwise payable to Executive hereunder on such date.

(b) Executive shall be entitled to participate (in addition to the incentive compensation pursuant to Section 5.3 below) in all equity incentive plans generally available to executive officers of Employer, subject to the Manager of Employer, or the board of directors of Employer or the compensation committee of the board of directors of Employer determining any awards and performance metrics for such awards under any such plans.

5.3 **Additional Incentive Compensation.** Employer shall provide the following additional incentive compensation to Executive on the following terms and conditions:

(a) Subject to and contingent upon both (i) an occurrence, pursuant to the applicable loan documents, of the triggering event for repayment by Employer to Motorsport Group, LLC, Motorsport Network, LLC and/or their affiliates in Employer and/or its subsidiaries the actual aggregate amount of investment by such parties in Employer and/or its subsidiaries, whether in the form of equity, debt or services through the date of consummation and closing of such Liquidity Event (as defined below) and (ii) a Liquidity Event resulting in Employer's valuation (based on the valuation of Employer, if non-IPO (as defined below) on the cash-free, debt-free basis established by the Liquidity Event or, if IPO, on the IPO price multiplied by the shares of Class A common stock issued and outstanding at consummation of the IPO) of at least One Hundred Million ($100,000,000) has occurred and closed, Employer shall issue as promptly as practicable to Executive (A) such number of shares of Class A common stock of Employer (after Employer's conversion into a Delaware corporation and authorization of such Class A common stock) that would constitute, as of the closing of the initial Liquidity Event, one percent (1%) of the total shares of Employer's Class A common stock issued and outstanding (on a fully diluted basis) immediately upon the consummation of the initial Liquidity Event (the "Initial Shares Award") and (B) a stock option award (exercisable for 10 years from the date of the grant) for such number of shares of Class A common stock of Employer that would constitute, as of the consummation of the initial Liquidity Event, two percent (2%) of the total shares of Employer's Class A common stock issued and outstanding (on a fully diluted basis) immediately upon the consummation of the initial Liquidity Event (together with the Initial Shares Award, the "Initial Award"); provided, however, that Executive shall have an option, in Executive's discretion, to replace all or a portion of the Initial Shares Award with the cash payment of up to One Million Dollars ($1,000,000). By way of example only: if Executive opts to replace one-half of the Initial Shares Award with cash payment, the cash amount would be $500,000; if Executive opts to replace the entire Initial Shares Award with cash payment, the cash amount would be $1,000,000. The Company shall gross up the amount of such cash payment by increasing the gross amount of such cash payment to Mr. Kozko to account for the taxes withheld from or attributable to such payment.

2

(b) Subject to satisfaction of the conditions set forth in Section 5.3(a) above, the amount of the stock options (exercisable for 10 years from the date of the grant) for the shares of Class A common stock of Employer to be issued to Executive shall be increased from time to time in the percentage increments set forth in the chart below if either, (1) in the event of a Liquidity Event that is an initial public offering that results in listing of Employer's Class A common stock on a major stock exchange such as Nasdaq of NYSE ("IPO") and at all times after the IPO so long as Employer's Class A common stock is traded on a major stock exchange such as Nasdaq of NYSE, Employer's market cap targets set forth in the chart below are achieved from time to time by Employer (such targets shall be deemed achieved if any 60 consecutive calendar days average closing trading price of the Class A common stock of Employer corresponds to the market cap targets set forth in the chart below), or (2) in the event of a Liquidity Event that is not an IPO and so long as Employer's Class A common stock is not traded on a major stock exchange such as Nasdaq of NYSE, Employer's valuation (based on the valuation of Employer on the cash-free, debt-free basis used for the Liquidity Event) targets set forth in the chart below are achieved by Employer. For the avoidance of doubt, the percentage increments set forth in the chart below shall be the percentage of the total shares of Employer's Class A common stock issued and outstanding (on a fully diluted basis) on the date of the applicable issuance.

| Employer's Market Cap Target or Employer's Valuation Target (as applicable) | Percentage of increase in the number of stock options for the shares of Class A common stock to be issued to Executive |
|---|---|
| $ 150,000,000 | 0.200% |
| $ 200,000,000 | 0.200% |
| $ 250,000,000 | 0.200% |
| $ 300,000,000 | 0.200% |
| $ 350,000,000 | 0.200% |
| $ 400,000,000 | 0.200% |
| $ 450,000,000 | 0.200% |
| $ 500,000,000 | 0.200% |
| $ 550,000,000 | 0.200% |
| $ 600,000,000 | 0.200% |
| $ 650,000,000 | 0.200% |
| $ 700,000,000 | 0.200% |
| $ 750,000,000 | 0.200% |
| $ 800,000,000 | 0.200% |
| $ 850,000,000 | 0.200% |
| $ 900,000,000 | 0.200% |
| $ 950,000,000 | 0.200% |
| $ 1,000,000,000 | 1.500% |

(c) Other than the Initial Award that shall vest immediately upon issuance, all other stock options issuable to Executive pursuant to this Section 5.3 shall be subject to vesting in three (3) equal installments during the 3-year period after the day of issuance of the applicable stock options (i.e., 1/3rd vesting on the date that is 12 months after the issuance of the applicable stock options, 1/3rd vesting on the date that is 24 months after the issuance of the applicable stock options and 1/3rd vesting on the date that is 36 months after the issuance of the applicable stock options) but only so long as Executive continues to be employed by Employer as of each such vesting date; *provided, however,* that

(x) in the event Executive's employment with Employer is terminated at any time during the Term by Executive for Good Reason (as defined below) or by Employer for any reason (including in the event of the death of Executive or upon Executive becoming Disabled (as defined below)) other than Cause (as defined below) or in the event of a Change in Control (as defined below) during Executive's employment with Employer, then (1) all earned pursuant to Sections 5.3(a) and 5.3(b)) but not yet vested stock options (as applicable) issued under this Section 5.3 shall be vested upon such termination or the effective date of such Change in Control (as applicable) and (2) the vested shares and/or stock options (as applicable) issued under this Section 5.3 shall not be forfeited by Executive; and

(y) in the event Executive's employment with Employer is terminated at any time during the Term either (1) by Executive for any reason (other than Good Reason) or (2) by Employer for Cause, all unvested at the time of such termination stock options issued under this Section 5.3 shall be forfeited by Executive.

(d) Executive understands and acknowledges that, the issuance of the Company securities pursuant to this Section 5.3 shall be unregistered in reliance on the applicable exemption under the U.S. securities laws, and any dispositions of such securities (including, without limitation, the shares of Class A common stock issued as the Initial Shares Award and the shares of Class A common stock underlying the stock options pursuant to this Section 5.3) shall be subject to Rule 144 under the Securities Act of 1933, as amended. In connection with each unregistered issuance of such securities and as a condition precedent to such issuance, Executive shall deliver to Employer not later than the date of each such issuance a filled out and signed by Executive accredited investors questionnaire and standard subscription agreement containing investor's representations and warranties acceptable to Employer and its counsel.

"Change in Control" means the sale of all or substantially all the assets of Employer to a party that is unrelated to Employer, any merger, consolidation or acquisition of Employer with, by or into another entity or person or any change in the ownership of more than fifty percent (50%) of both the economic and voting equity interests in Employer, in each case (whether it is a sale of assets, merger, consolidation, acquisition or change in ownership, or other) resulting in the current controlling person(s) of Employer cease having controlling voting capital in Employer in one or more related transactions.

"Liquidity Event" means a disposition of Employer in any one transaction or series or combination of transactions whereby equity interests of Employer (together with its subsidiaries) are acquired for consideration (cash or non-cash), including, without limitation, a sale or exchange of capital stock, a merger or consolidation, a recapitalization, a tender or exchange offer, a leveraged buy-out, in each case to an unaffiliated purchaser or Employer or its parent causing a sale by Employer and its subsidiaries of substantially all of Employer and its subsidiaries consolidated assets to an unaffiliated purchaser, an initial public offering of Employer equity securities, or any monetization event of Employer (together with its subsidiaries), but only so long as in each such transaction, sale, reorganization, merger, recapitalization, tender or exchange offer, buy-out, monetization event or IPO, Motorsport Group, LLC, Motorsport Network, LLC and/or their affiliates receive return in full of the aggregate amount of investment by such entities and/or persons in Employer and/or its subsidiaries whether in the form of equity, debt or services through the date of consummation and closing of the Liquidity Event. For the avoidance of doubt, any financing or contribution (whether of money, equity, any assets or otherwise) by Motorsport Group, LLC, Motorsport Network, LLC and/or their affiliates and/or member(s) to Employer and/or any of its subsidiaries or affiliates shall not be deemed a Liquidity Event.

4

5.4 **Vacation and Sick Days.** Subject to the last sentence of this Section 5.4, Executive shall be entitled to accrued vacation and sick days in accordance with Employer's procedures and policies applicable to senior executives, as established from time to time (currently, 21 vacation days annually plus standard observed holidays and 7 sick days annually). The cash value (pro-rated, based on Executive's base Salary) of Executive's accrued vacation and sick days that are not used by Executive in any calendar year shall be payable to Executive promptly after the end of the calendar year in which such unused vacation and sick days accrued.

5.5 **Expenses.** Employer will pay or reimburse Executive for all personal documented, reasonable and necessary (in line with Employer's policies) out-of-pocket expenses related to business travel and meetings incurred by Executive during the Term in the performance of Executive's duties hereunder.

5.6 **Perquisites**. During the Employment Period, (a) Executive will travel Business Class on flights that are business related and (b) Executive shall be reimbursed for executive training subject to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board) prior written approval of the cost of such training.

6. **Termination.**

6.1 **Termination by Employer for "Cause."** Any of the following acts or omissions shall constitute grounds for Employer to terminate Executive's employment pursuant to this Agreement for "<u>Cause</u>":

(a) The refusal or failure, for more than five (5) days from the date of notice by Employer to Executive, by Executive to perform any duties required of him by this Agreement or lawful instructions of the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board) (other than due to Disability (as defined below));

(b) The commission by Executive of any fraud, misappropriation or misconduct that causes demonstrable material injury to Employer or any of its subsidiaries;

(c) Conduct on the part of Executive which constitutes the breach of any statutory or common law duty of loyalty to Employer;

(d) Any material breach by Executive of any provisions of Sections 7, 8 or 9 of this Agreement;

(e) Any illegal act by Executive that affects the business of Employer; conviction of, or a plea of guilty or nolo contendere to, a misdemeanor involving moral turpitude, dishonesty, fraud, deceit, theft, unethical business conduct or conduct that impairs the reputation of Employer or any of its subsidiaries or affiliates, or a felony (or the equivalent thereof in a jurisdiction other than the United States);

(f) Executive's failure to comply in any material respect with this Agreement or any other written agreement between Executive, on the one hand, and Employer or any of its subsidiaries, on the other, if such failure causes demonstrable material injury to Employer or any of its subsidiaries; or

(f) Gross negligence, malfeasance, dishonesty or willful misconduct in connection with Executive's duties hereunder (either by an act of commission or omission).

Termination by Employer for Cause shall be accomplished by written notice to Executive of the decision to terminate Executive's employment for Cause specifying the particular act(s) or failure(s) to act serving as the basis for such decision. Any such termination shall be without prejudice to any other remedy to which Employer may be entitled either at law, in equity or under this Agreement. Notwithstanding anything contained herein to the contrary, Executive's employment may not be terminated for Cause pursuant to clause (a), (b) or (f) above unless Executive and his counsel had an opportunity to be heard on at least 10 days' prior written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board) and (B) if such act or failure to act is capable of being cured, Executive fails to cure any such act or failure to act to the reasonable satisfaction of the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board) within 10 days after such notice.

Upon the occurrence of an event that would constitute a Cause for Employer to terminate Executive's employment pursuant to this Section 6.1, Employer may, at its discretion, elect to continue Executive's employment and reserve any and all rights and remedies with respect to such event to which Employer may be entitled either at law, in equity or under this Agreement.

6.2 **Termination for Death or Disability.** Executive's employment pursuant to this Agreement shall be immediately terminated by Employer (i) upon the death of Executive or (ii) upon Executive becoming Disabled. For purposes of this Agreement, the term "Disabled" means an inability of Executive, due to a physical or mental illness, injury or impairment, to perform a substantial portion of his duties for a period of sixty (60) or more consecutive days or one hundred and eighty (180) or more days (whether or not consecutive) out of any three hundred and sixty (360) days period, as reasonably determined by the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board).

6.3 **Termination Without Cause or by Executive for Good Reason.**

(a) Employer may terminate this Agreement, and the employment of Executive under this Agreement, without Cause at any time upon written notice to Executive.

(b) Upon 30 days' prior written notice to Employer, Executive may terminate his employment with Employer for Good Reason. "Good Reason" means the occurrence of any of the following events:

(i) the failure of Employer to appoint Executive to, or to permit him to remain in, the positions set forth in Section 2, if that failure is not cured within 10 business days after written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board);

(ii) the assignment by Employer to Executive of duties materially inconsistent with his status as the chief executive officer of a similarly-situated company or any material diminution in Executive's duties and/or responsibilities, reporting obligations, titles or authority, as set forth in Section 2, if that inconsistency or diminution is not cured within 10 business days after written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board);

(iii) a reduction by Employer of Executive's Salary if such reduction is not cured within 10 business days after written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board);

(iv) Employer's failure to provide employee benefits required to be provided to Executive under Section 5.2 hereof and continuation of that failure for 10 business days after written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board); or

(v) any material breach of this Agreement by Employer if not cured within 10 business days after written notice from Executive to the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board).

Notwithstanding the foregoing, Good Reason will not be deemed to exist unless Executive gives the Manager of Employer (prior to the establishment of the Board) or the Board (after the establishment of the Board) notice within 30 days (or such shorter period specified above) after the occurrence of the event which Executive believes constitutes the basis for Good Reason, specifying the particular act or failure to act which Executive believes constitutes the basis for Good Reason.

6.4 **Payments Upon Termination**.

(a) If during the Term of this Agreement, Employer terminates Executive without Cause pursuant to <u>Section 6.3(a)</u> or Executive terminates his employment with Employer for Good Reason pursuant to <u>Section 6.3(b)</u>, then Executive shall be entitled to (i) continuation of payment of unpaid Salary from the effective date of such termination to the earlier of (1) expiration of twelve (12) months after the date of such termination and (2) to the end of the Term (the "<u>Severance</u>"), payable, subject to the provisions set forth in the next sentence of this Section 6.4(a), on a regular basis in accordance with Employer's normal payroll procedures and policies, and subject to applicable payroll deductions, (ii) any payments for reimbursement expenses, which are due, accrued or payable at the effective date of Executive's termination and (iii) all (if any) unvested stock awards or stock option awards by Employer to Executive pursuant to Employer's equity incentive plan shall be deemed vested on the effective date of such termination (for the avoidance of doubt, this Section 6.4 does not affect or modify the vesting schedule of the shares and stock options issued to Executive pursuant to Section 5.3 above, and the vesting of the shares and stock options issued to Executive pursuant to Section 5.3 above shall continue to be at all times be governed by the terms set forth in Section 5.3(c) above). Executive's right to receive, and the Company's obligation to pay and provide, any of the payments of Severance (other than payment of unpaid Salary (if any) earned and accrued prior to the effective date of such termination) shall be subject to (1) Executive's compliance with, and observance of, all of Executive's obligations under this Agreement that continue beyond such termination, and (2) Executive's execution, delivery and non-revocation of, and performance under, a release in favor of Employer and its affiliates in the form of <u>Exhibit A</u> attached hereto (as such form may be modified so as to comply with all applicable laws as then in effect) (the "<u>Release</u>") within forty-five (45) days of the termination of Executive's employment. For the avoidance of doubt, in the event of a Change in Control (as defined below) during Executive's employment with Employer, all (if any) unvested stock awards or stock option awards by Employer to Executive pursuant to Employer's equity incentive plan shall be deemed vested on the effective date of such Change in Control.

(b) If Employer terminates Executive for Cause pursuant to <u>Section 6.1</u>, or if Executive resigns or otherwise terminates his employment with Employer for any reason, other than Good Reason, then Executive shall be entitled to the following compensation: (i) the portion of the Salary which has accrued through the effective date of termination, and (ii) any payments for reimbursement expenses, which are due, accrued or payable at the effective date of Executive's termination. All payments required to be made by Employer to Executive pursuant to this <u>Section 6.4(b)</u> shall be paid when such payments are due and payable.

(c) If Employer terminates Executive pursuant to <u>Section 6.2</u>, then Executive shall be entitled to the following compensation: (i) the portion of the Salary which has accrued through the effective date of termination, and (ii) any payments for reimbursement expenses, which are due, accrued or payable at the effective date of Executive's termination. All payments required to be made by Employer to Executive pursuant to this <u>Section 6.4(c)</u> shall be paid when such payments are due and payable.

(d) In all events, subsequent to the termination of Executive's employment (other than a termination because of Executive's death), Executive shall be entitled to continuation of group health plan benefits to the extent authorized by and consistent with 29 U.S.C. §1161 <u>et seq.</u> (commonly known as "<u>COBRA</u>"), with the cost of the regular premium for such benefits paid exclusively by Executive.

(e) The amounts payable under this <u>Section 6.4</u> are intended to be, and are, exclusive and in lieu of any other rights or remedies to which Executive may otherwise be entitled, including under common, tort or contract law, under policies of Employer and its affiliates in effect from time to time, under this Agreement or otherwise, as a result of Executive's termination of employment hereunder. Employer shall not be obligated to (i) commence such payments (other than payment of (1) unpaid Salary (if any) earned and accrued prior to the effective date of such termination and reimbursement (subject to the terms and conditions of <u>Section 5.5</u> above) of Executive's business expenses incurred by Executive prior to the effective date of such termination) until such time as Executive has provided an irrevocable general release in favor of Employer and its subsidiaries and affiliates, and their respective shareholders, partners, members, managers, directors, officers, Executives, agents and representatives in form and substance reasonably acceptable to Employer, or (ii) continue such payments at any time following a breach of the provisions of <u>Section 7</u> through <u>9</u> of this Agreement.

6.5 **Board Resignation.** Upon termination of Executive's employment for any reason, Executive agrees to resign, as of the date of such termination and to the extent applicable, as an officer of Employer and its affiliates and from any other board or managers, board of directors, and any and all other managing body of Employer or other affiliates and their respective committees if and to the extent he is serving in any such capacity.

7. **Confidential Information.** Executive will hold at all times, including following the termination of Executive's employment under this Agreement, in strict confidence and not disclose or use any Confidential Information (as defined below). "<u>Confidential Information</u>" shall mean information about Employer and its affiliates, clients and customers and others with which any of Employer and/or its affiliates has business relationships and other information, documents or materials disclosed to Executive or known by Executive as a consequence of or through his employment by Employer that is not disclosed publicly by Employer, including for financial reporting purposes or otherwise in the public domain and that was or will be learned by Executive in the course of providing services to Employer or its affiliates, including (without limitation) all information and materials relating to (i) the financial condition, operations, business and interests of Employer or its affiliates, (ii) the systems, technology, data, formulae, know-how, records, marketing and sales techniques and/or programs, methods, methodologies, manuals, lists and other trade secrets from time to time acquired, sold, developed, maintained and/or used by Employer, (iii) the nature, terms and history of Employer's or its affiliates' relationships with their respective clients, customers, suppliers, underwriters, lenders, vendors, consultants, independent contractors, attorneys, accountants and employees, (iv) Employer's or its affiliates' employees, officers and/or managers, and (v) all papers, resumes, and records (including computer records) of the documents containing such information. Upon termination of employment, Executive shall deliver to Employer all documents, records, notebooks, work papers, electronic media and any other repositories of any source, including, without limitation, paper, electronic, etc., containing any information concerning Employer and/or its affiliates, whether prepared by Executive, Employer or anyone else. Notwithstanding the immediately preceding sentence, upon termination of employment, Executive may destroy (and certify such destruction in writing to Employer) any duplicates of the materials or documents referred to in the immediately preceding sentence, provided that, for the avoidance of doubt, Executive shall not destroy but rather return to Employer all Employer's property (including, without limitation, all property, equipment, computers, laptops, smartphones, documents, media and materials that are in Executive's possession or control relating to Employer, its affiliates and their respective business). The foregoing restrictions shall not apply to (i) information which is or becomes, other than as a result of a breach of this Agreement, generally available to the public, (ii) information which is obtained from a source other than Employer or its affiliates and other than by breach of an obligation of confidentiality owed to Employer or (iii) the disclosure of information required pursuant to a subpoena or other legal process; <u>provided</u> that Executive shall notify Employer, in writing, of the receipt of any such subpoena or other legal process requiring such disclosure immediately after receipt thereof and Executive shall make reasonable best efforts to allow Employer to have a reasonable opportunity to quash such subpoena or other legal process prior to any disclosure by Executive.

8. **Proprietary Rights.** Executive acknowledges and agrees that all work performed by Executive and all materials and products developed or prepared for either Employer or its affiliates or their respective customers, clients, agents or affiliates by Executive before and after the Effective Date are the property of Employer, and all title and interest therein shall vest in Employer and shall be deemed to be a work made for hire in the course of the services rendered hereunder. Executive shall also execute any Executive proprietary rights or invention assignment agreement reasonably requested by Employer.

8

9. **Non-Solicitation.** Executive agrees that during his employment with Employer and for two (2) years thereafter, he will not, directly or indirectly induce or solicit, or aid or assist any person or entity to induce or solicit, any members, managers, officers, employees or affiliates of Employer and/or its affiliates, or any customers or clients of Employer and/or its affiliates to terminate, curtail or otherwise limit its, his or her employment by or business relationship with Employer and/or its affiliates. The parties hereto agree that the provisions of this <u>Section 9</u> are reasonable. If a court determines, however, that any provision of this <u>Section 9</u> is unreasonable, either in period of time, geographical area or otherwise, then the parties hereto agree that the provisions of this <u>Section 9</u> should be interpreted and enforced to the maximum extent which such court deems reasonable.

10. **Assignment.** This Agreement shall not be assignable, in whole or in part, by Executive. This Agreement shall be assignable by Employer to Employer's successors and/or, in the event of any Liquidity Event, to Employer's assigns.

11. **Successors.** This Agreement shall inure to the benefit of and be enforceable by Executive's personal and legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If Executive should die while any amounts are still payable to him hereunder, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to Executive's devisee, legatee, or other designee or, if there be no such designee, to Executive's estate.

12. **Employer's Interest; Consideration to Executive; Injunctive Relief; Notification.**

12.1 **Employer's Interest.** Executive acknowledges that Employer has expended and will expend substantial amounts of time, money and effort to develop business strategies, customer relationships, employee relationships, trade secrets and goodwill and to build an effective organization and that Employer has a legitimate business interest and right in protecting those assets as well as any similar assets that Employer may develop or obtain. Executive acknowledges that Employer is entitled to protect and preserve the going concern value of Employer and its business and trade secrets to the extent permitted by law. Executive acknowledges and agrees that the restrictions imposed upon Executive under this Agreement are reasonable and necessary for the protection of Employer's goodwill, confidential information, trade secrets and customer relationships and that the restrictions set forth in this Agreement will not prevent Executive from earning a livelihood without violating any provision of this Agreement.

12.2 **Consideration to Executive.** In consideration of Employer's entering into this Agreement and Employer's obligations hereunder and other good and valuable consideration, the receipt of which is hereby acknowledged, and acknowledging hereby that Employer would not have entered into this Agreement without the covenants contained in <u>Section 7</u> through <u>9</u> of this Agreement, Executive hereby agrees to be bound by the provisions and covenants contained in <u>Section 7</u> through <u>9</u> of this Agreement.

12.3 **Injunctive Relief.** Executive agrees that it would be difficult to compensate Employer fully for damages for any violation of the provisions of <u>Section 7</u> through <u>9</u> of this Agreement. Accordingly, Executive specifically agrees that Employer shall be entitled to temporary and permanent injunctive relief to enforce the provisions of this Agreement. This provision with respect to injunctive relief shall not, however, diminish the right of Employer to claim and recover damages in addition to injunctive relief.

12.4 **Notification of Subsequent Employer.** Prior to accepting employment with any other person or entity during any period during which Executive remains subject to any of the covenants set forth in <u>Section 7</u> through <u>9</u> of this Agreement, Executive shall provide such prospective employer with written notice of the provisions set forth in <u>Section 7</u> through <u>9</u> of this Agreement, with a copy of such notice delivered simultaneously to Employer.

9

13. **Miscellaneous.**

13.1 **Governing Law; Venue.** This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Florida, without reference to its conflicts of law principles. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortuous conduct or otherwise) shall be brought exclusively in the federal or state courts located in Miami-Dade County, Florida and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding. The prevailing party in any dispute or legal action arising under this Agreement shall be entitled to recover its reasonable expenses, attorneys' fees and costs from the non-prevailing party.

13.2 **Waiver of Jury Trial.** EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.2.

13.3 **Prior Agreements.** This Agreement contains the entire agreement of the parties relating to the subject matter hereto and supersede all prior agreements and understanding with respect to such subject matter and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein.

13.4 **Withholding Taxes.** Employer may withhold from any salary and benefits payable under this Agreement all federal, state, city or other taxes or amounts as shall be required to be withheld pursuant to any law or governmental regulation or ruling.

13.5 **Amendments.** No amendment or modification of this Agreement shall be deemed effective unless made in writing signed by the parties hereto.

13.6 **No Waiver.** No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any provisions of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

13.7 **Severability.** To the extent any provision of this Agreement shall be invalid or unenforceable, it shall be considered deleted herefrom and the remainder of such provision and of this Agreement shall be unaffected and shall continue in full force and effect.

13.8 **Survival.** The rights and obligations of Employer and Executive under the provisions of this Agreement shall survive and remain binding and enforceable, notwithstanding any termination of Executive's employment with Employer, to the extent necessary to preserve the intended benefits of such provisions.

13.9 **Executive Representation**. Executive hereby represents to Employer that the execution and delivery of this Agreement by Executive and Employer and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, or be prevented, interfered with or hindered by, the terms of any employment agreement, non-competition agreement, confidentiality agreement, non-disclosure agreement, non-circumvention agreement, consulting agreement, services agreement, or other agreement or policy to which Executive is a party or otherwise bound.

13.10 **Set Off**. Employer's obligation to pay Executive the amounts provided and to make the arrangements provided hereunder shall be subject to set-off, counterclaim or recoupment of amounts owed by Executive to Employer or its affiliates.

13.12 **No Construction Against Draftsmen**. The parties acknowledge that this is a negotiated agreement, and that in no event shall the terms of this Agreement be construed against either party on the basis that such party, or its counsel, drafted this Agreement.

13.13 **Counterpart Execution.** This Agreement may be executed by facsimile and in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

[SIGNATURES ARE ON NEXT PAGE.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

**"Employer":**

MOTORSPORT GAMING US LLC

By:     */s/ Mike Zoi*
Name:  Mike Zoi
Title:   Manager

**"Executive":**

*/s/ Dmitry Kozko*
Print Name: DMITRY KOZKO

11

**EXHIBIT A**

**FORM OF**
**SEPARATION AGREEMENT AND GENERAL RELEASE**

This Separation Agreement and General Release (this "Agreement"), dated _____ is by and between MOTORSPORT GAMING US LLC, a Florida limited liability company (the "Company"), and DMITRY KOZKO ("you"). For all purposes in this Agreement, the Company shall also include its affiliates, subsidiaries, parents, and their respective present and former shareholders, officers, directors, members, employees, representatives and agents.

1. Termination of Employment. You acknowledge that you were an employee of the Company pursuant to that certain Employment Agreement between the Company and you, effective as of January 1, 2020 (the "Employment Agreement"), that your employment with the Company has been terminated without Cause (as such term is defined in the Employment Agreement) effective _____ (the "Termination Date").

2. Severance.

(a) In consideration of your acceptance of this Agreement, and in full satisfaction of all owed salary and benefits through the last date of your employment, after you sign this Agreement and all other conditions of payment have been met, the Company shall provide you with the Severance, as such term is defined in, and subject to the terms set forth in the Employment Agreement, payable as set forth in Section 6.4(a) of the Employment Agreement, but in any event not earlier than (i) you sign and deliver this Agreement to the Company and (ii) the expiration of the seven (7) day revocation period set forth paragraph 12 below. You acknowledge and agree that the Severance constitutes good and sufficient consideration for this Agreement. You acknowledge and agree that the Severance constitutes good and sufficient consideration for this Agreement.

(b) The Company will issue a W-2 form at the appropriate time for payment. You will receive a separate written notice, known as COBRA notice, regarding your ability to continue at your expense your health and dental coverage under the Company's group plans.

(c) You represent that you will not make any claim for any additional wages (including overtime), paid time off, bonuses, and other benefits and compensation to which you were or may have been entitled by virtue of your employment with the Company or termination thereof except for those expressly described in this Agreement. You will not receive the payments described in this paragraph 2 if you (i) do not sign this Agreement, (ii) rescind this Agreement after signing it, or (iii) violate any of the terms and conditions set forth in this Agreement.

3. General Release. In exchange for the consideration set forth in paragraph 2 above, you agree unconditionally to waive, release, forever discharge, covenant not to sue with respect to, and to hold each of the Company, and its affiliates, subsidiaries, parents, present and former shareholders, partners, members, managers, officers, directors, employees, representatives and agents (each, a "Released Party" and, collectively, the "Released Parties") harmless against, the assertion of each and every action, claim, right, or demand of any kind or nature, known or unknown, in law or equity, contract or tort and however originating or existing which you have or may have against any of the Released Parties up until the date of this execution of this Agreement with respect to your employment or the termination of your employment. This includes, without limitation, any and all claims, rights, actions, liabilities or demands of whatsoever nature which might be raised pursuant to any constitution, law, regulation, ordinance, statute, or common law theory or other authority, whether in tort, contract, equity or otherwise, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 1981, the Employee Retirement Income Security Act of 1974, as amended, the Family and Medical Leave Act, the Americans with Disabilities Act of 1990, Fair Labor Standards Act, the Florida Civil Rights Act, the Florida Whistle-Blower's Act, Fla. Stat. Section 440.205, the Age Discrimination in Employment Act, the Older Worker Benefit Protection Act, the National Labor Relations Act, the Fair Credit Reporting Act, the Immigration Reform Control Act, Executive Order 11246; the Occupational Safety and Health Act, the Equal Pay Act, the Uniformed Services Employment and Reemployment Rights Act, the Worker Adjustment and Retraining Notification Act, the Employee Polygraph Protection Act, the United States Constitution, the Florida Constitution, any state or federal anti-discrimination, consumer protection and/or trade practices act, and any local laws, including any local ordinances, together with any expenses, costs and attorney's fees which might be raised pursuant to the above stated laws. You expressly intend this release to reach to the maximum extent provided by law.

12

4. <u>Legal Proceedings</u>. You warrant that you have not filed any legal proceeding, whether in court or with an administrative agency, and you have not made any assignment to anyone of any claims against any of the Released Parties. This Agreement is intended to be a full and complete release of all claims against each Released Party. If you nevertheless initiate a lawsuit against any of the Released Parties in violation of this Agreement and receive monies therefrom, the Company shall be entitled to a set off in the amounts you have received or are entitled to receive under this Agreement.

5. <u>Prospective Employers</u>. The parties agree that any prospective employers who contact the Company for a reference will be advised of your dates of employment, your job title and your Salary. You agree that you will advise prospective employers to contact hr@motorsport.com for any reference.

6. <u>Non-Admission</u>. The parties further acknowledge that nothing in this Agreement constitutes an admission by the parties of any improper or unlawful act(s) or of any (a) violation of any statute, regulation, or other provision of statutory, regulatory, or common law, (b) breach of contract, or (c) commission of any tort. The parties forever waive all rights to assert that this Agreement was the result of a mistake in law or in facts.

7. <u>Non-Disparagement; Confidentiality</u>.

(a) From the time of your execution of this Agreement, (i) you agree to refrain from making any negative or disparaging comments about any of the Released Parties to anyone and (ii) the Company agrees to refrain from making any negative or disparaging comments about you to anyone.

(b) From the time of your execution of this Agreement, the Company, on the one hand, and you or anyone else acting on your behalf, on the other hand, shall not disclose, either directly or indirectly, any information whatsoever regarding any of the terms of, or the existence of this Agreement, or the fact that the Company is paying any Severance to you, or the amount of said payment. This confidentiality provision shall not apply to any disclosure of this Agreement by (i) the Company to its representatives and advisors on a need to know basis and (ii) you to your attorneys, accountant, or other bona fide tax adviser, or any bona fide financial planner you have employed, but you shall inform each of them of the confidentiality of this Agreement, and they shall be similarly bound.

8. <u>Information</u>. By signing this Agreement, you acknowledge and agree that you have had access in your employment with the Company to confidential and proprietary information, and further acknowledge and agree that the release or disclosure of any confidential or proprietary information will cause the Company or any other Released Party irreparable injury. By signing this Agreement, you acknowledge that you have not directly or indirectly used or disclosed, and agree that you will not at any time directly or indirectly use or disclose, to any other entity or person, directly or indirectly, any confidential or proprietary information of the Company or any of its affiliates and/or subsidiaries. For purposes of this Agreement, the term "confidential or proprietary information" shall include, but not be limited to, trade secrets, customer and contact lists and information pertaining to such lists, computer software designed for or by the Company or its affiliates, the Company's or its affiliates' proprietary applications and programs, databases, technology and know-how. However, you may disclose Confidential Information only to the extent you are required to disclose such Confidential Information by law.

13

9. <u>Return of Property</u>. As of the Termination Date, you shall return all property, equipment, computers, laptops, smartphones, documents and materials that were in your possession or control relating to the business of, or the services provided by, the Company or its affiliates. By signing this Agreement, you acknowledge and agree that all documents and materials relating to the business of, or the services provided by, the Company or its affiliates are the sole property of the Company or its affiliates. By signing this Agreement, you further agree and represent that you have returned and/or shall return by the Termination Date to the Company all of its property, including but not limited to, all customer records and other documents and materials, whether on computer disc, hard drive or other form, and all copies thereof, within your possession or control, which in any manner relate to the business of or the duties and services you performed.

10. <u>Remedies</u>. You agree that any breach by you of any of the provisions of paragraphs 7 or 8 of this Agreement will cause irreparable harm to the Company or its affiliates that could not be made whole by monetary damages and that, in the event of such a breach, you will waive the defense in any action for specific performance that a remedy at law would be adequate, and the Company or its affiliates will be entitled to specifically enforce the terms and provisions of paragraphs 7 or 8 of this Agreement without the necessity of proving actual damages or posting any bond or providing prior notice, in addition to any other remedy to which the Company or its affiliates may be entitled at law or in equity.

11. <u>Notice of Right to Consult Attorney and Twenty-One (21) Day Consideration Period</u>. By signing this Agreement, you agree and certify that (i) you have carefully read and fully understand all of the provisions of this Agreement, (ii) you understand and agree that you are and have been allowed a reasonable period of time (up to 21 days) from receipt of this Agreement to consider the terms hereof before signing it; (ii) you have been encouraged and you are advised in writing, by this Agreement, to consider the terms of this Agreement and consult with an attorney of your choice before signing this Agreement and you have done so, or chosen not to do so of your own accord; and (iii) you agree to the terms of this Agreement knowingly, voluntarily, and without intimidation, coercion, or pressure, and intend to be legally bound by this Agreement.

12. <u>Revocation Period.</u> You may revoke this Agreement within the seven (7) day period following its execution by you. Any revocation must be submitted, in writing, to legal@motorsport.com and must state, "I hereby revoke my acceptance of my Agreement." If the last day of either revocation period is a Saturday, Sunday or legal holiday recognized by the State of Florida, then such revocation period shall not expire until the next following day which is not a Saturday, Sunday or legal holiday. You acknowledge and agree that the general release in this Agreement includes a **WAIVER OF ALL RIGHTS AND CLAIMS** you may have under the Age Discrimination in Employment Act of 1967 (29 U.S.C. §621 et seq.), as amended by the Older Workers' Benefit Protection Act, and that this waiver is knowing and voluntary. You further acknowledge that you have been advised in writing by this Agreement that you have a maximum of seven (7) days following the execution of this Agreement to revoke this Agreement and that this Agreement shall not become effective until the revocation period has expired.

13. <u>Expiration of Offer</u>. The offer contained in this Agreement shall expire at 5:00 p.m. on the twenty-second (22nd) day after you receive it, not counting the date of receipt. If the Company has not received a signed original of this Agreement from you by that time, this offer will be automatically revoked.

14. <u>Entire Agreement; Modifications</u>. This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and all prior negotiations regarding any wages or compensation are merged into this Agreement. This Agreement may not be modified except as may be set forth in writing and executed by the parties hereto. The parties acknowledge that there are no other promises, agreements, condition, undertakings, warranties, or representation, oral or written, express or implied, between them other than as set forth herein and in the Employment Agreement.

14

15. <u>Governing Law and Venue</u>. This Agreement shall be construed, enforced and interpreted in accordance with the laws of the State of Florida and venue for any action to enforce or construe the Agreement shall be in Miami-Dade County, Florida. Should any action be brought regarding the enforceability of the Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs, including any fees and costs of appeal.

16. <u>Enforceability</u>. If one or more paragraph(s) of this Agreement shall be ruled unenforceable, the Company may elect to enforce the remainder of the Agreement. This Agreement may be executed in two or more counterparts, each of which will take effect as an original and all of which shall evidence one and the same agreement.

17. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts.

After you have reviewed this Agreement and obtained whatever advice and counsel you consider appropriate regarding it, please evidence your agreement to the provisions set forth in this Agreement by dating and signing this Agreement in the presence of a witness. The witness should also date and sign in the spaces provided for the witness. You should keep a copy of this Agreement for your records.

MOTORSPORT GAMING US LLC

By: _____
Name: _____
Title: _____

15

ACKNOWLEDGMENT AND SIGNATURE

By signing below, I acknowledge and agree that I have read this Agreement carefully. I understand all of its terms. In signing this Agreement, I have not relied on any statements or explanations except as specifically set forth in this Agreement. I have had adequate time to consider whether to sign this Agreement and am voluntarily and knowingly releasing my claims against the Released Parties (as defined in paragraph 3 of this Agreement) as set forth herein. I intend this Agreement to be legally binding.

Date I received this Agreement: _____, 20__.

Accepted this ___ day of _____, 20__.

_____
DMITRY KOZKO

**Witness**:  _____

(Print Name):  _____

16

# EXHIBIT C

 Gabriel Sierra <gsierra@ayalalawpa.com>

---

**Fwd: Booking confirmation : TW3ALO**

**Zach Griffin** <zach.griffin@gmail.com>                                                    Tue, Mar 11, 2025 at 8:03 AM
To: gsierra@ayalalawpa.com

Regards,

Zach Griffin
+61 437 658 845

---------- Forwarded message ----------
From: **QR ebooking** <ebooking@qatarairways.com.qa>
Date: Mon, 9 Aug 2021 at 12:18 am
Subject: Booking confirmation : TW3ALO
To: <zach.griffin@gmail.com>

Qatar Airways                                                           

## Booking confirmation

---

**Booking reference (PNR) - TW3ALO**

**Booking status: - Confirmed**

Dear Mr. Zachary nicholas Griffin,

Please use the following options for additional services from Qatar Airways.

| | | |
|---|---|---|
|  **The Qatar Airways App** At every step of your journey | QR code | Get your travel companion |

---

NEXT STEPS

# Manage booking

MANAGE BOOKING

---

**You Might be Interested in**



Hotels
Book a room



Excess Baggage
Purchase now



Meet & assist service
Book Al Maha



Mobile Apps
Learn more

---

OUTBOUND FLIGHT

# Melbourne > Miami

Monday,9 August 2021

| DEPARTURE | ARRIVAL | CLASS / CHECKED BAGGAGE ALLOWANCE: |
|---|---|---|
| Mon, 9 Aug 2021 | Tue, 10 Aug 2021 | |
| **22:55 MEL**<br>Melbourne,Melbourne International Airport<br>Australia<br>Terminal : 2 | **05:55 DOH**<br>Doha,Hamad International Airport<br>Qatar | QR 905<br>Boeing 777-300ER<br>Operated by: Qatar Airways | BUSINESS(I)<br>Adult: 2 piece(s), up to 32 kg each |

 14h 0 m

Connection time : 1h 55 m

| | | |
|---|---|---|
| Tue, 10 Aug 2021 | Tue, 10 Aug 2021 | |
| **07:50 DOH**<br>Doha,Hamad International Airport<br>Qatar | **16:35 MIA**<br>Miami,Miami International Airport<br>United States of America | QR 777<br>Boeing 777-300ER<br>Operated by: Qatar Airways | BUSINESS(I)<br>Adult: 2 piece(s), up to 32 kg each |

 15h 45 m



## Save at Qatar Duty Free

Enjoy up to 15% off luxury shopping at Hamad International Airport

**Departure transit**

Business Comfort

  15 % off

Terms and conditions apply



Stay up to date with every step of your journey


Get your travel companion

Viewing this email on your desktop?
Scan the QR code with your phone to download



**Join Privilege Club and earn 2,000 bonus Qmiles today**

Become a Privilege Club member using promo code **EARNWITHQR** and earn **2,000 bonus Qmiles**

Join now



# Passenger details

✓ This symbol indicates that the airline has confirmed your request. If your request is not confirmed within 24 hours, please contact us directly.

Melbourne  ›  Miami

| PASSENGER NAME/ E-TICKET # | FLIGHT | CLASS | SEAT | MEAL PREFERENCE |
|---|---|---|---|---|
| Mr . Zachary nicholas Griffin 157-2395053669 | QR 905 QR 777 | BUSINESS BUSINESS | 04J ✓ 06K ✓ | No preference No preference |

## Passenger contact details

Your e-mail address : zach.griffin@gmail.com
Mobile number : +61-0437658845

# Payment details

| CARD TYPE | CARD NUMBER | NAME ON CARD | EXPIRY DATE |
|---|---|---|---|
| AMERICAN EXPRESS | ███████ | Zachary Griffin | ████ |

- Please note that in some cases, Qatar Airways may request additional payment verification from the card holder for itineraries paid for with a credit card.

---

# Price breakdown

## Flight

| PASSENGER TYPE | ADULT |
|---|---|
| Fare per passenger | 5397.00 |

**Taxes and carrier-imposed fees per passenger**

| | |
|---|---|
| Carrier Imposed International Surcharge (YQAC) | 446.00 |
| Fiscal Tax (YRVB) | 10.80 |
| Passenger Movement Charge (AUDP) | 60.00 |
| Safety and Security or Baggage Screening Tax (WGSE) | 29.76 |
| Passenger Services Charge (WYDE) | 23.46 |
| Qatar Passenger Facility Charge PFC (G4AF) | 13.00 |
| Qatar Passenger Service Charge Arrivals (PZAV) | 0.70 |
| Arrival Transportation Tax (USAP) | 25.90 |
| APHIS User Fee (XACO) | 5.40 |
| Immigration User Fee (XYCR) | 9.50 |
| Customs User Fee (YCAE) | 8.10 |
| Credit card fee | 70.00 |
| Total Price per passenger | 6099.62 |
| Number of passengers | 1 |
| TOTAL PRICE | 6099.62 |

Grand total :  **6099.62 AUD**

---

## Contact us

Contact us

## Purchase conditions

- For more information on baggage rules and restrictions on Qatar Airways flights, please **click here**.

- When you make a reservation on a flight to/from the U.S. one week or more prior to your flight departure through our website at www.qatarairways.com , we will allow you to hold the reservation for 24 hours without payment.Once payment is received and ticket is issued, the fare rules will apply.
- Should you wish to change your booking, and the originally purchased fare or booking class is not available for your new flights, difference of fare will be collected on top of the change fee if the rule permits changes.
- If you have a stopover in Doha, please click here for more information.
- An additional administrative/service fee for rebooking/cancellation may apply.
- When a ticket is booked with a combination of fares, the most restrictive cancellation rule will apply.
- Fares are not guaranteed until full payment is received and tickets are issued.
- Where applicable, local airport taxes will be collected at time of check-in.
- Additional card transaction fees may apply and is dependent on the card issuer.
- You should carry a copy of this booking confirmation while you travel as it may be required for immigration purposes.
- **Remember to check your immigration and health requirements before you travel and ensure you carry the required travel documents.**
- **If you are holding a non-Qatar Airways ticket for a connection afterwards, you will need to hold immigration approval to land at the final city in your itinerary that is ticketed by Qatar Airways.**
- We accept all major credit and debit cards, subject to local regulations. Please note Qatar Airways may require you to submit additional payment information online to verify the identity of the card holder.
- **Passengers travelling to Massachusetts are required to complete an online traveler form and quarantine for 14 days or produce a negative COVID-19 test result taken within 72 hours of departure. Click here to learn more.**
- In the event of any taxes, fees or charges, which you have paid to us at the time of the ticket issuance are abolished or reduced such that they no longer apply to you, or a lesser amount is due, or you have not used the relevant portion of the ticket, you will be entitled to claim a refund of those.
- Please be advised that in the event you do not show up for any flight without advising us in advance with minimum three hours prior to flight departure, your return or onward reservations will automatically get canceled by the system and will be subject to the applicable penalties and fees.
- For Qatar Airways Terms & Conditions, click here.

**Additional security measures for international flights to or from the U.S.A**

The Transportation Security Administration (TSA) screens all airline passengers and baggage prior to boarding. For further information, please visit the U.S. Department of Homeland Security website at: https://www.tsa.gov/travel/security-screening

---

## Important information

We have partnered with leading travel industry service providers, allowing you to conveniently book services which complement your booking on our website. Please read the terms and conditions when booking partner services. Payments may be processed by the provider according to the applicable terms and conditions. Customers can contact the service provider directly for additional special requests, modifications or cancellations. This also applies to modifications or cancellations caused by changes or disruptions to your flight itinerary or similar unforeseen circumstances. Qatar Airways has no influence on the rates, or on the terms and conditions offered by our partners, and we are not responsible for these services.

Please do not reply to this message. For customer support, visit qatarairways.com/help.

---

**3 attachments**

 **FareRules.html**
13K

 **GENERAL_CONDITIONS_OF_CONTRACT_AND_NOTICE.pdf**
561K

**Email.html**
66K

# EXHIBIT D

**From:** Dmitry Kozko <dk@motorsportgames.com>
**To:** Zach Griffin <zach.griffin@motorsportgames.com>
**Subject:** Conversation with Dmitry Kozko,Zach Griffin
**Date:** Wed, 05 Jan 2022 10:56:05 -0500
**Importance:** Normal
**Attachments:** Screen_Shot_2022-01-05_at_10.55.49_AM.png
**Inline-Images:** 0-eus-d12-cf7b6263390dc0997546bb01e42b322d

---

FYI. Nothing to worry about obviously, but just so we're in sync

**Stephen Hood**   10:26 AM
Dima, do you know why Zach is travelling to the US for next week?

10:26 AM
Because I asked him to come and he is moving here permanently, so he is in a process of searching for a place.

**Stephen Hood**   10:27 AM
Right over the deliverable of BTCC, when he's already the bottleneck for it

CONFIDENTIAL

# EXHIBIT E

**From:** Dmitry Kozko <dk@motorsportgames.com>
**To:** Anne Dongois <adongois@lunerouge.com>, Andy Stack <astack@hanaiworld.com>, Zach Griffin <zach.griffin@motorsportgames.com>
**Cc:** Sebastian Garcia <sg@motorsport.com>
**Subject:** Re: DImitri's contact
**Date:** Sat, 12 Mar 2022 15:06:31 -0500
**Importance:** Normal
**Inline-Images:** image001.png; image002.png

---

Hi Anne,

Was pleasure to see you guys as well. Thank you for your comments.

@Andy, it's a pleasure to e-meet you. Allow me to introduce you to @Zach Griffin, our Global Director of Technology and who leads our Development Studios world wide. Zach is on his way to relocate to Miami with his family and will be here towards second half of March. Perhaps you gentlemen can have an intro call and then meet in person when your paths localy here in Miami cross.

Look forward to your discussions.
Thank you,


**Dmitry Kozko**
Chief Executive Officer
Motorsport Games (NASDAQ:MSGM)

5972 NE 4th Avenue | Miami, FL | 33137 | United States
**T:** +1 305 507 8799
**M:** +1 786 449 9222
**E:** dk@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

**From:** Anne Dongois <adongois@lunerouge.com>
**Date:** Friday, March 11, 2022 at 9:16 PM
**To:** Dmitry Kozko <dk@motorsportgames.com>, Andy Stack <astack@hanaiworld.com>
**Cc:** Sebastian Garcia <sg@motorsport.com>
**Subject:** Re: DImitri's contact

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Sebastian!
Dmitry, it was a pleasure to see you again yesterday. The achievements of your team since we last met are quite impressive!
Let me introduce you to Andy, our executive producer and tech guru 😉
I'll let you two schedule a call.
Have a great weekend!

**ANNE DONGOIS**
*Chef des communications*
*Head of communication & Chief Heart Officer*

**LUNE ROUGE**
2200 rue Stanley
Rez-de-chaussée
Montréal QC, H3A 1R6
T. 514-826-2050
lunerouge.com



---

**From:** Sebastian Garcia <sg@motorsport.com>
**Date:** Friday, March 11, 2022 at 6:57 PM
**To:** Anne Dongois <adongois@lunerouge.com>
**Subject:** Re: DImitri's contact

Dear Anne
Pleasure to see you again.
Please see Dmitry's email : dk@motorsportgames.com

Would you please also share with your team the following info.

Making of 24hrs of Lemans
https://motorsport.tv/embed/7mrk8NW1-24-hours-of-le-mans-virtual-sizzle-reel


Grand Turismo
https://www.youtube.com/watch?v=-xeUrfe3-IQ

F1 Survey:
https://us.motorsport.com/general/news/formula-1-and-motorsport-network-unveil-fan-results-of-largest-single-sports-survey-ever-conducted-/6690113/


thank you

**Sebastian Garcia**

E  sg@motorsport.com
M  +1 786 626 8081
T  +1 305 507 8799
www.motorsportnetwork.com
5972 NE 4th Avenue | Miami | FL 33137

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

---

**From:** Anne Dongois <adongois@lunerouge.com>
**Sent:** Friday, March 11, 2022 12:19 PM
**To:** Sebastian Garcia <sg@motorsport.com>
**Subject:** DImitri's contact

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sebastian,
I was a pleasure to see you yesterday.
Could you please send me Dimitri's email so I can introduce him to Andy on our technical team?
Thanks!

**ANNE DONGOIS**
*Chef des communications*
*Head of communication & Chief Heart Officer*
*Chief of Staff to Guy Laliberté*

**LUNE ROUGE**
2200 rue Stanley
Rez-de-chaussée
Montréal QC, H3A 1R6
T. 514-826-2050
lunerouge.com



CONFIDENTIAL

# EXHIBIT F



May 6th, 2022

Sent via email – zach.griffin@motorsportgames.com

**PRIVATE & CONFIDENTIAL**

Dear Zach,

This letter is to confirm that as of today, May 6th, 2022 The Schedule to your contract of employment, entered into as between you and Motorsport Games Australia Pty Ltd on March 19, 2021 is hereby amended as follows:

Item 8 of the schedule titled "Remuneration" is hereby amended and restated as follows:Rate:

   $240,000 USD per annum, inclusive of superannuation.

Item 9 of the schedule titled "Other Benefits", subsection ii) "Benefit 2"is hereby amended and restated as follows:

   An annual bonus of twenty percent (20%) of your annual remunertion to be paid in two instalments of ten percent (10%) each ($24,000), in January and June of each respective year during the term of your employment For the avoidance of doubt this change shall override the previous terms agreed in the contract and will not be in addition to the previous terms of this section.

Yours Sincerely,

**Dara M Malavolta**
Director of Human Resources, Motorsport Games (NASDAQ: MSGM)

5972 NE 4th Avenue | Miami, FL.|  33137
**M** +1 914 819 7764
**E** Dara.Malavolta@motorsportgames.com

**Motorsport Games Inc.**
**T**   +1 305 507 3799
**E**   info@motorsportgames.com
**W**   www.motorsportgames.com

# EXHIBIT G



May 6th, 2022

To Whom It May Concern,

We Motorsport Games Inc., a United States based entity, have called on Zach Griffin to relocate to our main headquarters in Miami, Florida, to pursue a promotion opportunity within our business.

Please see Zach's attached employment agreement, as well as his recent amendment to contract highlighting the recent changes.

As Zach continues to pursue his work visa, we hope that this letters provides clarity on his current role within our organization. Should you have any additional questions please feel free to reach out directly.


Yours Sincerely,


**Dara M Malavolta**
Director of Human Resources, Motorsport Games (NASDAQ: MSGM)

5972 NE 4th Avenue | Miami, FL.|  33137
**M** +1 914 819 7764
**E** Dara.Malavolta@motorsportgames.com

**Motorsport Games Inc.**
**T**   +1 305 507 3799
**E**   info@motorsportgames.com
**W**  www.motorsportgames.com

CONFIDENTIAL

# EXHIBIT H



# APARTMENT LEASE CONTRACT



Date of Lease Contract: _____ **May 19, 2022** _____
*(when the Lease Contract is filled out)*

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract)*:

**Francesca Holmes, Zachary Griffin**

_____

_____

_____

_____

_____

_____

_____

_____

_____

and *us*, the owner: **Miami Midtown VI Owner LLC**

_____

_____

_____

*(name of apartment community or title holder)*. You've agreed to rent Apartment No. _____ **1711** _____, at **3131 NE 1st Ave**

*(street address)* in _____ **Miami** _____ *(city)*, Florida, _____ **33137** _____ *(zip code)* (the "dwelling unit" or the "premises") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors in interest or assigns). Written or electronic notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

The ☐ Owner or ☐ Manager of these apartments is _____

_____

_____

whose address is _____

_____. Such person or company is authorized to receive notices and demands in the landlord's behalf.

A lease termination notice must be given in writing. Notice to the landlord must be delivered to the management office at the apartment community or any other address designated by management as follows: _____

_____

_____

Notice to the tenant must be delivered to the Resident's address as shown above.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract)*:

_____

_____

_____

_____

_____

_____

_____

_____

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than _____ **14** _____ days without our prior written consent. *If the previous space isn't filled in, two days per month is the limit.*

**3. LEASE TERM AND TERMINATION NOTICE REQUIREMENTS.** The initial term of the Lease Contract begins on the _____ **20th** _____ day of _____ **May** _____, _____ **2022** _____, and ends at 11:59 p.m. the _____ **19th** _____ day of _____ **August** _____, _____ **2023** _____. This Lease Contract will automatically renew month-to-month unless either party gives at least _____ **60** _____ days' written notice of termination or intent to move-out as required by this paragraph and paragraph 47 (Move-Out Notice). If the number of days isn't filled in, at least 30 days' notice is required. In the event you fail to provide us with the required number of days' written notice of termination and intent to vacate coinciding with the lease expiration date, as required by this paragraph and paragraph 47 (Move-Out Notice), you acknowledge and agree that you shall be liable to us for liquidated damages in the sum of $ _____ **4800.00** _____ (equal to one month's rent) if we give you the advanced written notice required by Fla. Stat. § 83.575(2). This liquidated damages amount is exclusive to insufficient notice under this paragraph and paragraph 47 (Move-Out Notice), and does not limit collection rights with regard to other amounts potentially owed to us. If the lease term is not a month-to-month tenancy, we must notify you with written notice no later than _____ **60** _____ days before the end of the lease term if the lease will not be renewed.

**Month-to-Month Tenancies:** In the event this Lease Contract renews on a month-to-month basis, you must pay the amount of rent we charge at the time the month-to-month tenancy commences pursuant to this paragraph and paragraph 15 (Rent Increases and Lease Contract Changes), inclusive of any applicable month-to-month fees and/or premiums. We may change your rent at any time thereafter during a month-to-month tenancy by giving you no less than 30 days' written notice. You will be required to abide by all notice requirements set forth in the lease and remain liable to pay all other applicable charges due under the lease during your month-to-month tenancy unless specifically changed in writing. All sums due under this paragraph shall be additional rent. We may require you to sign an addendum written for month-to-month tenants. Either party may terminate a month-to-month tenancy by giving the other party written notice no later than 15 days' prior to the end of the monthly rental period. If you fail to provide us at least 15 days' written notice to terminate a month-to-month tenancy prior to the end of the monthly rental period, you shall be liable to us for an additional 1 month's rent.

**Saint Petersburg:** Either party may terminate a month-to-month tenancy by giving the other party written notice no later than 21 days' prior to the end of the monthly rental period. If you fail to provide us at least 21 days' written notice to terminate a month-to-month tenancy prior to the end of the monthly rental period, you shall be liable to us for an additional 1 month's rent.

**Miami-Dade County:** Either party may terminate the month-to-month tenancy by giving the other party not less than 60 days' written notice prior to the end of any monthly period. We may change your rent at any time thereafter during a month-to-month tenancy by giving you no less than 60 days' written notice. You will be required to abide by all notice requirements set forth in the lease and remain liable to pay all other applicable charges due under the lease during your month-to-month tenancy unless specifically changed in writing. All sums due under this paragraph shall be additional rent. This paragraph is only applicable if the dwelling unit is located in Miami-Dade County.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ _____ **4800.00** _____, due on or before the date this Lease Contract is signed.

Any security deposit or advance rent you paid is being held in one of the following three ways as indicated below [Landlord check one option]:

☒ 1. In a separate NON-INTEREST bearing account for your benefit in the following bank: **PNC Bank**

_____

whose address is **249 Fifth Avenue Pittsburgh PA, 15222**

_____; OR

✔ Blue Moon eSignature Services Document ID: 317159245

☐ 2. In a separate INTEREST bearing account for your benefit in the following bank: _____

whose address is _____

_____

_____.

If an interest bearing account, you will be entitled to receive and collect interest in an amount of at least 75 percent of the annualized average interest rate payable on such account or interest at the rate of 5 percent per year, simple interest, whichever the landlord elects.

☐ 3. In a commingled account at the following bank _____

whose address is _____

_____

_____

provided that the landlord posts a surety bond with the county or state, as required by law, and pays you interest on your security deposit or advance rent at the rate of 5 percent per year simple interest.

*FH   ZG*_____ Initials of Resident. Resident acknowledges receiving a copy of F.S. 83.49(2)(d) which provides as follows:

YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND.

YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

**5. KEYS.** You will be provided __2__ apartment key(s), __2__ mailbox key(s), __2__ FOB(s), and/or __2__ other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ __4800.00__ per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☒ at **giomidtown.com resident portal**
_____
_____
_____

Prorated rent of $ __1858.06__ is due for the remainder of *[check one]*: ☐ 1st month or ☐ 2nd month, on _____
_____.

Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. We may, but are not required to, accept rent through direct debit, ACH or other electronic means established and approved by

us. If you don't pay all rent on or before the ___5th___ day of the month, you'll pay a late charge. Your late charge will be *(check one)* ☐ a flat rate of $ __0.00__ or ☒ __10__ % of your total monthly rent payment. You'll also pay a late charge of $ __75.00__ for each returned check or rejected electronic payment, plus a late charge. If you don't pay rent on time, or fail to pay any rent, utilities or contractual fees due under a prior lease if this is a renewal lease, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

We and you agree that our failure to pay rent timely or the violation of the animal restrictions results in added administrative expenses and added costs to us, the same as if we had to borrow money to pay the operating costs of the property necessary to cover such added costs. We both agree that the late fee and animal violations provisions are intended to be liquidated damages since the added costs of late payments and damages in such instances are difficult to determine. We also both agree that the amount of late rent and animal violation fees charged are reasonable estimates of the administrative expenses, costs, and damages we would incur in such instances.

All of the foregoing charges will be considered to be additional rent.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water   ☐ gas   ☐ electricity   ☐ master antenna.
☐ wastewater   ☐ trash   ☐ cable TV
☐ other _____

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected— including disconnection for not paying your bills— until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are submetered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance. Resident shall not heat the apartment using gas-operated stoves or ovens which are intended for use in cooking.

Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Landlord, they will be allocated first to non-rent charges and to rent last. Failure to maintain utilities as required herein is a material violation of the Lease and may result in termination of tenancy, eviction and/or any other remedies under the Lease and Florida law.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all Tenants, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA). We ☐ require ☐ do not require you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like. If no box is checked, renter's insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions is an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

✓ Blue Moon eSignature Services Document ID: 317159245

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your family, occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

**See Additional Special Provisions**

See any additional special provisions.

**11. EARLY MOVE-OUT.** Unless modified by an addendum, if you:
(1) move out without paying rent in full for the entire Lease Contract term or renewal period; or
(2) move out at our demand because of your default; or
(3) are judicially evicted.

You will be liable for all rent owed at the time and as it becomes due under the terms of your lease agreement until the apartment is re-rented.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment or apartment community due to a violation of the Lease Contract or rules, improper use, or negligence by you or your guests or occupants or any other cause not due to our negligence or fault as allowed by law, except for damages by acts of God to the extent they couldn't be mitigated by your action or inaction. You'll defend, indemnify and hold us harmless from all liability arising from your conduct or that of your invitees, your occupants, your guests, or our representatives who at your request perform services not contemplated in this Lease. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from your or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. CONTRACTUAL LIEN AND PROPERTY LEFT IN APARTMENT. All property in the apartment or common areas associated with the apartment is (unless exempt under state statute) subject to a contractual lien to secure payment of delinquent rent. The lien will attach to your property or your property will be subject to the lien at the time you surrender possession or abandon the premises.** For this purpose, "apartment" includes common areas associated with the apartment and interior living areas and exterior patios, balconies, attached garages, and storerooms for your exclusive use.

**Removal After Surrender or Abandonment.** We or law officers may, at our discretion, remove, dispose and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you surrender, are judicially evicted, or abandon the apartment (see definitions in paragraph 52 (Surrender and Abandonment)).

**THE LANDLORD IS NOT REQUIRED TO COMPLY WITH s. 715.104. BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY.**

*Storage.* We may store, but have no duty to store, property removed after surrender, eviction, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft except for property removed under a contractual lien. You must pay reasonable charges for our packing, removing, storing, and selling any property.

**14. FAILING TO PAY RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, or any other rent due under this lease we may end your right of occupancy and recover damages, attorney's fees, court costs, and other lawful charges.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules). If, at least 5 days before the advance notice deadline referred to in paragraph 3 (Lease Term and Termination Notice Requirements), we give you written notice of rent increases or lease changes effective when the lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 47 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in Paragraph 3 (Lease Term and Termination Notice Requirements)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in Paragraph 3 (Lease Term and Termination Notice Requirements) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in Paragraph 3 (Lease Term and Termination Notice Requirements) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.** Unless otherwise prohibited by law, if, during the term of this Lease, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the dwelling unit itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the dwelling unit, we may add this charge as Additional Rent, during the term of the Lease Contract, with thirty (30) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

**18. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it. At our request, any utility provider may give us information about pending or actual connections or disconnections of utility service to your apartment.

☑ Blue Moon eSignature Services Document ID: 317159245

## While You're Living in the Apartment

**19. COMMUNITY POLICIES OR RULES.**   You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**20. LIMITATIONS ON CONDUCT.**   The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude, and/or "No Trespass" from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract  or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community. Tenant agrees that landlord reserves the right to trespass any non-tenant from the leased premises and common areas.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.**   You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; engaging in criminal activity that threatens the health, safety, or right to peaceful enjoyment of others in or near the apartment community (regardless of arrest or conviction); storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others. You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person on the premises. You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person on the premises. If requested by us, you agree to conduct all further business with us in writing. You agree not to make, post or publish information that contains the personal information or likeness of another person, or is libelous, harassing, abusive, obscene, vulgar, sexually explicit, or is inappropriate with respect to race, gender,

sexuality, ethnicity, or other intrinsic characteristic; or is unrelated to the goods or services offered by or available at this Apartment Community; or is clearly false or misleading. You agree not to use our corporate names, slogans, images, photos, logos, internet domain names, trademarks, copyrights or trade names. Any violation of this paragraph shall be a material breach of this Lease and will entitle us to exercise all rights and remedies under the lease and law.

**22. PARKING.**   We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, recreational vehicles, and storage devices by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from parking; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.**   Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 24 (Military Personnel Clause), 32 (Responsibilities of Owner), 47 (Move-Out Notice), or by separate addendum, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**24. MILITARY PERSONNEL CLAUSE.**   All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**25. RESIDENT SAFETY AND PROPERTY LOSS.**   You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other access control devices. Upon termination of your tenancy under this paragraph, the tenant is liable for prorated rent due through the effective date of the termination payable at such time as would have otherwise been required by the terms of the lease.

**Smoke Detectors and Carbon Monoxide Detectors.**
We'll furnish smoke detectors and carbon monoxide detectors only if required by statute and we'll test them and provide working batteries when you first take possession. After that, you must test the smoke detectors and the carbon monoxide detectors on a regular basis, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable neither the smoke detectors nor the carbon monoxide detectors. If you disable or damage the smoke detectors or the carbon monoxide detectors, or fail to replace a dead battery or fail to report malfunctions to us, you will be liable to us and others for any loss, actual damages, fines imposed by any state or local agencies or municipalities, attorney fees and costs.

**Casualty Loss.**   We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. We have no duty to remove any ice,

Blue Moon eSignature Services Document ID: 317159245

water, sleet, or snow but may remove any amount with or without notice. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.**   Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property.  You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**Fire Protection.**    Please check only one box: ☐ Fire protection is **NOT** available or ☒ Fire protection **IS AVAILABLE**. Description of fire protection available *(not applicable unless the box is checked)*:
☒ Sprinkler System in apartment
☒ Sprinkler System in common areas
☒ Smoke detector
☒ Carbon monoxide detector
☒ Fire extinguisher
☐ Other (Describe):

**Building, Housing, or Health Codes.**   We will comply with the requirements of applicable building, housing, and health codes. If there are no applicable building, housing, or health codes, we will maintain the roofs, windows, screens, doors, floors, steps, porches, exterior walls, foundations, and all other structural components in good repair and capable of resisting normal forces and loads, and the plumbing in reasonable working condition. However, we are not responsible for the repair of conditions created or caused by the negligent or wrongful act or omission of you, a member of your family, or any other person on the premises, in the apartment, or in the common areas of the apartment community with your consent.

26. **CONDITION OF THE PREMISES AND ALTERATIONS.**   You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in. You must note on the form all defects or damage and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements and/or added fixtures to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**Liens for Improvements.**   The interest of the Owner/Landlord shall not be subject to liens for improvements made by the Tenant(s) or Tenant(s)' contractors as provided in Section 713.10, Florida Statutes. You shall notify all parties performing work on the premises at your request that the Lease **DOES NOT** allow any liens to attach to Landlord's/Owner's interest, and the knowing or willful failure to provide such notice to the contractor shall render the contract between you and the contractor voidable at the option of the contractor. Any violation of this provision constitutes a material breach and default of the lease entitling us to terminate your Lease and/or to seek all remedies available under this Lease and law.

**Pest Control.**   We will make reasonable provisions for the extermination of rats, mice, roaches, ants, wood destroying organisms, and bed bugs. If you are required to vacate the premises for such extermination, we shall not be liable for damages, but rent shall be abated. If you are required to vacate in order to perform pest control or extermination services, you will be given seven (7) days written notice of the necessity to vacate, and you will not be required to vacate for more than four (4) days. We may still enter your apartment as provided in Paragraph 29 (When We May Enter) of this Lease and F.S. 83.53 or upon 12 hours notice to perform pest control or extermination services which do not require you to vacate the premises. You must comply with all applicable provisions of building, housing and health codes and maintain the apartment and adjacent common areas in a clean and sanitary manner. You must properly dispose of and promptly remove all of your garbage so as to prevent foul odors, unsanitary conditions, or infestation of pests and vermin in your apartment, adjacent common areas (such as breezeways), and the common areas of the apartment community.

**Waterbeds.**   You are allowed to have a waterbed or flotation bedding systems provided it complies with any applicable building codes and provided that you carry flotation or renter's insurance which covers any damages which occur as a result of using the waterbed or flotation bedding system. You must provide us with a copy of the policy upon request. You must also name us as an additional insured at our request.

27. **REQUESTS, REPAIRS, AND MALFUNCTIONS.**   IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. *Rent will not abate in whole or in part.*

If we believe that fire, catastrophic damage, extermination issues, mold and mildew or any habitability issues whatsoever is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease Contract within a reasonable time by giving you written notice.

28. **ANIMALS.**   Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the Dwelling or Community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily

✓ Blue Moon eSignature Services Document ID: 317159245

apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a 24-hour written notice of intent to remove the animal, and (2) following the procedures of paragraph 29 (When We May Enter). We may keep or kennel the animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**29. WHEN WE MAY ENTER.**   Pursuant to Fla. Stat. §83.53, we may enter the dwelling unit at any time for the protection or preservation of the premises, in the case of an emergency, or if you unreasonably withhold consent. If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, then such persons may peacefully enter and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies) if:

(1)  we provide you with written notice to enter at least 12 hours prior to the entry to take place between the hours of 7:30 a.m. and 8:00 p.m.; and

(2)  entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector and carbon monoxide detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents; or any other reasonable business purpose.

**30. JOINT AND SEVERAL RESPONSIBILITY.**   Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of lease termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 52 (Deposit Return, Surrender, and Abandonment).

## Replacements

**31. REPLACEMENTS AND SUBLETTING.**   Replacing a resident, sub-letting, assignment, or granting a right or license to occupy is allowed only when we expressly consent in writing.

**Procedures for Replacement.**   If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents

must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**32. RESPONSIBILITIES OF OWNER.**   We'll act with customary diligence to:

(1)  keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);

(2)  maintain fixtures, furniture, hot water, heating and A/C equipment;

(3)  comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and

(4)  make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If we violate any of the above or other material provisions of the lease, you may terminate this Lease Contract and exercise other remedies under state statute only as follows:

(a)  you must make a written request for repair, maintenance, or remedy of the condition to us, specifying how we have failed to comply with Florida law or with the material provisions of this lease and indicating your intention to terminate the lease if the violation is not corrected within seven (7) days after delivery of the notice;

(b)  after receiving the request, we have a reasonable time to repair or remedy the condition, considering the nature of the problem and the reasonable availability of materials, labor, and utilities;

(c)  if our failure to comply with Florida law or material provisions of the rental agreement is due to causes beyond our control and we have made and continue to make every reasonable effort to correct the failure to comply, you may also exercise other statutory remedies.

All rent must be current at the time you give us notice of noncompliance.

**Recycling Program Disclosure Notification.**   Where required, this property participates in a recycling program that conforms to all applicable law(s) and general information, education and/or guidelines pertaining to our recycling program will be provided to you.

**33. DEFAULT BY RESIDENT.**   You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates this Lease Contract, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; or (6) any illegal drugs or paraphernalia are found in your apartment.

**Termination of Rental Agreement - Your Failure to Pay Rent Due.**   If you default by failing to pay rent when due and the default continues for three (3) days, not counting Saturday, Sunday, and court-observed legal holidays, after delivery of a written demand for payment of the rent or possession of the premises, we may

☑  Blue Moon eSignature Services Document ID: 317159245

terminate the rental agreement. Termination of this lease for non-payment of rent, or termination of your possession rights, filing of an action for possession, eviction, issuance of a writ of possession, or subsequent reletting doesn't release you from liability for future rent or other lease obligations.

**Termination of Rental Agreement - Your Failure to Comply with F.S. 83.52 or Material Provisions of the Lease.**

(1) If you default by materially failing to comply with F.S. 83.52 or material provisions of this lease, the rules and regulations, or any addenda (other than failure to pay rent due), and the non-compliance is of a nature that YOU SHOULD NOT BE GIVEN AN OPPORTUNITY TO CURE or if your non-compliance CONSTITUTES A SECOND OR CONTINUING NON-COMPLIANCE WITHIN TWELVE (12) MONTHS OF A SIMILAR VIOLATION, we may terminate the lease by delivering written notice specifying the nature of the non-compliance and our intention to terminate the lease. Upon receiving such a lease termination notice without opportunity to cure or constituting a second violation within 12 months, you will have seven (7) days from delivery of the notice to vacate the apartment and premises. Examples of non-compliance which are without opportunity to cure include, but are not limited to, destruction, damage, or misuse of our or other resident's property by your intentional acts or a subsequent or continued unreasonable disturbance.

(2) If you default by materially failing to comply with F.S. 83.52 or material provisions of this lease, the rules and regulations, or any addenda (other than failure to pay rent due), and the non-compliance is of a nature that YOU SHOULD be given an opportunity to cure it, we may deliver a written notice to you specifying the nature of the non-compliance and notifying you that unless the non-compliance is corrected within seven (7) days of delivery of the notice, we may terminate the lease. If you fail to correct the violation within seven (7) days of receiving such notice or if you repeat same conduct or conduct of a similar nature within a twelve (12) month period, we may terminate your lease without giving you any further opportunity to cure the non-compliance as provided above. Examples of non-compliance in which we will give you an opportunity to cure the violation include, but are not limited to, unauthorized pets, guests, or vehicles, parking in an unauthorized manner, or failing to keep the apartment and premises clean and sanitary. We will also have all rights under Florida law and this lease to tow or remove improperly parked vehicles in addition to our remedy of terminating the lease for such violations.

Termination of this lease for non-compliance with F.S. 83.52 or material provisions of the lease, termination of your possession rights, filing of an action for possession, eviction, issuance of a writ of possession, or subsequent reletting doesn't release you from liability for future rent or other lease obligations.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) we may file a holdover eviction lawsuit pursuant to Fla. Stat. §83.58 to recover possession of the dwelling unit, double the amount of rent due for each day that you continue to holdover and refuse to surrender possession during the holdover period, breach of contract damages, attorney fees and court costs as may be applicable; or (3) at our option, we may extend the Lease Contract term—for up to one month from the date of notice of Lease Contract extension—by delivering written notice to you or your apartment while you continue to hold over.

**Other Remedies.** We may report unpaid amounts to credit agencies. If we, or a third-party debt collector we use, try to collect any money you owe us, you agree that we or the debt collector may call you on your cell phone and may use an automated dialer. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies under state statute. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party attorney's fees and all other litigation costs. Attorney fees and all other expenses shall be deemed "costs". Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 18% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline. Unless modified by Addendum, you will also be liable for all of our actual damages related to your breach of the Lease Contract.

**Choice of Remedies and Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Early Move-Out) and all other remedies. If we regain possession of the apartment as a result of your breach of the lease, or because you surrendered possession of the apartment, or because you abandoned possession of the apartment, or because we obtained possession through eviction proceedings, unless modified by Addendum, we may either (a) treat the lease as terminated and re-take possession FOR OUR OWN ACCOUNT; (b) re-take possession of the apartment FOR YOUR ACCOUNT and attempt in good faith to re-let it in your behalf; or (c) take no action to obtain possession or re-let the apartment and continue to collect rent from you as it comes due. If we take possession of the apartment for our own account, then you will have no further liability for rents under the remainder of the lease. If we take possession of the apartment for your account and attempt to re-let it, you will remain liable for the difference between the rental remaining due under the lease and the amount we are able to recover by making a good faith effort at re-letting the premises on your behalf. We are not required to make an election of which remedies we choose to pursue nor notify you of which remedies we will select.

**Lease Renewal When A Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, We may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Remedies Cumulative.** Except where limited or prohibited by law, any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

## General Clauses

**34. ENTIRE AGREEMENT.** You understand and acknowledge that neither we nor any of our representatives have authority to make any statements, promises or representations in conflict with or in addition to the information contained in this Lease Contract or by a separate written agreement signed by you and us, and we hereby specifically disclaim any responsibility for any such statements, promises or representations. You acknowledge that you have not relied upon any such statements, promises or representations in signing this Lease Contract and waive any rights or claims arising from any such statements, promises or representations. Any current or prior understandings, statements, representations and agreements, oral or written, including but not limited to, renderings or representations in brochures, advertising or sales materials and oral statements of our representatives, if not specifically expressed in this Lease Contract, Addenda or separate writing, are void and have no effect. You acknowledge and agree that you have not relied on any such items or statements in signing this Lease Contract.

**35. NO AUTHORITY TO AMEND UNLESS IN WRITING.** This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.

**36. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, liens, or other rights isn't a waiver under any circumstances.

**37. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax or electronic signatures are binding. All notices must be signed.

☑ Blue Moon eSignature Services Document ID: 317159245

**38. MISCELLANEOUS.**
    A. Any dimensions and sizes provided to you relating to the dwelling unit are only approximations or estimates as actual dimensions and sizes may vary.
    B. Exercising one remedy won't constitute an election or waiver of other remedies.
    C. Unless prohibited by law or the respective insurance policies, if you have insurance covering the dwelling unit or your personal belongings at the time you or we suffer or allege a loss, you and we agree to waive any insurance subrogation rights.
    D. All remedies are cumulative.
    E. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
    F. All provisions regarding our non-liability or non-duty apply to our employees, agents, and management companies.
    G. This Lease Contract binds subsequent owners.
    H. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
    I. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
    J. All Lease Contract obligations must be performed in the county where the dwelling unit is located.
    K. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.
    L. **You affirmatively state that you are not a criminal sex offender.**

**39. RADON GAS:**   We are required by Florida Statute 404.056(5) to give the following notification to you. "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon gas and radon testing may be obtained from your county health department."

**40. WAIVER OF JURY TRIAL.**   In order to minimize legal expenses and, to the extent allowed by law, you and we agree that the trial of any lawsuit, claim, counterclaim, demand, action or cause of action based on statute, common law, equity, tort, personal injury, contract and/or in any way related to this Lease Contract, related to your tenancy, and/or related to your relationship with us, shall be to a judge and not a jury. YOU AND WE VOLUNTARILY WAIVE ANY RIGHT TO A JURY TRIAL.

**41. CONDOMINIUM OR HOME OWNERS ASSOCIATION RULES:**
To the extent applicable, you acknowledge that you have reviewed, understand and will abide by any Condominium or Home Owner Association Rules and Regulations ("HOA Rules") that may be in effect and promulgated from time to time. Your failure to abide by any HOA Rules is a material breach of this Lease Contract. A copy of the HOA rules is on file at the office.

**42. CONTACTING YOU.**   By signing this Lease Contract, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your Lease Contract including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**43. OBLIGATION TO VACATE.**   If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with the Lease Terms paragraph, and we accept such written notice, then you are required to vacate the apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

Although the property may currently be providing cable on a bulk basis to the resident, the property may, with 30 days notice to the resident, cease providing cable and the resident will contract directly with the cable provider for such services.

**44. FORCE MAJEURE.**   If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**45. PAYMENTS.**   Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 (Contractual Lien and Property Left In Apartment) or utility payments subject to governmental regulations) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments. We do not have to accept and may reject, at any time and at our discretion, any third party checks or any attempted partial payment of rent or other payments.

**46. ASSOCIATION MEMBERSHIP.**   We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**47. MOVE-OUT NOTICE.**   Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by the paragraph 3 (Lease Term and Termination Notice Requirements). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early (see paragraph 23 - Release of Resident) except if you are able to terminate the Lease Contract under a separate Addendum, the statutory rights explained under paragraph 11 (Early Move-Out), paragraph 23 (Release of Resident), or any other applicable law. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If the notice does not comply with the time requirements of paragraph 3 (Lease Term and Termination Notice Requirements), even if you move by the last date in the lease term, you will be responsible for damages permitted under the lease and law.   If you fail to vacate by the date set forth in any notice to vacate, we may seek the remedies and damages specified under the "Holdover" paragraph, or we may deem your notice void and you must submit a new written notice.  If you fail to provide proper notice and vacate, you will be responsible for damages permitted under the lease and law.

**48. MOVE-OUT PROCEDURES.**   The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the fifteen (15) day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**49. CLEANING.**   You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**50. MOVE-OUT INSPECTION.**   You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

☑ Blue Moon eSignature Services Document ID: 317159245

**51. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unpaid contractual fees, early termination charges, or liquidated damages if applicable; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector and carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; packing, removing, or storing property removed or stored under paragraph 13 (Contractual Lien and Property Left in Apartment); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under paragraph 28 (Animals); government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for any charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date.

**52. SURRENDER AND ABANDONMENT.**
**Surrender.**   You have surrendered the apartment when all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid.

**Abandonment.**   As set forth in Fla. Stat. s. 83.59(3)(c), in the absence of actual knowledge of abandonment, it shall be presumed that you have abandoned the apartment if you are absent from the apartment for a period of time equal to one-half the time for periodic rental payments; however, this presumption does not apply if the rent is current or you have notified us, in writing, of an intended absence.

Surrender, abandonment, and judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions, and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13 (Contractual Lien and Property Left in Apartment)), but do not affect our mitigation obligations (paragraph 33 (Default by Resident)).

## Severability, Signatures, Originals and Attachments

**53. SEVERABILITY.**   If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**54. ORIGINALS AND ATTACHMENTS.**   This Lease Contract has been executed in multiple originals, with original signatures.  We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and are hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

> **You are legally bound by this document.**
> **Read it carefully before signing.**

| Resident or Residents *(all sign below)* | Date Signed |
|---|---|
| *Francesca Holmes* | 05/21/2022 |
| *Zachary Griffin* | 05/21/2022 |
| | |
| | |
| | |
| | |

| Owner or Owner's Representative *(signing on behalf of owner)* | Date Signed |
|---|---|
| *Nicholas Attanasio* | 06/03/2022 |

**Address and phone number of owner's representative for notice purposes**

3131 NE 1st Ave

Miami FL 33137

(786) 300-9515

**Name and address of locator service** *(if applicable)*

**SPECIAL PROVISIONS (CONTINUED FROM PAGE 3)** **A late fee of 10% of the base rent will be added for any non-payment after the 5th of each month. It is hereby acknowledged this lease includes additional addenda for utilities, smoke free building, parking, animals, concessions, renters insurance and bed bugs.**

☑ Blue Moon eSignature Services Document ID: 317159245



**LEASE ADDENDUM FOR RENT CONCESSION
OR OTHER RENT DISCOUNT**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1711**_____, **3131 NE 1st Ave**

_____ (street address) in

_____**Miami**_____
(city), Florida, _____**33137**_____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**

_____
_____
_____
_____

Residents (list all residents):
**Francesca Holmes, Zachary Griffin**

_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.**  As consideration for your agreement to remain in your dwelling and to fulfill your Lease obligations throughout the full term of your Lease, you will receive the following rent Concession and or Discount.

(Check all that apply)

❏   **One-Time Concession.**  You will receive a One-Time Concession off the rent indicated in the Lease Contract in the total amount of $ _____. This Concession will be credited to your rent due for the month(s) of:

_____
_____
_____
_____ .

❏   **Monthly Discount/Concession.**  The rent indicated in the Lease Contract includes a Monthly Discount of $ _____ per month off of the suggested rental rate for your dwelling.

❏   **Other Discount/Concession.**  You will receive the following discount off the rent indicated in the Lease Contract:

_____
_____
_____
_____
_____

❏   **Non-Monetary Concession.**  You will receive the following non-monetary concession during the term of the Lease:

_____
_____
_____
_____
_____

**4. CONCESSION CANCELLATION AND CHARGE-BACK.** The concession and discounts indicated above are provided to you as an incentive and with the understanding that you will fulfill your obligations under the Lease Contract through the entire term of your Lease.

Unless modified by Addenda, if you breach the lease by failing to timely pay the full amount of rent, utilities, and contractual fees due, or your lease is terminated early due to your default (for example, if you abandon the premises without paying rent or are evicted), this Concession/Discount Agreement will be immediately terminated, and you will be required to immediately repay to the Owner the amounts of all (Check all that apply)

❏   Concessions
❏   Discounts

that you have actually received for the months you resided in the Premises, and without further notice from us.

**5. MARKET RENT.**   The market rent for this dwelling is the rent stated in the NAA Lease Contract. You acknowledge that the market rent is a fair representation of what the specific dwelling would actually rent for at the time the Lease Contract was negotiated and executed, and is reflective of the rent for a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.**   The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
(All residents must sign)

*Francesca Holmes*
*Zachary Griffin*

_____
_____
_____

**Owner or Owner's Representative**
(signs here)

*Nicholas Attanasio*

_____

**Date of Lease Contract**

**May 19, 2022**

© 2021, National Apartment Association, Inc. - 7/2021, Florida



☑ Blue Moon eSignature Services Document ID: 317159245



## UTILITY AND SERVICES ADDENDUM



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated
_____**May 19, 2022**_____ between **Miami Midtown VI Owner LLC**_____
_____

("We" and/or "we" and/or "us") and **Francesca Holmes, Zachary Griffin**_____
_____
_____
_____
_____
_____

("You" and/or "you") of Unit No. _____**1711**_____ located at **3131 NE 1st Ave**_____
_____ (street address) in **Miami, FL 33137**_____
_____ and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum
to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract.
Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum
shall control.

1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.

   a) **Water** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: **1**_____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ☒ 3rd party billing company if applicable **Conservice**_____

   b) **Sewer** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: **1**_____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ☒ 3rd party billing company if applicable **Conservice**_____

   c) **Gas** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   d) **Trash** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   e) **Electric** service to your dwelling will be paid by you either:
      ☒ directly to the utility service provider; or
      ❑ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   f) **Stormwater** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   g) **Cable TV** service to your dwelling will be paid by you either:
      ☒ directly to the utility service provider; or
      ❑ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   h) **Master Antenna** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   i) **Internet** service to your dwelling will be paid by you either:
      ☒ directly to the utility service provider; or
      ❑ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   j) **Pest Control** service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ pest control bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

   k) (Other) _____ service to your dwelling will be paid by you either:
      ❑ directly to the utility service provider; or
      ❑ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         ❑ If flat rate is selected, the current flat rate is $ _____ per month.
         ❑ 3rd party billing company if applicable _____

☑ Blue Moon eSignature Services Document ID: 317159245

l)   (Other) _____ service to your dwelling will be paid by you either:
  ❑ directly to the utility service provider; or
  ❑ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
    ❑ If flat rate is selected, the current flat rate is $ _____ per month.
    ❑ 3rd party billing company if applicable _____

METERING/ALLOCATION METHOD KEY
"1"  - Sub-metering of all of your water/gas/electric use
"2"  - Calculation of your total water use based on sub-metering of hot water
"3"  - Calculation of your total water use based on sub-metering of cold water
"4"  - Flat rate per month
"5"  - Allocation based on the number of persons residing in your dwelling unit
"6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7"  - Allocation based on square footage of your dwelling unit
"8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9"  - Allocation based on the number of bedrooms in your dwelling unit
"10" - Allocation based on a lawful formula not listed here
       (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

2.  If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

    If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3.  When billed by us directly or through our billing company, you must pay utility bills within _____ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late fees or final bill fees, you shall pay such fees as indicated below.

    New Account Fee:                          $ _____  (not to exceed $ _____ )
    Monthly Administrative Billing Fee:       $ _____  (not to exceed $ _____ )
    Late Fee:                                 $ _____  (not to exceed $ _____ )
    Final Bill Fee:                           $ _____  (not to exceed $ _____ )
    If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4.  You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ ____40.00____ .

5.  When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6.  We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7.  You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8.  Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9.  You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify Owner of any change in such number of occupants and/or the identity of occupants.

10. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

11. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

12. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

    **The monthly fee for trash is $25 per month. Regular pest control service & natural gas is included in the monthly rent**
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

☑ Blue Moon eSignature Services Document ID: 317159245

| | | | |
|---|---|---|---|
| Resident Signature | *Francesca Holmes* | Date | 05/21/2022 |
| Resident Signature | *Zachary Griffin* | Date | 05/21/2022 |
| Resident Signature | | Date | |
| Resident Signature | | Date | |
| Resident Signature | | Date | |
| Resident Signature | | Date | |
| Management | *Nicholas Attanasio* | Date | 06/03/2022 |

© 2018, National Apartment Association, Inc. - 7/2018, Florida

☑ Blue Moon eSignature Services Document ID: 317159245



**MOLD INFORMATION AND PREVENTION ADDENDUM**



*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1711**_____, **3131 NE 1st Ave**
_____ *(street address)* in
_____**Miami**_____
*(city)*, Florida, _____**33137**_____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

**4. PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for

water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out

- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

- Keep the thermostat set on the "COOL" and "FAN/AUTO" setting (not "FAN/ON" setting or "OFF" setting) to automatically circulate air in the event temperatures rise to or above 75 degrees during winter months, or 78 degrees during summer months. Relative humidity levels should be maintained under 60% at all times in order to prevent conditions conducive to the growth of mold and mildew.

**5. IN ORDER TO AVOID MOLD GROWTH**, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

**6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

☑ Blue Moon eSignature Services Document ID: 317159245

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:**   (1) visible mold on *porous surfaces,* such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.**   Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

   **If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **TERMINATION OF TENANCY.**   Owner, Management or agent reserves the right to terminate the tenancy and RESIDENT(S) agree to vacate the premises in the event Owner, Management or agent in its sole judgment feels that either there is mold/mildew present in the dwelling unit which may pose a safety or health hazard to RESIDENT(S) or other persons and/or

RESIDENT(S) actions or inactions are causing a condition which is conducive to mold/mildew growth. If RESIDENT fails to vacate the dwelling after receiving a written notice to vacate, RESIDENT assumes all risks of remaining in the dwelling and shall be liable for any resulting damage to person or property.

10. **SPECIAL PROVISIONS.**   The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

*Francesca Holmes*
_____
*Zachary Griffin*
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

*Nicholas Attanasio*
_____

**Date of Lease Contract**

**May 19, 2022**
_____

Florida/National Apartment Association Official Form, July 2018
National Apartment Association, Inc.

☑ Blue Moon eSignature Services Document ID: 317159245



# BED BUG ADDENDUM



Date: **May 19, 2022**
(when this Addendum is filled out)

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1711**, **3131 NE 1st Ave**
_____ *(street address)* in
**Miami**
*(city)*, Florida, **33137** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
Residents *(list all residents):*
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE:** This addendum modifies the Lease Contract to address any infestation of bed bugs (Cimex lectularius) that might be found in the dwelling or on your personal property. We will rely on representations that you make to us in this addendum.

**4. MANAGEMENT REPRESENTATION AND INSPECTION:** Management represents that it is not aware of any current infestation or presence of bed bugs in the dwelling unit. Under Florida law, only a licensed pest control professional, hereinafter "Pest Control" is permitted by law to inspect for insects and render an opinion as to infestation or the lack thereof. You acknowledge that you have either: (a) inspected the dwelling before moving in or signing this addendum, and you did not find any evidence of bed bugs or bed-bug infestation; or (b) you will inspect the dwelling within 48 hours of receiving keys for possession of the dwelling and will notify us of any bed bugs or bed-bug infestation. If you do not notify us of any bed bugs within 48 hours of receiving keys for possession of the dwelling, you agree and represent that your dwelling does not have bed bugs at the time you took possession of the dwelling.

**5. BEDBUG INFORMATION:** Resident represents and agrees that he or she has read the information about bed bugs provided by Management and is not aware of any infestation or presence of the bed bugs in Resident's current or previous dwelling(s), home(s), furniture, clothing, or personal property and possessions and has fully disclosed to Management any previous bed bug infestation or issues which Resident may have experienced or are experiencing and has not been subjected to or living in an environment, dwelling, or home in which there was a bed bug infestation or presence. Resident represents that if he or she WAS previously living in a dwelling or home that had a bed bug infestation that he or she has had all furniture, clothing, and personal property or belongings professionally and properly cleaned and treated by Pest Control that shall certify such items are free of further infestation. In the event Resident discloses a previous experience of bed bug infestation, Management shall have the right to see documentation of the treatment from Pest Control and inspect Resident's personal property and possessions to confirm the absence of bed bugs.

**6. USED AND DISCARDED ITEMS:** Resident acknowledges that used, abandoned or discarded furniture, clothing, and personal property can contain bed bugs which may infest the dwelling and be extremely difficult to control, and the costs associated with treating bed bugs are expensive. Resident represents and agrees that he or she shall not allow such property to enter the dwelling without confirming the absence of bed bugs or having such items properly and professionally cleaned and treated by Pest Control before bringing such items into the dwelling. Resident shall be required to provide proof that any such item has been inspected and or treated by Pest Control.

**7. ACCESS BY MANAGEMENT AND PEST CONTROL AND RESIDENT COOPERATION:** Resident shall allow Management, Maintenance staff and Pest Control to have full access to the dwelling at reasonable times and hours for inspection, pest control, and treatment of bed bugs if any exist. Resident and the Resident's family members, occupants, social guests, and invitees shall cooperate and shall not interfere in any way with inspections or treatments, or this shall constitute a material breach of the lease agreement. Upon confirmation of the presence or infestation of bed bugs, Resident must cooperate and coordinate with Management and Pest Control to treat and attempt to eliminate the bed bugs. Resident must follow all directions of Management and Pest Control to treat the dwelling. Management and Management's Pest Control shall have the right to set all conditions necessary for inspection and treatment of the premises for the presence or infestation of bed bugs. Simultaneously as we treat the dwelling, unless otherwise prohibited by law, you must, at your expense, have your personal property, furniture, clothing, and possessions treated according to accepted treatment methods by a licensed pest-control company that we approve. The Resident is required to remove or destroy personal property that cannot be treated or cleaned in the opinion of Management or Pest Control and holds Management and Pest Control harmless for any loss or damages to such personal property. Failure to comply shall constitute a material breach of the Lease Contract and this Addendum.

**8. NOTIFICATIONS BY RESIDENT:** Resident shall promptly notify Management of any conditions that may indicate the presence of bed bugs in the dwelling or in any of Resident's clothing, furniture, and/or other personal property. Resident shall promptly notify Management of any recurring or unexplained bites, irritations, sores of the skin or body which Resident believes are occurring from bed bugs or from any condition or pest believed to be within the dwelling. Resident shall promptly notify Management if he or she discovers any condition or evidence that might indicate the presence or infestation of bed bugs. Resident shall not try to treat the dwelling for a bed bug infestation on his own or hire any outside pest control company and acknowledges that Management has the full right to select its own Pest Control to perform treatments and cleaning of the dwelling and building if necessary. Failure to comply shall constitute a material breach of the Lease Contract and this addendum.

☑ Blue Moon eSignature Services Document ID: 317159245

9. **METHOD OF TREATMENT:** If Management decides to have the dwelling treated and not terminate the tenancy, Management along with Pest Control shall have the sole right to select the method of treating the dwelling or any affected areas. Resident is responsible to follow all protocols or directions from Management and/or Pest Control. Failure to comply shall constitute a material breach of the Lease Contract and this Addendum.

10. **ON SITE TRANSFERS OR TEMPORARY VACATING:**

   **A.   On-Site Transfers:** If Resident is allowed to transfer on-site to another dwelling in the community, Resident must have his or her personal property and possessions professionally treated by Pest Control prior to transfer in accordance with the instructions of Management and Pest Control and cooperate in preventing further infestation or spreading of bed bugs to another dwelling or building. TRANSFERS TO ANOTHER DWELLING ARE NOT GUARANTEED even if Resident is deemed by Management or Pest Control not to be at fault. Resident will not be eligible for transfer on-site to another dwelling in the community if, in the sole opinion of Management OR Pest Control, Resident or Resident's family members, occupants, social guests, or invitees caused, or are responsible for the infestation or presence of bed bugs in the dwelling or building, have not followed the necessary procedures mandated by Management or Pest Control or if in the opinion of Pest Control, the bed bugs have not been eradicated from the Resident's personal property or an on-site transfer will cause a re-infestation. Failure to comply shall constitute a material breach of the Lease Contract and this Addendum.

   **B.   Temporary Vacating:** If Resident is forced to temporarily vacate the premises and find other temporary accommodations, under Florida law FS 83.51(2)(a)1., Management's only legal responsibility is to abate the rent for the time period Resident cannot reside in the dwelling. Management may choose at its sole option to pay other expenses Resident may incur but has no legal obligation to do so under Florida law. If Resident is requested to temporarily vacate, they shall do so within 7 days of written notice to Resident or this shall be considered a material breach of the Lease Contract and this Addendum. Once Resident has been advised that the dwelling is habitable, Management shall have no further responsibility to abate rent, and Resident shall owe rent and all sums due per the Lease Contract and any addenda.

11. **RESIDENT CAUSED CONDITIONS:** If Resident or Resident's family members, occupants, social guests, or invitees are responsible for causing or introducing bed bugs into the dwelling, Resident shall be in default of the lease, subject to eviction, and shall be liable for all rent, damages, cleaning and pest control fees, and other charges related to dealing with the bed bug issue, and Resident shall pay all reasonable costs of cleaning and pest control treatment Management incurs to remedy the bed bug infestation situation. If Management must move other residents out of their dwellings in order to treat adjoining or neighboring dwellings, then Resident shall be liable for payment of any lost rental income and other expenses incurred by Management to relocate the other residents and perform pest control treatment to eradicate an infestation in other dwellings.

12. **NON-RESIDENT CAUSED BED BUG INFESTATIONS:** If in the sole opinion of Management and Pest Control the Resident or Resident's family members, occupants, social guests, or invitees are not responsible for causing or introducing bed bugs into the dwelling, AT MANAGEMENT'S OPTION the Lease Contract may be terminated and Resident may still be required to vacate the dwelling and return possession of the premises to Management if it is determined by Pest Control that it is not feasible to eradicate the infestation with the Resident continuing to reside on the premises. Management shall not be responsible for Resident's consequential losses if the Lease Contract is so terminated.

13. **DAMAGES:** Under no circumstances shall Management or Resident be liable to each other for punitive damages for breach of contract related to bed bugs.

14. **LEASE TERMINATION:** In the event bed bugs are determined to be in the dwelling, Management shall have the right to terminate the tenancy by giving Resident seven days' written notice requiring Resident to permanently vacate the dwelling and remove all furniture, clothing, and personal belongings. Management in its sole judgment shall have the right to terminate the tenancy and obtain possession of the dwelling regardless of who is responsible for causing the infestation or presence of bed bugs. Due to the difficulty of treating and the often repetitive treatments necessary to control the infestation, Resident must vacate the dwelling upon such termination. A Resident who fails to vacate after the lease has been terminated shall be subject to an eviction action and assumes all risks of remaining in the dwelling.

15. **INVALID OR UNENFORCEABLE PROVISIONS:** If any portion or provision of this addendum is declared to be invalid or unenforceable, then the remaining portions shall be severed and survive and remain enforceable. The court shall interpret and construe the remaining portion of this addendum so as to carry out the intent and effect of the parties.

16. **SPECIAL PROVISIONS.** _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All residents must sign)* | *(Signs below)* |
| *Francesca Holmes* | *Nicholas Attanasio* |
| *Zachary Griffin* | **Date of Signing Addendum** |
| | 06/03/2022 |

☑ Blue Moon eSignature Services Document ID: 317159245

## BED BUGS - A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed.

However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.

- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

Florida/National Apartment Association Official Form, December 2019
© 2019, National Apartment Association, Inc.



✓ Blue Moon eSignature Services Document ID: 317159245



**LEASE CONTRACT ADDENDUM**
**CHOICE OF DAMAGES, EARLY TERMINATION OF LEASE CONTRACT**



**DWELLING UNIT DESCRIPTION.**   Unit No. _____**1711**_____, **3131 NE 1st Ave**

_____ *(street address)* in

_____**Miami**_____ *(city)*, Florida, _____**33137**_____ *(zip code)*.

**LEASE CONTRACT DESCRIPTION.**   Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____

Residents *(list all residents)*:

**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

In accordance with Florida Statutes §83.595, in the event you breach the Lease Contract for the dwelling unit, and we have obtained a writ of possession, or you have surrendered possession of the dwelling unit before the lease term expires, or you have abandoned the dwelling unit, you may choose to pay a liquidated damage or early termination fee amount instead of other statutory damages to which we may be entitled. As such, you may elect to pay a fixed amount as specified below under Choice 1 (pursuant to Fla. Stat. §83.595(4)) OR you may elect to allow us to charge what is otherwise allowed by statute under Choice 2 (pursuant to Fla. Stat. §83.595(1), (2) or (3)). This choice must be made at the time the Lease Contract is signed. If no choice is made, and you breach the Lease Contract as set forth herein, then we will charge what is allowed by Florida Statutes and the Lease Contract.

*Mark only one Choice.*

| | |
|---|---|
| **Choice 1**<br><br>☒ *FH    ZG*<br>_____<br>Initial | You agree to pay $ __9600.00__ (an amount that does not exceed 2 month's rent) to us as liquidated damages or early termination fee in accordance with Fla. Stat. §83.595(4) if you breach the Lease Contract and we have obtained a writ of possession, or if you have surrendered possession of the dwelling unit before the lease term expires, or if you have abandoned the dwelling unit, or if you elect to terminate the Lease Contract before the lease term expires. You understand and accept this liquidated damage or early termination fee specified herein, which election is made by you at the inception of the Lease Contract.<br><br>In the event this Choice 1 is elected, then we are entitled to rent and all other charges (including property damages to the dwelling unit beyond normal wear and tear) accrued through the end of the month in which we retake possession of the dwelling unit, in addition to the liquidated damages or early termination fee amount set forth in this paragraph in accordance with Fla. Stat. §83.595(4). However, we waive the right to seek additional rent beyond the month in which we retake possession. |
| **Choice 2**<br><br>☐<br>_____<br>Initial | You do not agree to liquidated damages or early termination fee and you acknowledge that we may seek damages as provided by law in accordance with Florida Statutes §83.595(1), (2) or (3) if you breach the Lease Contract and we have obtained a writ of possession, or if you have surrendered possession of the dwelling unit before the lease term expires, or if you have abandoned the dwelling unit, or if you elect to terminate the Lease Contract before the lease term expires.<br><br>In the event this Choice 2 is elected, you may owe future rents as they become due under the lease. |

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All Residents must sign here)* | *(signs here)* |
| *Francesca Holmes*          05/21/2022 | *Nicholas Attanasio* |
| Resident                         Date | |
| *Zachary Griffin*            05/21/2022 | |
| Resident                         Date | **Date of Lease Contract** |
| _____      _____ | **May 19, 2022** |
| Resident                         Date | |
| _____      _____ | |
| Resident                         Date | |
| _____      _____ | |
| Resident                         Date | |
| _____      _____ | |
| Resident                         Date | |

Florida/National Apartment Association Official Form, July 2018
© 2018, National Apartment Association, Inc.



☑ Blue Moon eSignature Services Document ID: 317159245



**ADDENDUM PROHIBITING
SHORT-TERM SUBLETTING OR RENTAL**



1. **DWELLING UNIT DESCRIPTION.**
Unit No. _____1711_____, 3131 NE 1st
Ave _____
_____ (street address) in
_____Miami_____
(city), Florida, _____33137_____ (zip code).

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: May 19, 2022
Owner's name: Miami Midtown VI Owner LLC
_____
_____
_____
_____

Residents (list all residents):
Francesca Holmes, Zachary Griffin
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **SHORT TERM SUBLEASE OR RENTING PROHIBITED.** Without limiting the prohibition in the Lease on subletting, assignment, and licensing, and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting, licensing, or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com, VRBO, Craigslist, Couchsurfing, HomeAway, VacationRental, TripAdvisor, FlipKey or any other advertising, website, internet, listing service, or other similar internet sites.

4. **PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.** You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com, VRBO, Craigslist, Couchsurfing, HomeAway, VacationRental, TripAdvisor, FlipKey or any other advertising, website, internet, listing service, or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com, VRBO, Craigslist, Couchsurfing, HomeAway, VacationRental, TripAdvisor, FlipKey or any other advertising, website, internet, listing service, or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

5. **VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

6. **REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

7. **RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, personal injury, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

8. **SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
(All residents must sign)

*Francesca Holmes*
_____
*Zachary Griffin*
_____
_____
_____
_____

**Owner or Owner's Representative**
(Signs below)

*Nicholas Attanasio*
_____

**Date of Signing Addendum**
_____06/03/2022_____

© 2020, National Apartment Association, Inc. - 7/2020, Florida

☑ Blue Moon eSignature Services Document ID: 317159245



**CRIME/DRUG FREE HOUSING ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. ___1711___, 3131 NE 1st Ave
_____ (street address) in
___Miami___
(city), Florida, ___33137___
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents (list all residents):
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ADDENDUM APPLICABILITY.**   In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner.  The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.**   Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A.   Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.
2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.
3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Florida and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)
5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.
6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.
7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.
8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B.   YOU AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.**   Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.**   The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** (sign here) | **Date of Signing Addendum** |
|---|---|
| _Francesca Holmes_ | 05/21/2022 |
| _Zachary Griffin_ | 05/21/2022 |
| | |
| | |
| | |

| **Owner or Owner's Representative** (signs here) | **Date of Signing Addendum** |
|---|---|
| _Nicholas Attanasio_ | 06/03/2022 |

© 2018, National Apartment Association, Inc. - 7/2018, Florida



☑ Blue Moon eSignature Services Document ID: 317159245



## MIXED USE ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1711**, **3131 NE 1st Ave**
_____ (street address) in
**Miami**
(city), Florida, **33137** (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents *(list all residents):*
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This document shall serve as an addendum ("the Addendum") to the residential lease contract (the "Lease") between Resident and Owner. Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** The purpose of this Addendum is to provide you with notice that the dwelling is located in a mixed-use living environment. The area surrounding the dwelling contains both residences and commercial businesses. These commercial entities will produce certain noises, sounds, and odors up to twenty-four (24) hours a day.

**4. RESIDENT ACKNOWLEDGEMENT.** By signing this Addendum, Resident acknowledges, understands and hereby agrees:

The dwelling is located in the immediate area of commercial businesses, including, but not limited to, bars, nightclubs, restaurants, railways, trains, train traffic and retail stores. Certain challenges may be associated with living in immediate proximity to such commercial businesses. These challenges may include these businesses emitting, but are not limited to: lights, noises, sounds (including but not limited to music, voices and other forms of entertainment), train noises, vibrations, odors and smoke, which may penetrate the walls and floors of the dwelling. Such challenges may occur up to twenty-four (24) hours a day.

**5. RESIDENT DUE DILIGENCE.** Landlord has encouraged resident to research the area around their dwelling. You agree that you were given the opportunity to exercise due diligence by reading this Addendum and researching the area surrounding the dwelling. You acknowledge and understand the risks disclosed herein. Having conducted your due diligence, you agree to fully assume the risks set forth in this Addendum.

**6. ASSUMPTION OF RISK / WAIVER.** You have chosen to reside at the dwelling despite any inconveniences such as those disclosed herein or any other inconvenience, which may be associated with living in a mixed-use environment. You further agree: You are voluntarily assuming the risks of inconvenience and nuisance related to residing in a dwelling located in a mixed-use area. You agree that any inconvenience associated with the mixed-use and/or the surrounding area, such as, but not limited to, those disclosed herein, will not be deemed to give you any offset to rent obligations, nor will they be the basis for a complaint against us for rent relief, constructive eviction, fitness and habitability, peaceful and quiet enjoyment, nuisance, or any other claim, right or remedy. We shall have no duty to evict any commercial business for any lights, sounds, vibrations, odors, etc. that may occur as a result of their commercial business. As such, you waive any and all claims against us that arise out of or are in any way related to lights, noises, sounds, vibrations, smoke, odors or any other inconvenience that may be caused by commercial businesses within the mixed-use area and/or their guests.

**7. SEVERABILITY.** If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

*Francesca Holmes*
_____
*Zachary Griffin*
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

*Nicholas Attanasio*
_____

**Date of Signing Addendum**
06/03/2022
_____

© 2020, National Apartment Association, Inc. - 7/2020, Florida

☑ Blue Moon eSignature Services Document ID: 317159245



**PHOTO, VIDEO, AND STATEMENT
RELEASE ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1711** _____, **3131 NE 1st
Ave** _____
_____ *(street address)* in
_____ **Miami** _____
*(city),* Florida, _____ **33137** _____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC** ____
_____
_____
_____

Residents *(list all residents):*
**Francesca Holmes, Zachary Griffin** _____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Occupants *(list all occupants):*
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you, without payment or other consideration, agree to grant us permission to use your likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

A. CONSENT FOR MINOR OCCUPANTS. By signing this Addendum, if any minor occupants are named above, you further certify that you are the parent, or legal guardian of the minor occupant(s) named above, and you, without payment or other consideration, agree to grant us permission to use their likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

**4. PHOTO AND VIDEO RELEASE.** You hereby grant us and our agents and affiliates (collectively, the "Released Parties") permission and a license to take, use, reuse, and publish the likeness of you and any minor occupants in all photographs or other electronic and/or digital media in any and all of our publications, including, without limitation, any website entries, advertising websites, and any other marketing materials. You understand and agree that these materials will become the property of the Released Parties and will not be returned. You agree to irrevocably authorize the Released Parties to edit, alter, copy, exhibit, publish, or distribute this media for any lawful purpose whatsoever including, without limitation, promotional and advertising uses. You waive the right to inspect or approve the finished product, including any written or electronic copy, wherein your likeness appears now or in the future. In addition, you waive any right to payment, royalties, or any other compensation arising or related to the use of the media.

**5. CONSENT TO USE YOUR NAME, LIKENESS, WRITTEN COMMENTS, AND STATEMENTS.** You are expressly agreeing to allow us to post your name, picture, written comments, and statements, and/or the names, pictures, written comments, and statements of any minor occupants in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. You hereby grant the Released Parties permission and a license to use, reproduce, and publish any media on its website, social media platforms, or in other marketing-related materials, whether in electronic or print form.

**6. RELEASE OF LIABILITY.** You hereby release, hold harmless, and forever discharge us from any claims or causes of actions including, without limitation, any and all claims for libel or violation of any right of publicity or privacy, related to our use of the media in any and all of our publications, including any website entries, advertising websites, social media websites, and any other marketing material so long as the claim or cause of action does not result from our intentional misconduct or gross negligence. This consent and release shall be binding upon you and your heirs, legal representatives and assigns.

**7. REVOCATION.** You have the right to revoke your consent to our use of your name, picture, video, voice, written comments, or statement, and/or the name, picture, video, voice, written comments, or statement of any minor occupants, by written notice to us.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Blue Moon eSignature Services Document ID: 317159245

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All residents must sign)* | *(Signs below)* |

*Francesca Holmes*

*Zachary Griffin*

*Nicholas Attanasio*

**Date of Signing Addendum**

06/03/2022

© 2018, National Apartment Association, Inc. - 7/2018, Florida

☑ Blue Moon eSignature Services Document ID: 317159245



**PACKAGE ACCEPTANCE ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ 1711 _____, 3131 NE 1st
Ave _____
_____ *(street address)* in
_____ Miami _____
*(city)*, Florida, _____ 33137 _____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: May 19, 2022
Owner's name: Miami Midtown VI Owner LLC
_____
_____
_____
_____

Residents *(list all residents)*:
Francesca Holmes, Zachary Griffin
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

**4. PACKAGE ACCEPTANCE.**
**A. Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to any package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

**B. Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all.

**5. TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than ____ 14 ____ days after receipt (accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

**6. DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. You, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. You also agree to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. You also agree to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

**7. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

Packages will only be accepted in the name of the leaseholder(s). Packages in the name of the Guest(s) will be returned to sender. Unclaimed packages exceeding 30 days will be returned to sender and/or disposed of. The landlord will not be held liable for packages delivered into the lockers or at the front desk.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

*Francesca Holmes*
*Zachary Griffin*
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

*Nicholas Attanasio*

**Date of Signing Addendum**

_____ 06/03/2022 _____

© 2018, National Apartment Association, Inc. - 7/2018, Florida

☑ Blue Moon eSignature Services Document ID: 317159245



## ANIMAL ADDENDUM
*(to be completed only if an animal will occupy the dwelling unit)*
*Becomes part of Lease Contract*



Date: _____**May 19, 2022**_____
(when this Addendum is filled out)

> *Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be held liable if it causes any damage or disturbs other residents.*

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1711**_____, **3131 NE 1st**
**Ave**_____
_____ *(street address)* in
_____**Miami**_____
*(city)*, Florida, _____**33137**_____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. A.** ❑ **NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere in the dwelling unit or dwelling unit community unless we've authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

**B.** ❑ **CONDITIONAL AUTHORIZATION FOR ANIMAL.** If this box is checked you affirmatively represent and warrant that as of the date of this Lease and throughout the term of the Lease each of the animals described below is suited for living in an apartment community; does not pose a danger or threat of any kind to any person or property; has not displayed vicious, aggressive or dangerous behavior; and has never before injured you or any other person or animal or caused any damage to your or another person's property. You affirmatively represent and warrant that you have never had a claim or lawsuit filed against you or anyone else for an injury or damage caused by or related to your ownership or possession of the animal. You understand and agree that our approval of the animal to live in the apartment is expressly conditioned upon truthful disclosures and representations above, that nothing occurs during the term of the Lease that would make the disclosures or representations inaccurate or untrue and that we would not have approved the animal had you disclosed that it was dangerous, unsuited for apartment living, or had previously injured someone or damaged property. You may keep the animal that is described below in the dwelling until the Lease Contract expires.

But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DEPOSIT.** An animal deposit of $ _____ will be charged. We *[check one]* ❑ will consider, or ❑ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in the Lease Contract *[check one]* ❑ *does,* or ❑ *does not include* this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ ___**50.00**___. The monthly rent amount in the Lease Contract *[check one]* ❑ includes ☒ does not include this additional animal rent.

**6. ADDITIONAL FEE.** You must also pay a one-time fee of $ ___**500.00**___ for having the animal in the dwelling unit. It is our policy to not charge a deposit for support animals.

**7. LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**8. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or dwelling community.

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____
_____
_____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____
_____

© 2019, National Apartment Association, Inc. - 12/2019, Florida

☑ Blue Moon eSignature Services Document ID: 317159245

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

2 pet maximum per apartment. The non-refundable fee for 1 dog is $500.00 and for 2 dogs is $750.00. The non-refundable fee for a cat or max 2 cats, is $325.00. The following breeds are restricted:St. Bernard, Pit Bulls, Rottweilers, Chow Chows, Doberman Pinschers, German Shepherds, Siberian Huskies, Perro de Presa Canarios, Alaskan Malamutes, Akitas, American Staffordshire Terriers, Boxers, Great Danes, Bull Mastiffs, American Bulldogs, and Wolfhybrids. Additionally, any dog that may have the above designated breeds in their lineage is strictly prohibited. We do not allow visiting dogs.

_____
_____
_____
_____
_____

**10. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

**11. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: _____

- Outside, the animal may urinate or defecate *only* in these designated areas: _____

- Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

- You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose.

If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

- You will have the animal vaccinated and/or receive any shots or medical care as required by law. You will also obtain any licenses and/or permits for the animal as required by law. We may request proof of necessary vaccinations, licenses or permits at any time. Your failure to provide us such information is a material breach of this Lease Contract.

**12. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**13. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must permanently remove the animal from the premises within the time period specified in our notice. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**14. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**15. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling unit and remove the animal with one day's notice left in a conspicuous place. We can do this if, in our sole judgment, you have:

- abandoned the animal;
- left the animal in the dwelling unit for an extended period of time without food or water;
- failed to care for a sick animal;
- violated our animal rules; or
- let the animal defecate or urinate where it's not supposed to.

In doing this, we must follow the procedures of the Lease Contract, and we may board the animal or turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within 5 days after we remove it, it will be considered abandoned.

**16. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

☑ Blue Moon eSignature Services Document ID: 317159245

**17. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**18. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**19. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Read it carefully before signing.**

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All resident's must sign)* | *(Signs below)* |
| *Francesca Holmes* | *Nicholas Attanasio* |
| *Zachary Griffin* | |

☑ Blue Moon eSignature Services Document ID: 317159245



## SUPPORT OR SERVICE ANIMAL AMENDMENT
## TO ANIMAL ADDENDUM



Date: **May 19, 2022**
*(when this Amendment is filled out)*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1711**, **3131 NE 1st Ave**
_____ *(street address)* in
**Miami**
*(city)*, Florida, **33137** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents *(list all residents):*
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Amendment constitutes an Amendment to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Amendment vary or contradict any terms or conditions found in the Lease Contract, this Amendment shall control.

We hereby agree to allow you to have a support or service animal as a reasonable accommodation for your disability. You represent and affirm that you have properly licensed the support or service animal if there is any general municipal or governmental licensing requirement for this type of animal and that you have inoculated the animal for rabies and other usual inoculations for this type of animal. You further represent that the support or service animal does not pose a direct threat of harm or danger to any of the other residents, our staff, or any other individuals and will not cause damage to property beyond normal wear and tear. You acknowledge that the ownership of or need for the support or service animal does not entitle you to permit the animal to bother, disturb, threaten or harm other residents or persons without cause. While in common areas the animal must be supervised and the resident must retain control of the animal at all times. Resident is responsible for the proper disposal of animal waste. You acknowledge that if the animal violates the rules in this Amendment, the Animal Addendum or community rules, we have the right to evict both you and the support or service animal, as well as exercise other remedies under the lease.

The resident is responsible for the care of the support or service animal. In the event the support or service animal is sick or injured and you are unavailable to seek treatment for the animal, we will have the right (but not the duty) to contact a veterinarian and incur on your behalf any necessary veterinarian charges to render aid or treatment to the animal.

We will not charge any pet fees or a security deposit for your support or service animal. You will, however, be liable for any damages that this animal may cause.

Specifically in reference to a "service animal," you and we will comply with Fla. Stat. s. 413.08. You further acknowledge that, pursuant to Fla. Stat. s. 413.08, a person who knowingly and willfully misrepresents herself or himself, through conduct or verbal or written notice, as using a service animal and being qualified to use a service animal or as a trainer of a service animal commits a misdemeanor of the second degree, punishable as provided in Fla. Stat. s. 775.082 or s. 775.083.

Specifically, in reference to an "emotional support animal," you and we will comply with Fla. Stat. s. 760.27. You acknowledge that, unless otherwise prohibited by federal law, rule, or regulation, we may: (a) deny a reasonable accommodation request for an emotional support animal if such animal poses a direct threat to the safety or health of others or poses a direct threat of physical damage to the property of others, which threat cannot be reduced or eliminated by another reasonable accommodation; (b) if a person's disability is not readily apparent, request reliable supporting information as more fully specified in Fla. Stat. s. 760.27(2)(b) that reasonably supports that the person has a disability; (c) if a person's disability-related need for an emotional support animal is not readily apparent, request reliable information that reasonably supports the persons need for the particular emotional support animal being requested, which may include information identifying the particular assistance or therapeutic emotional support provided by the specific animal from a health care practitioner, as defined in Fla. Stat. s. 456.001; a telehealth provider, as defined in Fla. Stat. s. 456.47; or any other similarly licensed or certified practitioner or provider in good standing with his or her professions regulatory body in another state; (d) if a person requests to keep more than one emotional support animal, request information regarding the specific need for each animal; and (e) require proof of compliance with state and local requirements for licensing and vaccinating each emotional support animal. An emotional support animal registration of any kind, including, but not limited to, an identification card, patch, certificate, or similar registration obtained from the Internet is not, by itself, sufficient information to reliably establish that a person has a disability or a disability-related need for an emotional support animal. A person with a disability or a disability related need is liable for any damage done to the premises or to another person on the premises by his or her emotional support animal. A person who falsifies information or written documentation, or knowingly provides fraudulent information or written documentation, for an emotional support animal, or otherwise knowingly and willfully misrepresents himself or herself, through his or her conduct or through a verbal or written notice, as having a disability or disability related need for an emotional support animal or being otherwise qualified to use an emotional support animal, commits a misdemeanor of the second degree, punishable as provided in Fla. Stat. s. 404 775.082 or s. 775.083.

Therefore, if you misrepresent yourself as qualified to use a service animal, or an emotional support animal, you agree that such conduct constitutes a material violation of the Lease Contract, Florida law and that we shall have all rights and remedies set forth in the Lease Contract, including the right to terminate your lease, seek breach of contract damages, eviction, attorney's fees and court costs to the extent allowed by law.

© 2020, National Apartment Association, Inc. - 7/2020, Florida

☑ Blue Moon eSignature Services Document ID: 317159245

3. **SPECIAL PROVISIONS.**   The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All residents must sign)* | *(Signs below)* |
| *Francesca Holmes* | *Nicholas Attanasio* |
| *Zachary Griffin* | |
| | **Date of Signing Amendment** |
| | 06/03/2022 |

☑ Blue Moon eSignature Services Document ID: 317159245



**WASHER AND DRYER ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ 1711 _____, 3131 NE 1st Ave _____
_____ *(street address)* in
_____ Miami _____
*(city)*, Florida, _____ 33137 _____
*(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: May 19, 2022
Owner's name: Miami Midtown VI Owner LLC
_____
_____
_____
_____

Residents *(list all residents)*:
Francesca Holmes, Zachary Griffin
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** In consideration of your agreeing to rent a washer and dryer from us and by signing this Addendum, you agree to the terms and conditions set forth herein.

**4. OWNER SUPPLIED WASHER AND DRYER.**
**A. Washer and Dryer Rental Fees.** We agree to rent to you a washer and dryer for the sum of $ _____ per month, beginning on _____ and expiring concurrently with the above referenced Lease Contract, including any renewal periods.

You shall pay the monthly washer and dryer rental amount in advance and without demand, as additional rent, along with your monthly rent payment. If any monthly washer and dryer rent is not paid on or before the due date, we or our agent(s) reserve the right to remove the equipment, as provided by law.

**B. Identification of Washer and Dryer.** You are entitled to exclusive use of a:

❏ Full Size
❏ Stackable
❏ Other: _____

Washer Model/Serial Number:

_____

Dryer Model/Serial Number:

_____

The washer/dryer set will hereinafter collectively be referred to as the "equipment." You acknowledge that you have inspected the equipment, and have found the same to be in good working condition free from any defect or mechanical issue. You further acknowledge that the equipment is for your use and in consideration of your agreement to pay washer and dryer rent. We are the owner of the equipment, and you shall not remove the equipment from the dwelling. Removal

of the equipment from the dwelling without our prior written consent will constitute theft, and result in our reporting to law enforcement and pursuit of both criminal and civil penalties against you.

**C. Responsibility for Damages.** You agree to immediately report any and all repairs or maintenance needed to the equipment to us. You will be responsible for any damages to our property, or to the personal property of others, if you fail to promptly report needed repairs or maintenance, and such needed repairs or maintenance not being able to be carried out causes damage to our property, or to the personal property of others. Except as may otherwise be prohibited by law, (1) you are responsible for any damage caused by a leaking washer, and will be billed by us for such damage; (2) we are not liable for any damage caused by the equipment; (3) you agree to waive any and all claims, liabilities and actions of any nature you may ever have against us and our agents for the delivery, repair, maintenance or removal of equipment unless such claims arise from any proximately caused negligence or intentional act committed by us or our agents; and (4) you agree to indemnify and to hold us and our agents harmless from and/or for any and all damages of any nature or kind arising from your willful or negligent misuse of the equipment.

**D. Insurance.** At all times you must carry renter's insurance that provides insurance coverage for damage to your personal belongings from accidental water discharge from the equipment or other causes. The insurance must also provide coverage for any potential liability, due to your fault, for water or other damage to other units and to personal property of others. You must verify with your insurance agent that such coverages are included in your policy and must furnish us a copy of the policy upon our request.

**5. ACCESS TO WASHER AND DRYER; EMERGENCIES.** You agree to allow our agent(s) access to the dwelling and the equipment for the purpose of delivery, repair, maintenance, replacement or removal of the equipment. You agree to make any necessary preparations, including clearing a path to the laundry closet and securing all pets. Additionally, without advanced notice, you agree to allow our agent(s) access to the dwelling and the equipment in the event of an emergency, as provided by law.

**6. RESIDENT USE AND MAINTENANCE OF WASHER AND DRYER.** You agree to use the equipment for normal household purposes, to use diligence in using the equipment, and to take proper care of the equipment. An equipment operations manual will be provided to you upon your request. You acknowledge that you know how to operate the equipment. You are liable to us for all damages to the equipment beyond normal wear and tear including, but not limited to, scratches, dents, dings and costs for repairs. You must pay us for all damages to the equipment upon demand. If not previously paid, we will assess the cost of equipment rent and damages to the equipment against your security deposit and/or final account upon move-out. If you remove the equipment from the dwelling, you shall pay us the actual cost of replacing the equipment.

**7. ADDITIONAL PROVISIONS.** You agree that sums and charges owed under this Addendum are additional rent. Violation of this Addendum including, but not limited to, your failure to pay monthly equipment rent is a breach of the Lease Contract, and we shall have all remedies available including termination of the Lease Contract and eviction. In addition, upon your failure to pay equipment rent, we shall have the right to remove the equipment, as provided by law. You shall remain liable for all amounts due under this Addendum until you vacate the dwelling, including holding over or month-to-month periods, and all provisions of this Addendum will remain in full force and effect during such periods.

© 2018, National Apartment Association, Inc. - 7/2018, Florida

✓ Blue Moon eSignature Services Document ID: 317159245

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

|                        **Resident or Residents**                        |                **Owner or Owner's Representative**                |
| :------------------------------------------------------------------------: | :------------------------------------------------------------------: |
|                         *(All residents must sign)*                        |                          *(Signs below)*                          |
| *Francesca Holmes* | *Nicholas Attanasio* |
| *Zachary Griffin* | **Date of Signing Addendum** |
|  | 06/03/2022 |

© 2018, National Apartment Association, Inc. - 7/2018, Florida

☑ Blue Moon eSignature Services Document ID: 317159245




# NO-SMOKING ADDENDUM

Date: _____ **May 19, 2022** _____
(when this Addendum is filled out)

*Use of any product(s) involving smoking, burning, or combustion is prohibited in any portion of the apartment and/or entire community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. ____**1711**____, ___**3131 NE 1st Ave**___
_____
_____ *(street address)* in
_____**Miami**_____
*(city)*, Florida, _____**33137**_____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Francesca Holmes, Zachary Griffin**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, electronic cigarette, hookah, vaporizer, dab pen, juul, bowl, bong, or pipe which can be used to burn, light, vaporize, or ignite a product including, but not limited to, tobacco, marijuana, nicotine salts, THC cartridges, vape liquids, juul pods, oils or any other similar products, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke or vapor from such product.

**4. SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.**
All forms of smoking or possession of smoking products is strictly prohibited inside any dwelling, building, or interior of any portion of the Community. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited products or smoking extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

**5. SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking may be permitted only if there are specially designated areas outside the buildings of the apartment community. Smoking must be at least ____**25**____ feet from the buildings in the apartment community, including

administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage. The distance referenced above applies on development grounds **and** may apply even if you are on public property to the extent that your and/or your guest's conduct interferes with other residents' rights to quiet enjoyment of their apartment home and/or the common areas.

Smoking on balconies, patios, and common areas attached to or outside of your dwelling ☐ is ☒ is not permitted. If neither option is selected, then smoking is not permitted on balconies, patios and common areas.

The following outside areas of the community may be used for smoking: **Smoking outside the building must occur at a minimum of 25 feet away from the building.**
_____

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests. We reserve the right to modify or change the designated areas through modification to our community policies upon notification to all residents.

**6. YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of smoke, vapor, or any other byproduct of the referenced products, which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

**7. YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

**8. LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of this Addendum is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

✓ Blue Moon eSignature Services Document ID: 317159245

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is and/or will be smoke free. Smoking in certain limited outside areas may be allowed as provided above and certain areas may be in close proximity that are not under our control. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are able and/or obligated to investigate and act, and you must thereafter cooperate with us in the prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

*Francesca Holmes*
_____
*Zachary Griffin*
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(signs here)*

*Nicholas Attanasio*
_____

☑ Blue Moon eSignature Services Document ID: 317159245



### RESIDENT PARKING ADDENDUM

Date: **May 19, 2022**

(when this Addendum is filled out)



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1711** , **3131 NE 1st Ave**
_(street address)_ in
**Miami**
_(city)_, Florida, **33137**
_(zip code)._

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 19, 2022**
Owner's name: **Miami Midtown VI Owner LLC**

Residents _(list all residents)_:

**Francesca Holmes, Zachary Griffin**

The term of this Parking Addendum is as follows:
Begins on _____, _____ and
ending on _____.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

**3.** You agree to properly register all vehicles with management. If you get a new, replacement or temporary vehicle, you must notify us and complete a revised agreement.

**4.** If you are provided with a parking tag or sticker, it must be properly installed and displayed.

**5.** Unless your vehicle(s) has been assigned a specific space(s), you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you posses a government issued handicap decal or similar signage.

**6.** If you are assigned a specific parking space(s), we shall assign you the space(s) and retain the right to change assigned spaces at our sole discretion. You understand and agree that we maintain the absolute right to reassign any assigned parking spaces, if applicable, to any other parking space on the premises, or to revoke such parking space altogether at any time and for any reason whatsoever at our sole election.

**7.** You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

**8.** You agree to use parking spaces in accordance with the terms of the Lease and Community Rules.

**9.** Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**10.** You acknowledge and understand that there are inherent risks to parking your vehicle on any part of the property, including damage, theft or loss to your personal property and vehicle. You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept any and all risks of parking any vehicle(s) on the property.

**11.** Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a violation of the Lease Contract and shall entitle us to any and all rights and remedies available under the Lease and Florida law for such material violation of the Lease Contract.

**12.** You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, and/or the subject leased dwelling unit, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING**
Resident agrees to pay a onetime fee of $ _____
per vehicle on or before the _____ day of _____, _____. In alternative, resident agrees to pay $ **100.00** monthly per vehicle due on or before the **1st** day of the month, which is hereby deemed and defined as additional rent. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is **5** days delinquent in paying the required parking fee.

Resident agrees to pay $ **75.00** NSF fee for all checks returned for non-sufficient funds, which is hereby deemed and defined as additional rent.

**VEHICLE INFORMATION:**

**Vehicle 1**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 2**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 3**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**13. SPECIAL PROVISIONS.**

**Unregistered vehicles (not matching the description above or failure to display stickers while on the premises) are considered illegal parked & subject to towing at owner's expense. Replacement parking decal stickers are 50.00 through the Management Office. Applicable parking specials are only valid through initial lease agreement and will not be honored in a renewal contract. Additional parking spaces may be leased at Landlord's sole discretion. All registered vehicles must display the parking decal. Lessee is responsible for notifying Management Office should any vehicle information change. Motorcycles must be registered with the management office.**

© 2018, National Apartment Association, Inc. - 7/2018, Florida

Blue Moon eSignature Services Document ID: 317159245

| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign)* | *(Signs below)* |

Francesca Holmes

Zachary Griffin

Nicholas Attanasio

**Date of Signing Addendum**

06/03/2022

☑ Blue Moon eSignature Services Document ID: 317159245



## Acknowledgment of Liability Insurance Requirement

As managing agent for <u>**Miami Midtown VI Owner LLC**</u>
_____, the "Owner" of <u>**Gio Midtown**</u>
_____ located at <u>**3131 NE 1st Ave #1711, Miami, FL 33137**</u>
the "Apartments"), Bozzuto Management Company ("Bozzuto") requires all Lessees to maintain personal liability insurance, or renters' insurance, in the amount of at least $_____.

It is the Lessee's responsibility to establish a policy and make all required payments to keep the policy current. Lessee understands that the following should be listed as an Additional Interested Party:

**Additional Interested Party**
<u>**Gio Midtown**</u>
_____
_____

Lessee shall provide Bozzuto with proof of coverage and notify Bozzuto at least 30 days prior to any suspension or cancellation of the policy.

Please note that neither Bozzuto's nor the Owner's insurance covers Lessee's possessions if they are damaged or stolen.  To obtain coverage for your possessions, we strongly recommend you purchase a policy that includes "contents" coverage.

For the convenience of Lessees, Bozzuto has arranged for a convenient, affordable insurance option for this community through a preferred insurance provider.  There is no application, and acceptance is guaranteed for residents of this community.

If Lessee fails to procure renter's insurance and provide property manager with documentation, and/or Lessee's insurance policy is terminated or lapses for any reason during the Lease term, Bozzuto shall retain the right to "force place" the Lessee's apartment for coverage under a master policy procured by the Lessor. Lessee shall be responsible for all premiums and other costs associated with the insurance policy. All such costs shall be considered additional rent under the Lease Agreement. Resident understands and acknowledges that it is within Bozzuto's sole discretion whether or not to schedule Lessee's apartment unit for coverage under a forced-place master insurance policy and nothing contained herein shall require Bozzuto to procure such coverage.

By signing below, I acknowledge that I have arranged for personal liability or renters' insurance coverage for the duration of my lease and that I have listed Bozzuto and the Owner of the Apartments as interested parties on my policy.  I further acknowledge that I have provided Bozzuto with proof of personal liability or renters' insurance coverage.

*Francesca Holmes*                                              *Zachary Griffin*
_____        _____
Resident Signature                                  Resident Signature
**Francesca Holmes**                               **Zachary Griffin**
_____        _____
Resident (Print Name)                              Resident (Print Name)

_____        _____
Resident Signature                                  Resident Signature

_____        _____
Resident (Print Name)                              Resident (Print Name)

_____        _____
Resident Signature                                  Resident Signature

_____        _____
Resident (Print Name)                              Resident (Print Name)

REVISED 6.2019



## UTILITY BILL RELEASE
## ADDENDUM TO LEASE

I, the undersigned Lessee and/or Tenant of _____ **Gio Midtown** _____ [property name]; agree to release my _____ [name of utility provider] energy usage information to Bozzuto Management Company and **Miami Midtown VI Owner LLC** _____ _____ [ownership entity name]. This information may also be used for related statistical analyses and as a requirement of any building certifications for energy conservation certification.  This release will be in effect for the entire duration of my residency at the below specified service address.

Electric company utility account number: _____

Name on account: _____

Service Address on account: **3131 NE 1st Ave #1711, Miami, FL 33137** _____

Date of authorization: _____


I, _____, hereby authorize my landlord and its representatives of _____ **Gio Midtown** _____, [property name] to make inquiries into my utility account as specified above for purposes of usage history and utility billing rates.

I understand that no changes will be made to my account without my express permission and that this authorization is limited to inquiry and survey purposes only.


Regards,


*Francesca Holmes* _____
Signature


_____ **Francesca Holmes** _____
Printed Name


10/18

☑ Blue Moon eSignature Services Document ID: 317159245



## COMMUNITY POLICIES AND PROCEDURES
### ADDENDUM – ALL STATES

This property is managed by the Bozzuto Management Company ("Management") on behalf of the Owner. It is Management's goal to maintain this property as an outstanding apartment community. In order to promote and maintain this Property, and as a condition of residency, Management has established the following policies. All residents agree to abide by these policies, as they are essential for the comfort and convenience of all community residents. The decision of whether Community Policies and Procedures have been violated shall be made at Management's sole discretion. A failure by Resident to abide by the Community Policies and Procedures may constitute a breach of Lease. In the event of any contradiction between the terms of this Addendum and any other Addendum or the Lease, this Addendum shall control.

**Contacting Management Office:**

Phone#: **(786) 800-9515**

Emergency After Hours Phone #: **(786) 800-9515**

Email: **giomidtown@bozzuto.com**

Other contact information:

**Additional Fees Related to Lease**
The following fees may be charged by Owner to the extent permitted by local law:

      **Transfer Fee:** $_____. Resident agrees that any approved transfer will be subject to additional payment of this amount.

      **Holdover/MTM**: $_____/month. Resident agrees that in the event the Lease term expires, and Resident holds over and/or becomes a month-to-month tenant pursuant to the Lease or by operation of law, the monthly rent will increase by the foregoing amount. Resident agrees that this Addendum shall serve as written notice of the additional rent and/or rent increase and waives any right to further notice.

      **Amenities Fee:** $_____. Resident agrees to pay an amenities fee to Landlord for the foregoing amount as an additional charge under the Lease.

      **Occupant Change Fee**: $_____. New occupants or tenants, or any changes to the authorized occupants and tenants under the Lease, are conditioned on the payment of the foregoing fee.

To the extent any of the above fees are not completed or specified, Resident agrees that Owner may establish such fees through its policies and/or by written notice to the Resident. Resident agrees that Owner may change the amounts described above based on market conditions or for any other reason by providing written notice of the new fees, rent, or other charges. Any transfer or occupancy change requested by Resident is subject to approval by Owner and that payment of the above amounts does not entitle Resident to transfer apartments or change occupancy. The failure to complete the above amounts does not waive Owner's right to charge fees or increase rent as otherwise permitted by local law.

## KEYS, FOBS, CARDS, PASSES, AND REMOTE CONTROLS
Resident agrees to abide by all written and/or posted instructions regarding the Access Items and to report any malfunctioning, broken or damaged Access Items, gates, locks, doors or related access equipment. Resident is liable for damages to Access Items and related access equipment caused by misuse or negligence of Resident, occupants or guests.

A key fob may be granted for use and access to amenities at the Property such as a club room, business center, theatre, fitness center etc. To the extent permitted by local law, Resident agrees that Resident's access to these amenities may be restricted by Management, in its sole discretion, should Resident violate the Community Policies and Procedures related to the use of these amenities. To the extent permitted by local law, Owner may reset and reissue key fobs or other access items due to emergencies or security concerns, and in such cases will reissue key fobs or access items to the leaseholder. Resident acknowledges and understands that Resident's guests will not be granted a key fob or other access items.

☑ Blue Moon eSignature Services Document ID: 317159245

## RECREATIONAL FACILITIES AND AMENITIES

Please contact the rental office prior to using the amenities such as swimming pool, rooftop terrace, sunning deck, clubroom for specific policies that govern their use. Some amenities have limited hours of operation. Some amenities may have supervision requirements and guest restrictions.

We cannot assume responsibility for the safety of Residents, occupants or guests who use our facilities. Most facilities are for use without any Management supervision and Residents, guests and occupants assume the risks of any injury incurred in the use of those facilities, except in the case of Management's omission, fault, neglect or other misconduct. Residents must adhere to all posted signage for everyone's safety and protection. Use of amenities and facilities is prohibited after the posted hours. Any misuse of a facility or amenity will be grounds for Lease termination or for suspension of use of the facility or amenity, to the extent permitted by local law.

Management cannot guarantee that all facilities, amenities, equipment and services are or will be available at all times. Availability of amenities and common areas may be curtailed or limited by construction, renovation, servicing, repairs or other reasons and Management shall not be in default under the Lease when this occurs. Residents are not entitled to rent abatement or damages when facilities, services, amenities and equipment are not available, except as provided for by local law. MANAGEMENT MAY ADD OR CHANGE RULES REGARDING AMENITIES AT THE COMMUNITY AT ANY TIME AND AT ITS SOLE DISCRETION.

## SERVICE GUARANTEE PROGRAM AND REQUESTS

Management's Service Guarantee Program guarantees a 24-hour response time to reasonable maintenance requests. Management accepts requests made by phone, in-person, or electronically. The Service Guarantee only ensures that Management will contact Resident within 24 hours of receiving a maintenance request in an effort to start responding promptly. While maintenance will respond within 24 hours, the time necessary to complete the repairs may exceed 24 hours. Routine maintenance requests made on weekends or holidays and requests received after 4:00 p.m. on weekdays will be considered to have been placed the following business morning at 9 a.m. Residents have an obligation to contact Management if they receive no response to their maintenance request within twenty-four (24) hours. Management's response to Resident can be made by phone, email, letter or a note hand-delivered to Resident's apartment or mail-box. This Service Guarantee includes routine repairs to appliances, plumbing, smoke alarms, ceiling fans, heating and air conditioning, outside lighting, and other routine repairs. Priority service will be given to repairs of a serious nature, i.e., electric outages, loss of heat or air conditioning, no hot water, clogged toilets, broken windows, broken locks etc. The Service Guarantee Program may be suspended or restricted without notice as required by a force majeure or emergency situation, including without limitation the COVID-19 epidemic. During any emergency situation, the property may need to alter operations or reduce staffing, and that maintenance requests will be addressed as soon as possible.

Resident understands that rent will not be abated for the failure to complete a maintenance request within 24 hours. Resident acknowledges that Management's ability to address a maintenance request is conditioned upon Resident's good faith cooperation and Resident agrees to provide the cooperation necessary for Management to address Resident's maintenance requests.

Any plumbing problem, frozen water line, lack of heat in winter, gas leak or electrical failure should be considered an emergency. Please dial the designated emergency number for such occurrences, and our on-call personnel will respond. Any expense incurred as a result of mistreatment of the apartment or common areas will, insofar as necessary, be assessed against the Resident responsible. For your convenience and information, a set of instructions for the operation of appliances and mechanical equipment is available upon request. If you are concerned for your health or safety due to a condition in the building, please dial 911 to contact local Fire, Police, or Emergency response rather than calling the Management office.

## GUESTS

Guests must be accompanied at all times when using the Property's facilities and amenities. Guests of all ages must limit their stay to no more than 14 days per year unless prior written approval from Management has been obtained. Residents are responsible for the conduct of their guests and should inform them of the Community Policies. Failure of guests to adhere to Community Policies may be grounds for exclusion from the Property or certain amenities and/or may constitute a breach of Lease.

Residents are responsible for the behavior of all family members, guests, and invitees. Regardless of age, if it is necessary for a family member, guest, or invitee to be accompanied by an adult when in common areas or when using amenities, then Resident should ensure that that person is accompanied. All Residents, guests or invitees shall follow all posted signage for the safety and protection of everyone.

☑ Blue Moon eSignature Services Document ID: 317159245

**RESIDENT CONDUCT**

**Harassment:** We expect all residents, guests, vendors and employees to treat each other with courtesy and respect. Harassment of any type, including but not limited to, physical, verbal, written, cyber-based, or sexual, is strictly prohibited. Shouting, threats, use of obscenities, personally disparaging remarks, violence, coercion and/or intimidation against anyone in this community, including staff, shall be grounds for lease termination. Any person engaging in harassment will be asked to stop and immediately leave the area. A failure to cooperate may result in law enforcement being called. Any Resident who feels that they have been subject to, or becomes aware of, harassment should contact Management immediately. Residents are prohibited from harassing staff or disrupting our business operations. Residents are also prohibited from injuring our reputation by making bad faith and/or defamatory allegations against us to others.

**Communicating Concerns:** If you or a household member has a concern about your apartment or your experience living at the community, please contact the Property Manager or Assistant Manager. If you are not comfortable talking to them about the concern, you should request the name and telephone number of the Regional Manager. We will do our best to address concerns with sensitivity and professionalism. Residents must secure permission from Management prior to posting fliers or notices in the common areas.

**Quiet Hours and Disturbances:** Resident acknowledges that the hours from 10:00PM – 7:00AM are designated "Quiet Hours" at the Community. During Quiet Hours, Residents must exercise special caution about noise and loud activities are prohibited, including, but not limited to: large social gatherings, vacuuming, loud music and television, loud household activities, and move-ins/move-outs. A violation of the noise policy is grounds for Lease termination and/or termination of Resident's right to possession of the apartment. In order to reduce noise or disruption to other Residents, Management may ask or require that Resident adopt noise reduction measures (including reduced activities or noise dampening items, such as rugs or carpeting).

**SECURITY**

**Weapons/Guns.** For the safety of our residents and visitors, no knives, firearms or other weapons are allowed in the common and public areas of this community, whether concealed or open-carry, except for weapons carried by law enforcement or security guards hired by Management. Guns kept inside apartments shall be stored unloaded and separately from ammunition in an enclosed and locked container. The sale or purchase of weapons and guns on the property is prohibited.

**Lobby and Front Desk Security Procedures.** If a community has a lobby and front desk, Residents should contact Management for hours when staff will be at the front desk and rules regarding sign-in for visitors or other security procedures.

**Video Doorbells.** Electronic video doorbell cameras (such as Ring, Google NEST, Arrow, etc.) are not permitted to be installed on apartment entry doors within the building.

**Out of Town Security Procedures.** Residents must notify Management of anticipated extended absences from their Apartment in excess of Seven days. Management is not liable for any damages in the Apartment occasioned by Residents' absence, and Resident agrees to pay for any damages caused by an extended absence, unless the damage is caused by Management's negligent acts or omissions.

**BALCONY AND EXTERIORS**

Please help us maintain an attractive community by keeping your balcony neat and free of unsightly clutter. Only patio or lawn furniture should be placed on the balcony. Balconies are not to be used as storage areas. Trash containers, bikes, and motorcycles are prohibited.

**Safety**: Balconies are potentially dangerous if overloaded with too many people or heavy furniture. Please contact the Management office immediately and do not use your balcony if you observe any of the following: leaning, sagging or soft spots; cracks or separation where the balcony and building connect; rust stains or abnormal water ponding; obstructed or poorly functioning drains, loose or damaged handrails. Nothing may be thrown over the balcony.

**Fire Hazards:** Grills, stoves, fire pits or other open flame devices of any kind ARE NOT PERMITTED. Their use is a fire code violation and grounds for immediate lease termination. Residents may only use grills provided by Owner and located in the outdoor common areas

**Signs/Flags:** Residents are prohibited from posting signs, notices, advertisements, flags, banners or similar items from their balcony, patio, terrace, or windows.

☑ Blue Moon eSignature Services Document ID: 317159245

Community Policies and Procedures Addendum

## GENERAL EXTERMINATION

Management may conduct extermination operations in Residents' apartment several times a year and as needed to prevent insect infestation. Management will notify Residents in advance if extermination will occur in Resident's apartment, and give Resident instructions for the preparation of the apartment and safe contact with insecticides. Residents will be responsible for preparing the apartment for extermination in accordance with Management's instructions. Where permitted by law, Residents may be charged a fee for cancelled appointments caused by unprepared apartments. Residents must request any additional extermination treatments in writing. Resident understands that routine treatment of the apartment may be required in order to protect the health and safety of the community, and that individual apartments will not be excepted from treatment except as required by law.

## BUSINESS CENTER

If this community has a business center, Resident agrees to use the business center at Resident's sole risk and according to any rules established by Management. Management is not responsible for data, files, programs or any other information lost or damaged in the Business Center or on its computers. No software may be loaded on Business Center computers without the written approval of Management. Business Center computers and equipment may not be used for illegal, inappropriate, or offensive purposes. At its discretion, Management may impose time and other limits on use of the Business Center. Resident understands and acknowledges that Resident's use of the business center is not private or confidential, and any information disclosed or used by Resident on the property's computers or equipment could be stored or reviewed by Management or other parties.

## MOLD

In addition to the requirements of the Mold Information and Prevention Addendum, Resident agrees as follows

Resident understands that the lack of temperature control and air circulation will increase the likelihood of mold growth in the apartment. Resident agrees that air conditioning should not be turned off for an extended period of time, and that the temperature and air flow should be maintained at reasonable levels at all times.

Resident shall provide Owner with immediate written notification of any windows or fans that are broken or not working. Resident shall use all reasonable care to close all windows to prevent rain or outdoor water from penetrating the apartment. Resident shall endeavor to be aware of any water leaks or damage and humidity levels in the apartment. Resident shall conduct a visual inspection for the presence of mold growth inside the apartment at least once per month. This inspection shall include window frames, carpets, ceiling tiles, plants, personal property, and any currently or formerly damp material containing cellulose such as wallpaper, books, papers and newspapers. Resident agrees to take steps to control the humidity in the apartment and to immediately report any water leaks or mold growth. Failure to report water leaks or mold growth may be grounds for Lease termination.

Resident agrees not to bring any personal property into the apartment that may contain mold, especially "soft possessions" such as sofas, mattresses and pillows. Resident shall clean and dry any damp or wet building materials or personal property within 24 hours.

## PET/ANIMAL POLICIES

If the community permits pets, permission must be secured in writing from Management before the pet resides in your apartment. Visiting pets are not permitted at any time. If pets are permitted, pet owners must adhere to all guidelines included in the Animal Addendum and the Pet Policies set forth below:

- Management reserves the right to approve or disapprove all Pets for any reason and at any time.
- Visual Inspection: Upon request, Resident shall present the Pet to Management for visual inspection before final approval is given for the Pet to reside at the Premises.
- Photograph: Upon request, Resident shall provide Management with a photograph of the Pet
- Proof of Vaccination: Resident must provide Owner with proof of the Pet's annual inoculations for rabies, distemper, and any other vaccinations required by law or by Management.
- Management reserves the right to prohibit, at its sole discretion, certain small pets at the Property or to limit the number of small pets at the Property.
- Resident is not permitted to keep animals that are undomesticated, dangerous, or not commonly known as pets, as determined by Management in its sole discretion.
- In applying for approval of any animal to reside at the Property, Resident is required to disclose whether: the animal has ever been designated dangerous by a government authority or veterinarian; has bitten, attacked or caused injury to another animal or person; or has been removed from another residential community. Owner reserves the right to remove the animal from the Property if such an event has occurred.
- Total Pets Permitted in Premises: Only 2 Pets (excluding small pets such as hamsters, fish, etc.) will be permitted to reside in the Premises.
- Cats: Must be neutered/spayed, as applicable, with supporting documentation provided.
- Animals may not be left unattended on the balcony. Animals may not defecate and urinate on balconies.

Restricted Dog Breeds: The following dog breeds (including any mix thereof) are not permitted to reside at or visit the Premises or the Property ("Restricted Breeds"): Akbash, Akita/Akita Inu, American Bulldog, Anatolian Shepherd, Bandog/Bandogge, Beauceron (a.k.a. Berger de Beauce, Bas rouge, Beauce Shepherd, Red Stocking dog), Belgian Shepherd (a.k.a. Belgian Sheep Dog, Malinois, Tervuren, Laekenois, Groenendael), Black Russian Terrier (a.k.a. Russian Bear Schnauzer, Black Terrier, Tchiorny Terrier, Chornyi), Boerboel, Briard, Bully Kutta/Bully Cutha/Bohli Kutta (a.k.a. PBK,), Cane Corso (a.k.a. Italian Mastiff), Chinese Shar Pei (a.k.a Chinese Fighting Dog), Doberman Pinscher, Dogo Argentino, Dogue De Bordeaux (a.k.a. Bordeaux Bulldog, French Mastiff), Fila Brasileiro, Great Dane, Gull Dong (Gull Terr, Bully Gull Terr), Jindo/Chindo, Kangal, Kuchi/Koochee, Kuvasz, Mastiffs, Pit Bull (including Pit Bull Terriers, American Pit Bull Terrier, any Staffordshire Terrier or Bull Terrier), Perro de Presa Mallorquin, Presa Canario (a.k.a. Canary Dogs), Rottweiler, Tosa Inu (a.k.a. Tosa Ken, Japanese Tosa, Japanese Mastiff), Wolf, Wolf-Dog Hybrids (including all wolf-like breeds). The list of Restricted Breeds is subject to change by Management at any time without notice. Management has sole discretion to determine whether an animal is a restricted breed and may base its decision on documentation, visual inspection, examination by a veterinarian, and other measures. Residents who are found to have a restricted breed occupying their apartment (or a pet in a no-pet building) are in violation of their Lease, are required to remove the pet. Note: the list of Restricted Breeds applies to pets only, and not to support or assistance animals that have been approved as a reasonable accommodation.

## STORAGE

In the event Management provides storage lockers or units ("Lockers") on the Property to accommodate Residents in the storage of personal property, the use of said storage lockers shall be subject to the terms and conditions that Management prescribes. Management makes no representations or warranties regarding the security of the storage lockers. Upon termination of the lease or rental of a Locker, Resident agrees to empty the Locker of all personal property. Resident agrees not to store items that are dangerous or detrimental to the life or health of residents or safety of the property including flammable items such as straw, cotton, paper stock, rags, or perishable items. Resident agrees not to make any improvements or alterations to the Locker without prior written consent. All items in the Locker will be deemed abandoned if not removed within ten days after (i) termination of Resident's rental of the Locker, (ii) Resident's failure to pay storage or rental fees for the Locker, or (iii) termination of Resident's occupancy of the apartment, whichever comes first. Upon such abandonment, as allowed by law, Owner may remove all personal property from the Locker and sell or dispose of in its discretion. Management shall not be liable for any damages to Resident's property kept in the storage lockers, unless such damages are the result of Management's negligence.

## COVID-19 EPIDEMIC AND OTHER EMERGENCIES

Management's priority during the COVID-19 epidemic (or any other public health, natural disaster, or other emergency) is to promote the health and safety of the community. To that end, Resident ("you") acknowledge and agree that the community may be subject to certain restrictions and policy changes by Management ("we") during the time of a health or other crisis, including the following:

**Emergency Restrictions:** We reserve the right to implement emergency policies and procedures. These policies and procedures may be adopted based on governmental orders or restrictions, guidance from public health or other authorities, or in Management's discretion. These restrictions may include, but are not limited to, the following: closure of common areas, access restrictions, reduced staffing or services by Management, limitations on visitors or guests, required social distancing or use of protective equipment, and enhanced cleaning or safety protocols.

**Resident Notification**. We will make reasonable efforts to keep the community informed of material information during a public health crisis or emergency. However, we must take care not to provide inaccurate information and to respect the privacy of other persons at all times, and therefore may be limited in what information we can provide. During an emergency, you should seek up-to-date guidance and information from governmental and public health authorities.

**Resident's Compliance.** To ensure the safety of all in the community during a public health or other emergency, Residents and Management must work together in a cooperative and respectful manner. You agree to follow and comply with any directive or restriction from us and/or governmental authorities. You understand that the failure to follow such restrictions (for example, by failing to follow social distancing protocols, failing to wear proper protective equipment, or improperly accessing to common area facilities) may risk the health and safety of others in the community. A failure to comply with directives or restrictions is a breach of the lease and may lead to lease termination. We reserve the right to deny access for persons refusing to abide by our requirements.

**Assumption of the Risk.** You assume the risk of your use of common areas and amenity spaces, including the gym and pool areas, including the risk that COVID-19 may be transmitted among members of the community despite the precautions in place. Our decision to reopen common areas, the gym, the pool, or other amenities/services at the property is not a representation of the safety of using these areas.

☑ Blue Moon eSignature Services Document ID: 317159245

Community Policies and Procedures Addendum

**SATELLITE DISHES**
Prior to the installation of any  or similar equipment, Resident shall be required to provide Landlord with a certification (by a structural engineer or other certified professional) that the structural system of the roof is adequate to support the installation of the Satellite Dish, and that installation of the Satellite Dish will not cause damage to the construction materials or structure of the building. No Satellite Dish or similar may be installed without such a certification and approval by Management.

**SOLICITORS AND SALESPERSONS**
Residents should not solicit other Residents for commercial purposes without the approval of Management. Anyone having the approval of the Management to sell or solicit within the Property (such as Girl Scouts, Little League, etc.) must obtain a letter of authorization from Management.

**PARKING AND VEHICLE USE**
All parking on the property is subject to the rules and regulations of Management and/or any independent company hired to manage the parking. Resident agrees to the following rules and restrictions:

- To the extent permitted by local law, Owner reserves the right to tow vehicles at resident's expense, when parked as follows: in a reserved or handicapped parking space without required tags; in a fire zone; blocking access to other vehicles or to buildings or amenities; taking up more than one space; without valid parking permits; invalid registration; in abandoned or wrecked condition; or for other lawful reasons.
- Parking spaces may not be used for any purpose other than parking a vehicle.
- No one may use the driveway space in front of their parking spot or individual parking garage for additional parking or storage.
- Parking Permits must be displayed at all times. A lost or stolen permit should be reported immediately.
- Management reserves the right, in its sole discretion, not to issue Visitor Parking Permits to visitors who have previously violated Community Policies and Procedures and/or the community parking rules.
- Some properties have designated parking areas or other restrictions for motorcycles, commercial vehicles, recreational vehicles, or other vehicles. Check with Management for these guidelines.
- Resident agrees that Owner is not liable for damages related to the towing of any vehicle nor for any consequential damages which may be incurred as a result of said towing, unless such damages are the result of Management's negligence.
- Unless there is a designated car wash area, washing of vehicles in the community is not permitted. Residents shall not perform any repairs or maintenance such as changing oil or tuning engines on their vehicles in the garage or parking lots surrounding the community.

If the property has a garage entrance door or parking gate, Resident agrees to comply with the following rules when using the garage or parking area:

- Always approach exit and entry gates with caution and at a slow rate of speed.
- Never stop your car where the gate can hurt your vehicle as the gate opens and closes.
- Never follow an open vehicle into an open gate. Always use your card to gain entry.
- Never force the gate open with your car.
- Never get out of your vehicle while the gates are opening or closing.
- If you are using the gates with a boat or trailer, please contact Management for assistance.
- Do not operate the gate if there are small children nearby.
- If you lose your card, please contact Management immediately.
- Do not give your card or code to anyone.
- Do not tamper with the gate or allow occupants or guests to do so.

Resident releases Management and Owner from any liability or claim arising from the use of parking facilities (including any damage to a vehicle or loss of personal property), except for claims or liability arising from Management or Owner's negligence.

**PRIVACY/DISCLOSURE OF RESIDENT INFORMATION**
Owner and/or Manager collects nonpublic, personally identifiable financial information on Residents. During the application process, Residents disclose a certain amount of personal financial information such as income, prior rental history, assets and liabilities. Owner may obtain a personal credit report that contains personal financial information from one of the credit reporting agencies. In addition, Owner undertakes criminal background checks of residents and occupants prior to granting authorization to reside in the Apartment. Owner keeps personal information which has been collected about Residents in its files. Owner also shares such information with affiliates or nonaffiliated third parties as permitted by law to assist in collection efforts in the event of a default under any lease. Owner may be asked by other landlords to describe a Resident's rental history, and may share such information such as a Resident's rental payment history.

Community Policies and Procedures Addendum

Owner maintains appropriate security standards and procedures to prevent unauthorized access to Resident information. Employee access to personal financial information is limited to those with a business reason for knowing such information. Employees are educated about the importance of maintaining confidentiality of personal information. Owner takes appropriate measures to enforce employee privacy responsibilities.

Resident agrees that Owner may collect personal information, including but not limited to names, addresses, phone numbers, email addresses and credit card information ("Personal Information") about Resident, family members, or occupants ("Information Providers") for the purpose of administering certain services, transactions, amenities, or information ("Owner Services"). Resident consents to the exchange of Personal Information between Owner and the various vendors and service providers that may from time to time be selected or utilized by Owner to provide or assist with Owner Services (collectively, "Service Providers") and other related purposes or as permitted or required by law. Resident further consents to the Service Providers' collection and use of Personal Information for the purposes described herein.

| **Resident's Parking, Storage, and Access Items** | |
|---|---|
| **Apartment and Access Keys/Passes** | **Parking and Garage Gate Access** |
| Apartment Key(s): _____ | No. of Parking Spaces: _____ |
|    Replacement Cost: $_____ per key |    Cost per parking space/month: $_____ |
| Mailbox Key(s): _____ |    Cost per 2nd parking space/month: $_____ |
| Mailbox No.: _____ |    Assigned Space Numbers: _____ |
|    Replacement Cost: $_____ per key | Parking Permits/Stickers: _____ |
| Access Entry Key(s) or Fobs: _____ |    Replacement Cost: $_____ per permit |
|    Replacement Cost: $_____ per key | Access Cards/Controls Received: _____ |
| |    Replacement Cost: $_____ per card/control |
| **Storage Locker** | **Vehicle Information** |
| Assigned Locker No. _____ | **Vehicle 1:** |
|    Cost of Locker Per Month: $_____ |    Make: _____ |
| Locker Key(s) Given: _____ |    Model: _____ |
|    Replacement Cost: $_____ |    Color: _____ |
| |    License Plate No.: _____ |
| |    Permit or Space No. Assigned: _____ |
| | **Vehicle 2:** |
| |    Make: _____ |
| |    Model: _____ |
| |    Color: _____ |
| |    License Plate No.: _____ |
| |    Permit or Space No. Assigned: _____ |

Community Policies and Procedures Addendum

**I have read, understand, and agree to this COMMUNITY POLICIES AND PROCEDURES ADDENDUM:**

**RESIDENT(S):**

**OWNER**
By: BOZZUTO MANAGEMENT COMPANY

_____
Signature *Holmes*

_____
Signature *Anastasio*

_____
Signature *Griffin*

_____
Signature

_____
Date 06/03/2022

_____
Signature

_____
Signature

_____
Signature

_____
Date 05/31/2022



**REQUIRED INSURANCE ADDENDUM**

This Addendum is attached to and becomes a part of the Residential Lease Agreement.  For the duration of the Lease, Lessee is required to maintain and provide the following minimum required insurance coverage:

- $_____ Limit of Liability for Lessee's legal liability for damage to Lessor's property for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage ("Required Insurance").

Lessee is required to furnish Lessor with evidence of Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period.  Lessee may obtain Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice.  If Lessee furnishes evidence of such insurance and maintains the insurance for the duration of the Lease, then nothing more is required.

If at any time Lessee does not have Required Insurance, Lessee is in breach of the Lease and Lessor shall have the right but not the obligation to purchase Required Insurance coverage through the Lessor's Legal Liability Insurance Policy ("LLIP").  Coverage under the LLIP protects the sole interest of the Lessor for losses required to be covered under the Required Insurance.  Lessor is entitled to seek contractual reimbursement from the Lessee for all costs and expenses associated with a purchase under the LLIP, and an amount equal to the total cost to the Lessor for the LLIP coverage shall be charged to Lessee by the Lessor as a recoverable expense under the Lease.  Some important points of this coverage, which Lessee should understand are:

1. LLIP is designed to fulfill the insurance requirement of the Lease.  Lessor is the Insured under the LLIP.  Lessee is not an Insured, Additional Insured or beneficiary under the LLIP.  All loss payments are made to the Lessor.

2. LLIP coverage is <u>NOT</u> personal liability insurance or renters insurance. LLIP does not cover the Lessee's personal property (contents), additional living expenses or liability arising out of bodily injury or property damage to any third party.  If Lessee requires any of these coverages, then Lessee should contact an insurance agent or insurance company of Lessee's choice to obtain personal liability insurance or renters insurance to protect Lessee's interests.

3. Coverage under the LLIP may be more expensive than the cost of Required Insurance obtainable by Lessee elsewhere. At any time, Lessee may contact an insurance agent or insurance company of their choice for insurance options to satisfy the Required Insurance under this Lease.

4. Licensed insurance agents may receive a commission on the LLIP.

5. The total cost to the Lessee for the Lessor obtaining LLIP shall be _____ _____ ($_____) per month. This is an amount equal to the actual premium charge to the Lessor including any premium taxes and fees due to state governing bodies and also includes a _____ ($_____) administrative expense fee for the expense of processing monthly payments and administering this program.  There is no other fees, cost or charge added to or included within this total cost.

6. In the event that loss or damage to Lessor's property exceeds the amount of Required Insurance, Lessee shall remain contractually liable to Lessor for such amount.  In the event of liability to any other party for bodily injury or property damage, Lessee shall remain liable to such other party.

As used in this Addendum: "Lease" may be interchangeable with "Lease Agreement"; "Lessee" may be interchangeable with "Resident" or "Tenant", and "Lessor" may be interchangeable with "Landlord" or "Owner".

Scheduling of the premises under the LLIP is not mandatory and Lessee may purchase Required Insurance from an insurance agent or insurance company of Lessee's choice at any time and coverage under the LLIP will be terminated by the Lessor.

REVISED 10.2019

1

I have read, understand and agree to this **REQUIRED INSURANCE ADDENDUM** to the Lease.

**OWNER:** Miami Midtown VI Owner LLC

By: BOZZUTO MANAGEMENT COMPANY,
as authorized agent for the Owner

By: *Nicholas Attanasio*
Date: 06/03/2022

**RESIDENT(S)**

*Francesca Holmes*
Date: 05/21/2022

*Zachary Griffin*
Date: 05/21/2022

Date:_____

Date:_____

Date:_____

Date:_____



REVISED 10.2019

2



**ADDENDUM OF SPECIAL PROVISIONS**
**TO FLORIDA LEASE**

This Addendum to the Lease by dated **05/19/2022**_____ and between **Miami Midtown VI Owner**
**LLC**_____ ("Owner")
and **Francesca Holmes, Zachary Griffin**_____
_____

(hereinafter collectively referred to as "Resident", whether one or more persons) shall be incorporated in and made a part of the aforesaid Lease and shall be renewed and shall expire under the same terms and conditions of the Lease. In the event of any contradiction between the terms of this Addendum and any other Addendum or the Lease, this Addendum shall control.

**Resident's Waiver for Use of Common Areas and Amenity Spaces**
Resident ("You") expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, including incidents leading to or causing death, that are causally related to your use of common areas or amenities at the Community (including the gym, pool, clubroom, roof areas, lobby, elevators, and entryways). You agree to hold Owner and Manager harmless and to release and to waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, that you may have against Owner and that are in any way related to or that arise from such use, except as the result of negligence on the part of the Owner that proximately caused the injury or damage alleged. This provision shall be enforceable to the fullest extent of the law.

**Security Deposit**
Owner reserves the right to require that payment of a security deposit and other charges be made with certified funds. Notwithstanding any provisions of the Lease to the contrary, security deposits may be waived under certain conditions. Owner may pay any refund of the deposit to any Resident identified in paragraph 1 of the Lease without obligation to any other named Resident. Upon the sale or conveyance of the Property, Owner may transfer or assign any deposit to the new owner and all of Owner's liability for such deposit shall terminate.

**Prepayment of Rent**
Prepayment of rent is only permitted with prior approval. Residents shall not be entitled to a discount or interest payment for any rent that is paid in advance.

**Utilities and Services**
If, during the term of the Lease, Resident fails to pay all charges for utilities and other services required by the Utility and Services Addendum which charges shall be deemed additional rent, Owner reserves the right to apply a portion of the next month's rent to any outstanding balances under said Addendum, as allowed by applicable law.

**Animals**
Resident certifies and warrants that any animal residing in the Apartment is housebroken and has no history of causing physical harm or injury to persons, animals or property. In addition, Resident certifies and warrants that the animal has no history of biting, no vicious tendencies and has never exhibited any aggressive behavior to humans or other animals. Owner reserves the right to require animals occupying apartments to wear muzzles when in the common areas. Requiring an animal to wear a muzzle does not waive Owner's right to terminate Resident's tenancy and seek eviction.  A violation of this paragraph is a breach of the Lease.

Excessive dog barking is not permitted and is considered a lease violation. Excessive barking is barking that is persistent and occurs for an extended period of time or on a repeated basis. When determining if barking is excessive, Owner, in its sole discretion, will consider the time of day, duration and frequency of the barking.

**Termination under the Service Members Civil Relief Act**
The Military Personnel Clause of the Lease is clarified as follows: After you deliver to us your written termination notice (which must include a copy of your military orders or written notification from a commanding officer) your tenancy will be terminated under this military clause thirty (30) days after the date on which your next rental

☑ Blue Moon eSignature Services Document ID: 317159245

Addendum of Special Provisions - Florida

payment is due. Therefore, delivery of the written termination notice is not complete until a copy of the resident's military orders or written notification from a commanding officer is provided to Owner.

**Cooperation with Government Authorities**
Owner cooperates with government authorities including law enforcement and census takers. Owner also assists law enforcement in entering the Apartment with a warrant or without a warrant if law enforcement asserts that it has legal grounds for a warrantless entry. Resident hereby waives any legal action against Owner for providing information to government authorities and for allowing law enforcement to enter the Apartment.

**For Active Construction Sites**
Resident acknowledges that there may be active and on-going construction in the apartment community. Resident acknowledges that this Construction Activity may cause noise, inconveniences and disturbances to Resident's quiet enjoyment of the apartment community. Resident further acknowledges that areas covered by the Construction Activity may be unavailable for use by Resident and any occupants or guests. Resident agrees to exercise extreme care and caution while travelling through the walkways, hallways, stairwells and all public and common areas of the apartment community. Resident agrees to follow all instructions or directions provided by Owner. Resident agrees not to enter any areas which are protected by barricades or which are posted as being closed to all but construction personnel. Resident agrees that access to the apartment community is limited to those walkways, hallways, stairwells and other common and public areas which Resident has been expressly notified are available for use.

**Mold**
In addition to the requirements of the Mold Information and Prevention Addendum, Resident agrees to take the following steps to prevent mold:

Resident understands that the lack of temperature control and air circulation will increase the likelihood of mold growth in the apartment.  Resident agrees that air conditioning should not be turned off for an extended period of time, and that the temperature and air flow should be maintained at reasonable levels at all times.

Resident shall provide Owner with immediate written notification of any windows or fans that are broken or not working. Resident shall use all reasonable care to close all windows to prevent rain or outdoor water from penetrating the apartment. Resident shall endeavor to be aware of any water leaks or damage and humidity levels in the apartment. Resident shall conduct a visual inspection for the presence of mold growth inside the apartment at least once per month. This inspection shall include window frames, carpets, ceiling tiles, plants, personal property, and any currently or formerly damp material containing cellulose such as wallpaper, books, papers and newspapers. Resident agrees to take steps to control the humidity in the apartment and to immediately report any water leaks or mold growth. Failure to report water leaks or mold growth may be grounds for Lease termination.

Resident agrees not to bring any personal property into the apartment that may contain mold, especially "soft possessions" such as sofas, mattresses and pillows. Resident shall clean and dry any damp or wet building materials or personal property within 24 hours.

**Third Party Vendors**
From time to time Owner may share information regarding various third party vendors who can provide residents with direct services ("Third Party Vendor(s)") to be performed either by the Third Party Vendor's own employees or by connecting residents to various service providers. When obtaining services from, or hiring, a Third Party Vendor, you agree that Owner is not part of any contractual relationship with said Third Party Vendor and shall not be liable for any property damage, physical injury or consequential damages caused either directly or indirectly by said Third Party Vendors.

**Holdover**
Notwithstanding any lease language to the contrary, Resident agrees that the damages to be paid in the event of holding over shall include, but not be limited to, double the amount of rent due for each day that Resident continues to holdover and refuses to surrender possession during the holdover period, breach of contract damages, attorney fees and court costs. All other Lease terms shall remain in full force and effect during the holdover period.

☑ Blue Moon eSignature Services Document ID: 317159245

Addendum of Special Provisions - Florida

**Notice of Exposure to Airborne Allergens, including Smoke, Chemicals, Perfumes and Animal Allergens**
Residents and occupants of the Apartment hereby accept notice that they may be exposed to airborne allergens including, but not limited to, smoke, vapors, scented chemicals, perfumes and animal dander and fur ("Allergens"). Scented chemicals, including paint, cleaners, air fresheners, and insecticides, are used by Owner in the Apartment community's maintenance and repair processes and they are also used by Residents. Owner does not guarantee that any Apartments or the common and public areas will be free from Allergens. Resident acknowledges that he/she, occupants and guests may be exposed to Allergens and that said exposure does not constitute Owner's default under or breach of the Lease.

Notwithstanding the foregoing, Owner reserves the right to restrict, and in some cases prohibit, the keeping of animals, and the use of chemicals and perfumes by Residents, occupants and guests inside Apartments and in common and public areas in the event such activities interfere with other Residents' quiet enjoyment of their Apartment and the Apartment community.

Residents and occupants hereby accept notice that no part of this Apartment community is or will be free of animals. Federal law requires that service and assistance animals be allowed to reside in Apartment communities and on floors that are designated as "pet free."

**Consent to Collection, Use and Disclosure of Personal Information**
Resident agrees that Owner may collect personal information, including but not limited to names, addresses, phone numbers, email addresses and credit card information ("Personal Information") about Resident, Resident's spouse, domestic partner, dependents, family members or occupants ("Information Providers") residing in the apartment for the purpose of administering certain services to Information Providers which may include, but not be limited to, services necessary or appropriate to complete any transaction, delivery, or provision of products and services that Owner may offer or provide from time-to-time ("Owner Services"). Resident consents to the exchange of Personal Information between Owner and the various vendors and service providers that may from time to time be selected or utilized by Owner, or a vendor/service provider required to be a party to certain transactions, delivery or provision of Owner Services (collectively, "Service Providers"), or their respective agents, for the purposes of administering and carrying out the Owner Services, and other related purposes or as permitted or required by law. Resident further consents to the Service Providers' collection of Personal Information relating to the use of such Personal Information by Service Providers for the purposes described herein.

**Subordination and Attornment**
Resident agrees that the Lease and all of Resident's rights hereunder, is now and shall continue at all times to be subject and subordinate to the lien of any mortgage held by Owner on the Apartment community, and to any and all increases, renewals, substitutions, replacements and/or consolidations of any mortgage, and to any future mortgage affecting the Apartment community. Upon any transfer of Owner's mortgage of the Apartment community, by sale, foreclosure or otherwise, Resident agrees to accept, recognize and attorn to any new Owner of the Apartment community and accept said new Owner as the Owner under the same terms and conditions as set forth under this Lease.

**Resident Estoppel**
If Resident is executing this Lease as a renewal to a current Lease, Resident acknowledges and agrees that all of the obligations of Owner under the current Lease have been duly performed and completed. Resident has no claims against Owner and Owner is not in default under the current Lease. The Apartment, including all improvements and common areas, satisfy the requirements of the current Lease and have been accepted and approved by Resident.

**Validity/Authentication**
The Parties agrees that their electronic signatures and initials included in the Lease and all Addendums are intended to authenticate those documents and to have the same force and effect as manual signatures. The Parties further agree that the PDF, photocopy or digital version of the Lease and all addendums shall have the full force and effect as the original and shall be considered sufficient evidence of intent in a court of law.

☑ Blue Moon eSignature Services Document ID: 317159245

Addendum of Special Provisions - Florida

**Multiple Residents or Occupants – Notices**
Notwithstanding contrary provisions in the Lease, notices of Lease termination and notices to vacate provided by Residents to Owner are only valid if signed by all Residents who have signed the Lease.

**Miscellaneous:** Resident hereby warrants that you have read this Addendum carefully, understand its terms and conditions, acknowledge that you have signed this Addendum freely and voluntarily, without any inducement, assurance or guarantee, and intend for your signature to serve as confirmation of your complete and unconditional acceptance of the terms, conditions and provisions of this Addendum.  This Addendum represents the complete understanding between the parties regarding these issues and no oral representations, statements or inducements have been made apart from this Addendum. If any provision of this Addendum is held to be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this Addendum and shall not affect the validity and enforceability of any remaining provisions**. TO THE EXTENT PERMISSIBLE BY LAW, EACH PARTY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS ADDENDUM OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES OR ANY OTHER AGREEMENT WHETHER SOUNDING IN TORT, PERSONAL INJURY, COMMON LAW, EQUITY, CONTRACT OR OTHERWISE.**

I understand and agree to this **ADDENDUM OF SPECIAL PROVISIONS** to the Lease.

OWNER: Miami Midtown VI Owner LLC          **RESIDENT(S)**

Miami Midtown VI Owner, LLC

By: BOZZUTO MANAGEMENT COMPANY

By: *Nicholas Attanasio*                               *Francesca Holmes*
Name:                                               Name: Francesca Holmes
Date: 06/03/2022                                    Date: 05/21/2022

                                                    *Zachary Griffin*
                                                    Name: Zachary Griffin
                                                    Date: 05/21/2022

                                                    Name: _____
                                                    Date: _____

                                                    Name: _____
                                                    Date: _____

                                                    Name: _____
                                                    Date: _____

                                                    Name: _____
                                                    Date: _____

☑ Blue Moon eSignature Services Document ID: 317159245



**WELCOME HOME COMMITMENT-30 DAY SATISFACTION**

This Addendum to the Lease between **Miami Midtown VI Owner LLC** _____
_____ ("Owner"), by its agent Bozzuto Management Company ("Agent" or "Bozzuto") and **Francesca Holmes, Zachary Griffin** _____
_____ ("Resident") shall be incorporated in and made a part of the aforesaid Lease.  In the event of any contradiction between the terms of this Addendum and any other Addendum or the Lease, this Addendum shall control.

Owner has agreed to offer a <u>30-Day Satisfaction Guarantee</u> to residents who enter into a Lease.  If, within the 30-day period immediately following the start of the Lease term, Resident is not satisfied with the Unit, Resident may terminate the Lease without incurring any early termination fees.  In order to terminate the Lease pursuant to this Addendum, Resident must notify the Property Manager in writing of the move-out date and must vacate the Unit within 30 days from the start of the Lease term.  This option to terminate the Lease will expire 30 days after the start of the Lease term.

If Resident exercises this termination option, Resident will be responsible for the payment of rent and utilities from the start of the Lease term through the provided move-out date.  Resident also will be responsible for any moving expenses and damage caused to the Unit in excess of ordinary wear and tear, as well as any charges owed under the Lease, including parking.  Additionally, Resident will be responsible for paying back the concession provided pursuant to the Concession Addendum. The Property will refund to Resident any unused rent and the Security Deposit, less any damages or other amounts owed under the Lease, consistent with the Lease and applicable local law.  To the extent permitted by local law, the Owner will retain all fees paid on move-in (including application, amenity, or pet fees).  If Resident chooses to transfer to another apartment at the property, Resident would be required to enter into a new Lease with Owner for that apartment, which may include additional terms or increased rent.

By signing below, the parties agree to abide by the terms of this Addendum.


OWNER:

By: BOZZUTO MANAGEMENT COMPANY

By: *Nicholas Attanasio* _____
Date: 06/03/2022 _____

RESIDENT(S):

*Francesca Holmes* _____
Date: 05/21/2022 _____

*Zachary Griffin* _____
Date: 05/21/2022 _____

_____
Date: _____

_____
Date: _____

_____
Date: _____

_____
Date: _____

Page **1** of 1
JULY 2020

☑ Blue Moon eSignature Services Document ID: 317159245

## E-SIGNATURE CERTIFICATE
*This certificate details the actions recorded during the signing of this Document.*



### DOCUMENT INFORMATION

| | |
|---|---|
| Status | Signed |
| Document ID | 317159245 |
| Submitted | 06/03/22 |
| Total Pages | 53 |
| Forms Included | Apartment Lease Form, Addendum for Rent Concession, All-In-One Utility Addendum, Mold Information and Prevention Addendum, Bed Bug Addendum, Choice of Damages, Early Termination Addendum, Short-Term Subletting or Rental Prohibited, Crime/Drug Free Housing Addendum, Mixed Use Addendum, Photo, Video, and Statement Release Addendum, Package Acceptance Addendum, Animal Addendum, Assistance Animal Addendum, Washer and Dryer Addendum, No-Smoking Addendum, Parking Addendum, Bozzuto Insurance Addendum 2019, Utility Bill Release, All States - Community Policies 2, Bozzuto FP 2020 Insurance Addendum, Florida - Special Provisions 2, Welcome Home Commitment-30 Day Satisfaction |

### PARTIES

**Francesca Holmes**
signer key: b095eb88139c5a0cd0a4c20d6d274b96
IP address: 8.28.102.18
signing method: Blue Moon eSignature Services
authentication method: eSignature by email francesca.holmes@outlook.com
browser: Mozilla/5.0 (iPhone; CPU iPhone OS 15_4_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Mobile/15E148



**Zachary Griffin**
signer key: c58556f5d3cdf8a134b372a82e4fa114
IP address: 8.28.102.18
signing method: Blue Moon eSignature Services
authentication method: eSignature by email zach.griffin@gmail.com
browser: Mozilla/5.0 (iPhone; CPU iPhone OS 15_4_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/15.4 Mobile/15E148 Safari/604.1



**Nicholas Attanasio**
signer key: 6ea56006a9000246e18831afe796f4bf
IP address: 10.100.10.68
signing method: Blue Moon eSignature Services
authentication method: eSignature by email giomidtown@bozzuto.com
browser: PHP 7.3.29/SOAP



(Assistant General Manager)

## DOCUMENT AUDIT

| | | |
|---|---|---|
| 1 | 05/21/22 04:01:32 PM CDT | Francesca Holmes accepted Consumer Disclosure |
| 2 | 05/21/22 04:02:18 PM CDT | Francesca Holmes initialed Apartment Lease Form |
| 3 | 05/21/22 04:02:45 PM CDT | Francesca Holmes signed Apartment Lease Form |
| 4 | 05/21/22 04:02:49 PM CDT | Francesca Holmes dated Apartment Lease Form |
| 5 | 05/21/22 04:02:55 PM CDT | Francesca Holmes signed Addendum for Rent Concession |

**DOCUMENT AUDIT CONTINUED**

| | | |
|---|---|---|
| 6 | 05/21/22 04:03:02 PM CDT | Francesca Holmes signed All-In-One Utility Addendum |
| 7 | 05/21/22 04:03:05 PM CDT | Francesca Holmes dated All-In-One Utility Addendum |
| 8 | 05/21/22 04:03:11 PM CDT | Francesca Holmes signed Mold Information and Prevention Addendum |
| 9 | 05/21/22 04:03:16 PM CDT | Francesca Holmes signed Bed Bug Addendum |
| 10 | 05/21/22 04:03:23 PM CDT | Francesca Holmes checked box on Choice of Damages, Early Termination Addendum |
| 11 | 05/21/22 04:03:26 PM CDT | Francesca Holmes initialed Choice of Damages, Early Termination Addendum |
| 12 | 05/21/22 04:03:28 PM CDT | Francesca Holmes signed Choice of Damages, Early Termination Addendum |
| 13 | 05/21/22 04:03:31 PM CDT | Francesca Holmes dated Choice of Damages, Early Termination Addendum |
| 14 | 05/21/22 04:03:36 PM CDT | Francesca Holmes signed Short-Term Subletting or Rental Prohibited |
| 15 | 05/21/22 04:03:42 PM CDT | Francesca Holmes dated Crime/Drug Free Housing Addendum |
| 16 | 05/21/22 04:03:44 PM CDT | Francesca Holmes signed Crime/Drug Free Housing Addendum |
| 17 | 05/21/22 04:03:48 PM CDT | Francesca Holmes signed Mixed Use Addendum |
| 18 | 05/21/22 04:03:57 PM CDT | Francesca Holmes signed Photo, Video, and Statement Release Addendum |
| 19 | 05/21/22 04:04:05 PM CDT | Francesca Holmes signed Package Acceptance Addendum |
| 20 | 05/21/22 04:04:13 PM CDT | Francesca Holmes signed Animal Addendum |
| 21 | 05/21/22 04:04:19 PM CDT | Francesca Holmes signed Assistance Animal Addendum |
| 22 | 05/21/22 04:04:24 PM CDT | Francesca Holmes signed Washer and Dryer Addendum |
| 23 | 05/21/22 04:04:31 PM CDT | Francesca Holmes signed No-Smoking Addendum |
| 24 | 05/21/22 04:04:36 PM CDT | Francesca Holmes signed Parking Addendum |
| 25 | 05/21/22 04:04:41 PM CDT | Francesca Holmes signed Bozzuto Insurance Addendum 2019 |
| 26 | 05/21/22 04:04:47 PM CDT | Francesca Holmes signed Utility Bill Release |
| 27 | 05/21/22 04:04:54 PM CDT | Francesca Holmes signed All States - Community Policies 2 |
| 28 | 05/21/22 04:04:55 PM CDT | Francesca Holmes dated All States - Community Policies 2 |
| 29 | 05/21/22 04:05:00 PM CDT | Francesca Holmes dated Bozzuto FP 2020 Insurance Addendum |
| 30 | 05/21/22 04:05:01 PM CDT | Francesca Holmes signed Bozzuto FP 2020 Insurance Addendum |
| 31 | 05/21/22 04:05:07 PM CDT | Francesca Holmes signed Florida - Special Provisions 2 |
| 32 | 05/21/22 04:05:13 PM CDT | Francesca Holmes dated Florida - Special Provisions 2 |
| 33 | 05/21/22 04:05:18 PM CDT | Francesca Holmes signed Welcome Home Commitment-30 Day Satisfaction |
| 34 | 05/21/22 04:05:21 PM CDT | Francesca Holmes dated Welcome Home Commitment-30 Day Satisfaction |
| 35 | 05/21/22 04:05:25 PM CDT | Francesca Holmes submitted signed documents |
| 36 | 05/20/22 12:44:39 PM CDT | Zachary Griffin accepted Consumer Disclosure |
| 37 | 05/21/22 03:27:04 PM CDT | Zachary Griffin initialed Apartment Lease Form |
| 38 | 05/21/22 03:28:45 PM CDT | Zachary Griffin signed Apartment Lease Form |
| 39 | 05/21/22 03:28:48 PM CDT | Zachary Griffin dated Apartment Lease Form |
| 40 | 05/21/22 03:29:14 PM CDT | Zachary Griffin signed Addendum for Rent Concession |
| 41 | 05/21/22 03:29:33 PM CDT | Zachary Griffin signed All-In-One Utility Addendum |
| 42 | 05/21/22 03:29:39 PM CDT | Zachary Griffin dated All-In-One Utility Addendum |
| 43 | 05/21/22 03:29:47 PM CDT | Zachary Griffin signed Mold Information and Prevention Addendum |
| 44 | 05/21/22 03:29:56 PM CDT | Zachary Griffin signed Bed Bug Addendum |
| 45 | 05/21/22 03:31:12 PM CDT | Zachary Griffin checked box on Choice of Damages, Early Termination Addendum |
| 46 | 05/21/22 03:31:15 PM CDT | Zachary Griffin initialed Choice of Damages, Early Termination Addendum |
| 47 | 05/21/22 03:31:18 PM CDT | Zachary Griffin signed Choice of Damages, Early Termination Addendum |
| 48 | 05/21/22 03:31:19 PM CDT | Zachary Griffin dated Choice of Damages, Early Termination Addendum |
| 49 | 05/21/22 03:31:26 PM CDT | Zachary Griffin signed Short-Term Subletting or Rental Prohibited |
| 50 | 05/21/22 03:31:31 PM CDT | Zachary Griffin dated Crime/Drug Free Housing Addendum |
| 51 | 05/21/22 03:31:33 PM CDT | Zachary Griffin signed Crime/Drug Free Housing Addendum |
| 52 | 05/21/22 03:31:41 PM CDT | Zachary Griffin signed Mixed Use Addendum |

**DOCUMENT AUDIT CONTINUED**

| 53 | 05/21/22 03:31:52 PM CDT | Zachary Griffin signed Photo, Video, and Statement Release Addendum |
|----|--------------------------|---------------------------------------------------------------------|
| 54 | 05/21/22 03:31:59 PM CDT | Zachary Griffin signed Package Acceptance Addendum |
| 55 | 05/21/22 03:32:13 PM CDT | Zachary Griffin signed Animal Addendum |
| 56 | 05/21/22 03:32:19 PM CDT | Zachary Griffin signed Assistance Animal Addendum |
| 57 | 05/21/22 03:32:25 PM CDT | Zachary Griffin signed Washer and Dryer Addendum |
| 58 | 05/21/22 03:32:33 PM CDT | Zachary Griffin signed No-Smoking Addendum |
| 59 | 05/21/22 03:32:52 PM CDT | Zachary Griffin signed Parking Addendum |
| 60 | 05/21/22 03:33:01 PM CDT | Zachary Griffin signed Bozzuto Insurance Addendum 2019 |
| 61 | 05/21/22 03:33:08 PM CDT | Zachary Griffin signed Utility Bill Release |
| 62 | 05/21/22 03:33:19 PM CDT | Zachary Griffin signed All States - Community Policies 2 |
| 63 | 05/21/22 03:33:25 PM CDT | Zachary Griffin dated Bozzuto FP 2020 Insurance Addendum |
| 64 | 05/21/22 03:33:27 PM CDT | Zachary Griffin signed Bozzuto FP 2020 Insurance Addendum |
| 65 | 05/21/22 03:33:37 PM CDT | Zachary Griffin signed Florida - Special Provisions 2 |
| 66 | 05/21/22 03:33:40 PM CDT | Zachary Griffin dated Florida - Special Provisions 2 |
| 67 | 05/21/22 03:33:45 PM CDT | Zachary Griffin signed Welcome Home Commitment-30 Day Satisfaction |
| 68 | 05/21/22 03:33:48 PM CDT | Zachary Griffin dated Welcome Home Commitment-30 Day Satisfaction |
| 69 | 05/21/22 03:33:52 PM CDT | Zachary Griffin submitted signed documents |
| 70 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Apartment Lease Form |
| 71 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Apartment Lease Form |
| 72 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Addendum for Rent Concession |
| 73 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed All-In-One Utility Addendum |
| 74 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated All-In-One Utility Addendum |
| 75 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Mold Information and Prevention Addendum |
| 76 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Bed Bug Addendum |
| 77 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Bed Bug Addendum |
| 78 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Choice of Damages, Early Termination Addendum |
| 79 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Short-Term Subletting or Rental Prohibited |
| 80 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Short-Term Subletting or Rental Prohibited |
| 81 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Crime/Drug Free Housing Addendum |
| 82 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Crime/Drug Free Housing Addendum |
| 83 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Mixed Use Addendum |
| 84 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Mixed Use Addendum |
| 85 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Photo, Video, and Statement Release Addendum |
| 86 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Photo, Video, and Statement Release Addendum |
| 87 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Package Acceptance Addendum |
| 88 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Package Acceptance Addendum |
| 89 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Animal Addendum |
| 90 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Assistance Animal Addendum |
| 91 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Assistance Animal Addendum |
| 92 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Washer and Dryer Addendum |
| 93 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Washer and Dryer Addendum |
| 94 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed No-Smoking Addendum |
| 95 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Parking Addendum |
| 96 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Parking Addendum |
| 97 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Bozzuto Insurance Addendum 2019 |
| 98 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Utility Bill Release |
| 99 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed All States - Community Policies 2 |

**DOCUMENT AUDIT CONTINUED**

| 100 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated All States - Community Policies 2 |
|-----|--------------------------|-----------------------------------------------------------|
| 101 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Bozzuto FP 2020 Insurance Addendum |
| 102 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Bozzuto FP 2020 Insurance Addendum |
| 103 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Florida - Special Provisions 2 |
| 104 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Florida - Special Provisions 2 |
| 105 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio signed Welcome Home Commitment-30 Day Satisfaction |
| 106 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio dated Welcome Home Commitment-30 Day Satisfaction |
| 107 | 06/03/22 02:03:11 PM CDT | Nicholas Attanasio submitted signed documents |

# EXHIBIT
# I



# GUARANTOR PRE-LEASING APPLICATION

*This form is not a binding guarantor agreement, but rather an application to provide pertinent guarantor information and to allow the rental property owner to proceed with credit/background screening. If you and the resident(s) are approved, you will be asked to execute a Lease Contract Guaranty.*

## Lease Contract Information

**ABOUT LEASE:** Resident names *(list all residents responsible for the Lease Contract)*:
Zachary Griffin

Street address of dwelling being leased: 3131 NE 1st Avenue NE Apt #1711

City/State/Zip of above dwelling: Miami, FL 33137

## Guarantor Information *Use for one guarantor only (can include spouse of guarantor)*

**ABOUT GUARANTOR:** Full name *(exactly as on driver's license or govt. ID card)*
Dmitry Kozko

Current address where you live: 19484 39th Ave
Golden Beach, FL 33160

Phone: (786) 449-9222

Alternate or cell phone: _____

Email address: dkozko@gmail.com

*(Please check one)* Do you ☒ own or ☐ rent your home?

If renting, name of apartments: _____

Manager's name: _____ Phone: _____

Your Social Security #: ▐▐▐▐▐▐▐

Driver's license # and state: ▐▐▐▐▐▐▐

OR govt. photo ID card #: _____

Birthdate: ▐▐ 1983 Sex: male

Marital Status: ☐ single ☒ married ☐ divorced ☐ widowed ☐ separated

Total number of dependents under the age of 18 or in college: 3

What relationship are you to the resident(s)? ☐ parent ☐ sibling
☒ employer ☐ other _____

Are you or your spouse a guarantor for any other lease? ☐ Yes ☒ No
If so, how many? _____

**YOUR WORK:** Present employer: Motorsport Games, Inc.

Employer's address: 5972 NE 4th Ave
Miami, FL 33137

Work phone: (305) 507-8799

Alternate phone: _____

Email address: dk@motorsportgames.com

How long? 2-2 years

Position: CEO

Your gross monthly income is over: $ 42,916

Supervisor's name: Board of Directors Phone: _____

**YOUR SPOUSE:** Full name *(exactly as on driver's license or govt. ID card):*
_____

Driver's license # and state: _____

OR govt. photo ID card #: _____

Social Security #: _____

Birthdate: _____

Alternate or cell phone: _____

Email address: _____

Present employer: _____

How long? _____ Position: _____

Work phone: _____

Monthly gross income is over: $ _____

**YOUR CREDIT/RENTAL HISTORY:**

Your bank's name: TD Bank

City/State: Miami, FL

List major credit cards: Chase, Amex

To your knowledge, have you, your spouse, or any resident listed in this Guaranty ever: ☐ been asked to move out? ☐ broken a rental agreement? ☐ declared bankruptcy? or ☐ been sued for rent?

To your knowledge, has any resident listed in this Guaranty ever: ☐ been sued for property damage? ☐ been convicted (or received an alternative form of adjudication equivalent to conviction) of a felony, misdemeanor involving a controlled substance, violence to another person or destruction of property, or a sex crime? Please explain: _____

You represent that all information submitted by you is true and complete. You authorize verification of the above information via consumer reports, rental history reports, and other means. You acknowledge that our privacy policy is available to you. A facsimile or

Date of Signing Guarantor Application: 05/05/2022

Signature of Guarantor

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | 576 |
|-----|------|-------|-------|-----------|-----|
| X7C | 000081 | 000600 | XN50K | 0000170026 | 1 |

# Earnings Statement



MOTORSPORT  GAMES  INC
5972  NE  4TH  AVENUE
MIAMI,  FL  33137
#954  274  7871

| | |
|---|---|
| Period Beginning: | 04/16/2022 |
| Period Ending: | 04/30/2022 |
| Pay Date: | 04/29/2022 |

DMITRY  KOZKO
19484  39TH  AVENUE
GOLDEN  BEACH  FL  33160

Filing Status: Married  filing jointly
Exemptions/Allowances:
   Federal: Standard  Withholding  Table

| Earnings | rate | salary/hours | this period | year to date |
|----------|------|--------------|-------------|--------------|
| Regular | 22102.08 | 86.67 | 22,102.08 | 176,816.64 |
| Vacation | | | | 59,423.00 |
| **Gross Pay** | | | **$22,102.08** | 236,239.64 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | -4,656.91 | 59,108.51 |
| | Medicare Tax | -310.44 | 3,345.16 |
| | Medicare Surtax | -192.69 | 276.31 |
| | Social Security Tax | | 9,114.00 |
| | **Other** | | |
| | Medical | -629.96* | 5,039.68 |
| | Ts Dental | -53.58* | 428.64 |
| | Ts Vision | -11.06* | 88.48 |
| | Reimbursement | | -5,560.00 |
| | **Adjustment** | | |
| | Reimbursement | +695.00 | |
| | **Net Pay** | **$16,942.44** | |
| | Checking | -16,942.44 | 164,398.86 |
| | **Net Check** | **$0.00** | |

| Other Benefits and Information | this period | total to date |
|-------------------------------|-------------|---------------|
| G.T.L. | 2.25 | 18.00 |
| Totl Hrs Worked | 86.67 | |

**Important Notes**
ADP TotalSource,  Inc.,A  Professional  Employer  Organization
10200  Sunset  Drive,  Miami,  FL  33173
1-844-448-0325

BASIS  OF PAY:  SALARY

**Additional Tax Withholding Information**

| Taxable Marital Status: | |
|---|---|
| FL: | Married |
| Exemptions/Allowances: | |
| FL: | No State Income  Tax |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$21,407.48

© 2009  A.D.P.,  LLC



5800 Windward Parkway
Alpharetta, GA 30005

| | | |
|---|---|---|
| Advice number: | 00000170026 | |
| Pay date: | 04/29/2022 | |

| Deposited  to the account  of | account number | transit ABA | amount |
|-------------------------------|----------------|-------------|--------|
| DMITRY  KOZKO | xxxxxx5186 | xxxx  xxxx | $16,942.44 |

THIS IS NOT A CHECK

# NON-NEGOTIABLE



# EXHIBIT J

| | Total | $ | 345,471 |
|---|---|---|---|
| | Tax Rate | | 45% |
| | Rent Deduction | $ | (155,685) |
| | Net | $ | 289,786 |
| | Gross (Pre-tax) | $ | 526,884 |
| | USD | $ | 320,668 |

| | April | May | June | July | August | September | October | November | December | January | February | March | April | May | June | July | August |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AUD-USD** | 0.7366 | 0.7107 | 0.6994 | 0.6894 | 0.7118 | 0.6705 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 | 0.6201 |
| **AUSTRALIA** | | | | | | | | | | | | | | | | | |
| *Income* | | | | | | | | | | | | | | | | | |
| Salary - Zach | 11,204 | 11,204 | 12,380 | 12,647 | 12,060 | 12,060 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 | 13,723 |
| Bonus - Accrued | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 | 4,807 |
| Salary - Francesca | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 | 6,077 |
| | 22,588 | 22,588 | 23,264 | 23,531 | 22,947 | 23,647 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 |
| *Expenses* | | | | | | | | | | | | | | | | | |
| Rent | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) | (2,260) |
| Health Insurance | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) |
| Phone | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) | (283) |
| | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) | (2,887) |
| **Net** | 19,701 | 20,460 | 20,377 | 20,644 | 20,060 | 20,760 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 | 21,719 |
| **Cumulative** | 19,701 | 39,849 | 60,226 | 80,870 | 100,593 | 121,690 | 143,409 | 165,129 | 186,848 | 208,567 | 230,287 | 252,006 | 273,726 | 295,445 | 317,164 | 338,884 | 360,603 |
| **FLORIDA** | | | | | | | | | | | | | | | | | |
| *Income* | | | | | | | | | | | | | | | | | |
| Salary - Zach | 11,204 | 11,204 | 22,164 | 22,653 | 21,654 | 22,987 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 | 24,856 |
| Bonus - Accrued | | 18,981 | 4,246 | 4,340 | 4,149 | 4,404 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 | 4,762 |
| Salary - Francesca | | | | | 7,221 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 | 7,808 |
| | 11,204 | 40,729 | 26,411 | 26,999 | 25,802 | 34,613 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 | 37,426 |
| *Expenses* | | | | | | | | | | | | | | | | | |
| Rent | (2,260) | (16,424) | (7,193) | (7,662) | (7,677) | (7,677) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) |
| Phone US | (317) | (317) | (355) | (327) | (379) | (344) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) |
| | (2,577) | (16,410) | (7,509) | (7,989) | (7,956) | (7,970) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) | (8,448) |
| **Net** | 9,127 | 24,119 | 52,107 | 71,111 | 88,958 | 115,601 | 144,579 | 173,558 | 202,536 | 231,514 | 260,492 | 289,470 | 318,449 | 347,427 | 376,405 | 405,383 | 434,362 |
| **Cumulative** | 9,127 | 33,246 | | | | | | | | | | | | | | | |
| **ACTUAL** | | | | | | | | | | | | | | | | | |
| *Income* | | | | | | | | | | | | | | | | | |
| Salary - Zach | 11,204 | 15,399 | 13,581 | 16,537 | 15,917 | 16,747 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 | 15,900 |
| Bonus - Accrued | | | 18,292 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 | 3,164 |
| Salary - Francesca | | | | | | | | | | | | | | | | | |
| | 11,204 | 15,399 | 31,873 | 19,701 | 19,081 | 19,911 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 | 19,064 |
| *Expenses* | | | | | | | | | | | | | | | | | |
| Rent | (2,260) | (16,567) | (7,193) | (7,662) | (7,677) | (7,677) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) | (8,155) |
| Health Insurance | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) | (344) |
| Travel Insurance | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) | (767) |
| Phone US | (317) | (186) | (355) | (327) | (379) | (344) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) | (293) |
| Phone AUS | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) | (380) |
| Legal Wedding | (10,000) | | | | | | | | | | | | | | | | |
| Furniture | | (15,000) | | | | | | | | | | | | | | | |
| Car sale | | (10,000) | | | | | | | | | | | | | | | |
| Flights | | | | (4,174) | | | | | | | | | | | (1,200) | | (4,600) |
| Relocation | (10,000) | | | | | | | | | | | | (3,833) | | | | (21,000) |
| | (39,068) | (17,844) | (9,041) | (13,620) | (9,461) | (9,511) | (9,939) | (9,939) | (9,939) | (9,939) | (9,939) | (9,939) | (13,772) | (9,939) | (11,139) | (9,939) | (35,539) |
| **Net** | (27,864) | (2,445) | 22,832 | 10,221 | 5,463 | 10,450 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 5,292 | 9,125 | 7,925 | 9,125 | (16,476) |
| **Cumulative** | (27,864) | (28,609) | (6,971) | 3,244 | 8,264 | 15,154 | 28,278 | 37,403 | 46,527 | 55,652 | 64,776 | 73,902 | 79,193 | 88,317 | 96,241 | 105,366 | 88,890 |
| **DELTA (AFTER TAX)** | | | | | | | | | | | | | | | | | |
| Australia (AUD) | (47,065) | (22,594) | 2,455 | (10,423) | (14,600) | (8,197) | (12,595) | (12,595) | (12,595) | (12,595) | (12,595) | (12,595) | (16,428) | (12,595) | (13,795) | (12,595) | (38,195) |
| | (47,065) | (69,658) | (67,203) | (77,626) | (92,226) | (100,424) | (113,019) | (125,614) | (138,209) | (150,804) | (163,399) | (175,994) | (192,422) | (205,017) | (218,812) | (231,407) | (269,602) |
| Florida (AUD) | (36,491) | (26,564) | 3,971 | (8,783) | (12,387) | (16,193) | (19,854) | (19,854) | (19,854) | (19,854) | (19,854) | (19,854) | (23,686) | (19,854) | (21,054) | (19,854) | (45,454) |
| | (36,491) | (63,055) | (59,084) | (67,867) | (80,254) | (96,448) | (116,301) | (136,155) | (156,009) | (175,862) | (195,716) | (215,570) | (239,256) | (259,110) | (280,164) | (300,017) | (345,471) |

# EXHIBIT K

 Gabriel Sierra <gsierra@ayalalawpa.com>

---

**Fwd: Fw: Bonus incentives**
1 message

---

**Zach Griffin** <zach.griffin@gmail.com>                                      Tue, Mar 11, 2025 at 8:53 AM
To: gsierra@ayalalawpa.com



---------- Forwarded message ---------
From: **Zach Griffin** <zach.griffin@motorsportgames.com>
Date: Wed, 14 Jun 2023 at 1:40 am
Subject: Fw: Bonus incentives
To: zach.griffin@gmail.com <zach.griffin@gmail.com>

**Zach Griffin**
Director of Technology
Motorsport Games

675 Victoria St | Abbotsford | 3067 | Australia
**M:** +61 4 3765 8845
**E:** zach.griffin@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

---

**From:** Zach Griffin <zach.griffin@motorsportgames.com>
**Sent:** Tuesday, February 14, 2023 7:43 AM
**To:** Dmitry Kozko <dk@motorsportgames.com>
**Subject:** Re: Bonus incentives

Hi Dmitry,

As discussed today, I've provided an alternative to your proposed incentive structure below:

1. $72,000 for the release of the NASCAR Heat 5 2022 DLC to be paid on its launch.
2. $125,000 for the release of INDYCAR to be paid when collected revenue is equal to the total development cost less any applicable rebates and exclusive of sales, marketing and distribution costs.

By structuring the INDYCAR bonus in this way, it aligns  key objectives for both the company and myself. That is, by allowing for development expenses to be recouped first, it penalises excessive development spend of which additional monthly burn from a delay is the largest contributor. Secondly, tying it to revenue ensures that quality is incentivised, as a poor game will not perform in the market.

Finally, as it pertains to NASCAR, we can revisit the incentive once we firm our plans for the next product.

Thanks,

**Zach Griffin**
Director of Technology

Motorsport Games

675 Victoria St | Abbotsford | 3067 | Australia
**M:** +61 4 3765 8845
**E:** zach.griffin@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

---

**From:** Dmitry Kozko <dk@motorsportgames.com>
**Sent:** Sunday, January 15, 2023 9:17 am
**To:** Zach Griffin <zach.griffin@motorsportgames.com>
**Subject:** Bonus incentives

Zach,

As per our last discussion, I'd like to propose you to update your employment agreement with the following additional milestone incentives. This will be in addition to what you currently already have in your contract.

Additional incentives:

1. $50,000 for
   a. launching planned 2022 DLC for Heat 5 before 2023 NASCAR season starts
   b. bonus payment will be paid out as fast as we are collecting revenue from sales of this DLC (I believe our terms are net 30, but I can double check). All first collected revenue from sales of this DLC, up to $50,000 will go towards bonus payout, as fast as we collect
2. $100,000 for
   a. Launching 2023 INDYCAR Game within 90 days from 2023 INDY500 (on or before August 28)
   b. Bonus amount to be reduced by $3,000 per calendar day of delay after August 28th or after agreed upon launch date with INDYCAR (whichever is sooner, within the 90 day window from 2023 INDY500)
   c. If above two conditions are met, bonus will be payable within couple of days after metacritic score for PlayStation and Xbox comes out of at least 70 each on each console
3. $100,000 for
   a. Launching NASCAR 2023 before mid-October by porting Rivals on PlayStation and Xbox
   b. If above condition is met, bonus will be payable within couple of days after metacritic score for PlayStation and Xbox comes out of at least 70 each on each console
4. [amount to be discussed] for
   a. Launching Apex Game (details to be outlined and discussed)

Goal of this to create materially sizeable milestones for you worthy and achievable. If you believe something is not physically possible, please let me know. My intend to create something is possible for you to achieve and valuable for the company.

Let me know your thoughts. I didn't want to overcomplicate this. If you agree to the first three, I will have Dara put it into similar format as we did last time (attached).

Thank you,

**Dmitry Kozko**
Chief Executive Officer
Motorsport Games

5972 NE 4th Avenue | Miami, FL | 33137 | United States

**T:** +1 305 507 8799
**M:** +1 786 449 9222
**E:** dk@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

# EXHIBIT L



## Fwd: Fw: Amendment to Contract | Zach Griffin

1 message

**Zach Griffin** <zach.griffin@gmail.com>                                               Tue, Mar 11, 2025 at 8:51 AM
To: gsierra@ayalalawpa.com



---------- Forwarded message ---------
From: **Zach Griffin** <zach.griffin@motorsportgames.com>
Date: Sat, 11 Mar 2023 at 1:50 am
Subject: Fw: Amendment to Contract | Zach Griffin
To: zach.griffin@gmail.com <zach.griffin@gmail.com>


**Zach Griffin**

Director of Technology
Motorsport Games

675 Victoria St | Abbotsford | 3067 | Australia
**M:** +61 4 3765 8845
**E:** zach.griffin@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

---

**From:** Dara Acker <dara.acker@motorsportgames.com>
**Sent:** Tuesday, February 28, 2023 8:07 AM
**To:** Zach Griffin <zach.griffin@motorsportgames.com>
**Cc:** Dmitry Kozko <dk@motorsportgames.com>
**Subject:** Amendment to Contract | Zach Griffin


Dear Zach,


We continue to value your contributions, and wanted to offer you an increase to your overall compensation in order to help you with personal financial concerns that you brought up recently. This letter is to confirm that as of March 1st, 2023, the schedule to your contract of employment, entered into as between you and Motorsport Games Australia Pty Ltd on March 19th, 2021 (then further amended on May 6th, 2022) is hereby amended as follows:


Item 8 of the schedule titled "Remuneration" is hereby amended and restated as follows.


- Motorsport Games withdraws its request made on May 6th, 2022, for your relocation to Miami, for which you were offered an increased annual remuneration, increasing your previously established $170,000 USD annual remuneration to $240,000 USD

annual remuneration for such relocation. Motorsport Games offers you to keep your increased compensation, while relocation to Miami is no longer required for this increase to stay in effect.

- Motorsport Games also withdraws its request made on October 3rd, 2022, for immediate remuneration reduction of 20% effective October 3rd, 2022, allowing you to keep the $240,000 USD base annual remuneration from October 3rd effective day to current and until further notice.

Item 9 of the schedule titled "Other Benefits" is hereby amended and restated as follows.

- "Benefit 2" to be amended as restated as follows:
  - A discretionary performance annual bonus of up to twenty percent (20%) of your annual remuneration to be paid in two instalments of up to ten percent (10%) each ($24,000), in January and June of each respective year during the term of your employment.
  - A one-time conditional bonus of $50,000 (USD) for releasing 2022 Season update for NASCAR Heat 5 to consumers. Payment of this bonus is conditional to the release and company collecting revenue from DLC sale of such Season update. First collected cash revenue from sale of such DLCs should go towards pay out of this bonus.
  - An additional $48,000 (USD) bonus for the successful release of INDYCAR 2023 demo on or by May 22nd, 2023. Scope of demo state to be defined by team and presented to you no later March 15th, 2023.
  - Motorsport Games may from time to time offer additional incentives during your employment with Motorsport Games or any of its affiliates such as Motorsport Games Australia Pty Ltd. Such offers will be made in writing, such as this one, and only such official offers considered effective.

For the avoidance of doubt this change shall override the previous terms agreed in the contract, or it's amendments and will not be in addition to the previous terms of this section.

Please reply to this email and we will push through the attached document for a digital signature.

Warmest Regards,

**Dara Acker**
Director of Human Resources
Motorsport Games

5972 NE 4th Avenue | Miami, FL | 33137 | United States
**T:** +1 305 507 8799
**M:** +1 914 819 7764
**E:** dara.acker@motorsportgames.com
www.motorsportgames.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
Please be advised the information contained in this email message is confidential and intended only for use by the recipient. If you are not the named recipient, you are hereby notified that any disclosure, distribution, dissemination, or copying of the information is prohibited. If the information has been directed to you in error, please contact the sender immediately via a reply to the sender's email or the telephone number listed above.

**GRIFFIN, ZACH (Amendment to Contract - 2.27.2023).pdf**
227K