UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-cv-21929-BLOOM/Elfenbein

ZACHARY GRIFFIN,

    Plaintiff,
v.

MOTORSPORT GAMES INC.,

    Defendant.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Motorsport Games Inc.'s ("MSG") Motion for Summary Judgment ("MSG's Motion"), ECF No. [43], and Plaintiff Zachary Griffin's ("Griffin") Motion for Summary Judgment ("Griffin's Motion"), ECF No. [45], both of which were filed on March 19, 2025. Griffin filed a Response to MSG's Motion, ECF No. [53], to which MSG filed a Reply, ECF No. [61]. MSG filed a Response to Griffin's Motion, ECF No. [56], to which Griffin filed a Reply. ECF No. [59]. The Court has reviewed the record, the supporting and opposing submissions,[1] the applicable law, and is otherwise fully advised. For the reasons that follow, MSG's Motion is granted, and Griffin's Motion is denied.

**I.  BACKGROUND**

On May 20, 2024, Griffin filed his Complaint against MSG, asserting claims for breach of contract (Count I), breach of covenant of good faith and fair dealing (Count II), promissory estoppel (Count III), and breach of fiduciary duty (Count IV). ECF No. [1]. On October 24, 2024, the Court granted MSG's Motion to Dismiss in part, dismissing all claims against MSG except

---

[1] Both parties filed Statements of Material Facts with their respective Motions for Summary Judgment, ECF Nos. [42], [44], to which each party filed a Response, ECF Nos. [52], [55], and a Reply. ECF Nos. [60], [58].

Count III, the claim of promissory estoppel. ECF No. [22].

    a. **Undisputed Facts**

The following facts are undisputed, unless otherwise noted:

MSG is a racing videogames developer, publisher, and e-sports ecosystem provider. ECF No. [44] ¶ 1. Motorsport Games Australia Pty Ltd ("MSG Australia") is a subsidiary of MSG. ECF No. [42] ¶ 3. On March 16, 2021, MSG Australia hired Griffin as "Director of Studio." *Id.* Griffin's total compensation was $240,000, consisting of a $170,000 base salary and three bonuses, totaling $70,000. *Id.* ¶ 5 (citing ECF No. [42-5] at 19). Griffin's Employment Agreement contained a clause entitled "entire agreement," which stated "[t]his Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes and prevails over any prior agreement[,] covenant[,] or understanding (if any) between the parties." *Id.* ¶ 8 (quoting ECF No. [42-5] at 15). The Employment Agreement also contained a clause stating "[a]ny work-related travel must be approved by the Employer in writing prior to booking or other arrangements being made" and "[a]ny necessarily incurred (and approved) reasonable travel, accommodation or other expense reimbursement will be made after you provide to the Employer satisfactory evidence of the expense being incurred by you in the performance of your duties." *Id.* ¶ 9 (quoting ECF No. [42-5] at 6). Around August 2021, Griffin and Dmitry Kozko ("Kozko"), the CEO of MSG, began discussing Griffin's possible relocation to the United States. *Id.* ¶ 13. On August 9, 2021, Griffin traveled to Miami, Florida at Kozko's request. ECF No. [44] ¶ 3.

Around November 1, 2021, Griffin's wife, Francesca Holmes ("Holmes"), gave her employer a notice of termination in advance of Griffin's pursuit of relocating to Miami. ECF No. [42] ¶ 23. At this point, neither Holmes nor Griffin had applied for a visa, and they would not relocate to Miami until April 2022. *Id.* ¶ 23.

2

On January 5, 2022, Kozko forwarded Griffin a text conversation between Kozko and then-MSG President, Stephen Hood, discussing Griffin's relocation to Miami, in which Kozko stated he had "asked [Griffin] to come and . . . mov[e] here permanently." ECF No. [44] ¶ 9 (quoting ECF No. [44-1] at 19). On March 12, 2022, Kozko sent an email to MSG's Head of Communications, Anne Dongois, and MSG's Executive Producer, Andy Stack, introducing Griffin as MSG's new "Global Director of Technology," and stating that Griffin was "on his way to relocate to Miami with his family." *Id.* ¶ 13 (quoting ECF No. [44-1] at 25). On April 20, 2022, with Kozko's approval, Griffin applied for a 15-month lease on behalf of MSG for Griffin and his wife. *Id.* ¶ 15 (citing ECF No. [44-1] at 34-35). The lease application was denied on April 27, 2022. *Id.* ¶ 16. Griffin thereafter reapplied for the lease with Kozko as the guarantor, including a cover letter from Dara Malavolta ("Malavolta"), MSG's Director of Human Resources, and paystubs in support of Griffin. *Id.* ¶¶ 11, 21; ECF No. [42] ¶ 30. Griffin secured a 15-month lease on May 21, 2022. ECF No. [44] ¶ 21.

Regarding the visa discussions, on September 9, 2021, Amanda LeCheminant ("LeCheminant"), MSG's General Counsel, introduced Griffin to an immigration attorney, Mark Katsman ("Katsman") to assist Griffin with applying for his visa. ECF No. [42] ¶ 14. On September 13, 2021, following a call between Katsman and Griffin, Griffin shared with Katsman his background information in support of preparing Griffin's visa application. *Id.* ¶ 16. One week later, Katsman told Griffin that he potentially qualified for two visa options: an L-1 Intracompany transferee or an E-3 Specialty Occupation Workers visa. *Id.* ¶17. Katsman explained the requirements and procedure for each of these visa applications. *Id.* ¶ 17. On October 12, 2021, Griffin emailed Katsman to advise him that he preferred to pursue the L-1 visa option because it was a quicker path for a green card. *Id.* ¶ 21. Katsman responded on October 14, 2021 with

3

clarifications regarding the L-1 visa. *Id.* ¶ 22.

Katsman advised Griffin that he would have to wait until his first work anniversary with MSG Australia—March 16, 2022—to apply for the L-1 visa. *Id.* ¶ 26. On January 4, 2022, Griffin asked Katsman what documentation he should gather to apply for an L-1 visa. *Id.* ¶ 20. On January 6, 2022, Katsman sent Griffin a list of documents needed to file the application. *Id.* ¶ 29.

On April 27, 2022, Griffin emailed Katsman requesting that they start the visa application. *Id.* ¶ 35. Katsman resent Griffin the same list of required documents he had sent almost four months prior. *Id.* ¶ 36. Although Griffin had gathered some of the documents for the visa application, he had never sent any to his immigration counsel. *Id.* ¶ 37. In June 2022, MSG began sending documents to Katsman in support of Griffin's visa application. *Id.* ¶ 40. During a video call with Katsman, LeCheminant, Malavolta, and Griffin on June 8, 2022, Katsman told Griffin he did not know that the income years for tax purposes in Australia were different than in the United States. ECF No. [44] ¶ 22. By December 2022, Griffin had become frustrated with Katsman because Griffin believed that Katsman mistakenly advised him that he needed one full year of employment before he could start his visa process. ECF No. [42] ¶ 41. Kozko told Griffin that MSG would pay for a new immigration firm to prepare visa applications for Griffin and his wife. ECF No. [44] ¶ 30. On December 30, 2022, Griffin sent Kozko an engagement letter and wire instructions to retain the services of a new immigration firm, which Griffin chose to replace Katsman, along with a spreadsheet of "the money . . . lost since moving." ECF No. [42] ¶ 42 (quoting ECF No. [42-34] at 1). MSG paid the retainer for the new firm, in full, within 10 days. *Id.* ¶ 43. At that point, Griffin had decided to apply for an E-3 visa instead of an L-1 visa. *Id.* ¶ 44. The visa petition was never filed. *Id.* ¶ 45.

b. **Disputed Facts**

The following facts are disputed unless otherwise noted:

Griffin states that, around August 18, 2021, while he was in Miami, Florida, Kozko requested that Griffin relocate from Australia to Miami to work in MSG's Miami office. ECF No. [44] ¶ 4. MSG disputes this statement, admitting that although "Griffin and Kozko may have had an ongoing conversation about Griffin's relocation to Miami, there is no evidence of the purported oral agreements between Kozko and Griffin, besides Griffin's self-serving testimony." ECF No. [55] ¶ 4. MSG alleges that, "[t]o the contrary, all agreements with respect to Griffin's employment relationship are reflected in the written amendments to his employment contract with MSG Australia." *Id.*

Griffin alleges that, on September 8, 2021, Kozko and Griffin orally agreed to the terms of Griffin's relocation to MSG's Miami office, which "included Griffin's promotion to Director of Technology; a base salary of $240,000 per year; an annual bonus of $70,000; and visa sponsorship for Griffin and his wife." ECF No. [44] ¶¶ 5-6. MSG denies that there was any oral "Relocation Agreement" between MSG and Griffin and states that "[a]ll agreements with respect to Griffin's employment are reflected in his employment contract with [MSG Australia] and its written amendments." ECF No. [55] ¶ 5. MSG also states that MSG Australia—not MSG—promoted Griffin to Director of Technology. *Id.* ¶ 6 (quoting ECF No. [42-12]).

It is undisputed that, on October 6, 2021, MSG's Vice President of Studios sent an email to several MSG executives announcing that Griffin would "become our MSG[] Studios' Director of Technology." ECF No. [44] ¶ 8 (quoting ECF No. [44-1] at 17). However, MSG asserts that the Vice President of Studios "misspoke as Griffin became MSG[] Australia's Director of Technology." ECF No. [55] ¶ 8. MSG also notes that the email stated that Griffin would become

5

the Director of Technology "effective as of this week." *Id.* (quoting ECF No. [44-1]).

It is also undisputed that, on March 12, 2022, Kozko sent an email introducing Griffin as MSG's "new Global Director of Technology" and stating that he was "on his way to relocate to Miami with his family." ECF No. [44] ¶ 13. However, MSG argues that this Kozko "misspoke as Griffin became *MSG*[] *Australia's* Director of Technology." ECF No. [55] ¶ 13.

Griffin states that, around May 6, 2022, he requested from Kozko and MSG a letter stating that Griffin would be receiving a paycheck with his new move to Florida. ECF No. [44] ¶17. Griffin states that, on May 6, 2022, Kozko requested that Griffin agree to a reduction in his bonus to $48,000, from the previously agreed $70,000, based on MSG's financial position. *Id.* ¶ 18. MSG disputes that Griffin requested a letter stating he would be receiving a paycheck with his new move to Florida or that there was any previous agreement other than what was reflected in Griffin's written employment agreement. ECF No. [55] ¶¶ 17-18. MSG does not dispute that Griffin agreed to a $48,000 bonus, as reflected by the amendment to his employment contract with MSG Australia. ECF No. [55] ¶ 18. It is undisputed that Malavolta sent Griffin a revised employment agreement dated May 6, 2022. ECF No. [44] ¶ 20. Griffin states that the revised agreement "misrepresented the date of the relocation request as being May 6, 2022." *Id*. However, MSG states the May 6, 2022 date "reflected the date of the agreement between MSG[] Australia and Griffin regarding Griffin's increased remuneration: i.e. a $240,000 base salary with a $48,000 bonus." ECF No. [55] ¶ 20.

Regarding the visa discussions, both parties agree that on a June 8, 2022 video call, Katsman told Griffin that Katsman did not know that the income years for tax purposes in Australia were different than in the United States. ECF No. [44] ¶ 22. Griffin states that, based on Katsman's statement that Griffin's FY20/21 tax returns could not be submitted with the L-1 visa petition

6

because it did not demonstrate 12 months of employment, Griffin believed that he had no other choice than to wait to file the L-1 visa petition until he had his FY 21/22 tax return. ECF No. [44] ¶¶ 23-24. However, MSG notes—and it is undisputed—that on September 20, 2021, Katsman told Griffin that he could apply for an L-1 or an E-3 visa. ECF Nos. [42] ¶17. MSG also states that it was Griffin's preference to apply for the L-1 visa instead of the E-3. ECF No. [55] ¶ 23 (quoting ECF No. [42-13] at 1). Although both parties appear to agree that there were no further communications between Katsman and Griffin following the June 8, 2022, they disagree as to who is to blame for the lack of communication. ECF Nos. [44] ¶ 25 ("Katsman did not follow up or otherwise communicate with Griffin following this June 8 call."); [55] ¶ 25 ("[I]t was Griffin who did not follow up with Katsman after the call[.]")

   c. **Cross-Motions for Summary Judgment**

Both MSG and Griffin seek summary judgment on Griffin's promissory estoppel claim. ECF Nos. [43], [45]. Griffin also moved for summary judgment on MSG's 19 affirmative defenses. ECF No. [45]. In MSG's Motion, it argues that (1) none of the alleged oral promises are clearly identified in the Complaint or corroborated by any objective evidence in the record; (2) the alleged oral promise to give Griffin a permanent promotion and increase in salary in exchange for permanent relocation is barred by the statute of frauds; and (3) the alleged promise to cover certain expenses associated with his relocation "was repudiated within three months and did not result in any detrimental reliance as a matter of undisputed fact and settled law." ECF No. [43] at 1-2. In Griffin's Motion, he argues there is "no genuine dispute that MSG made a promise and that Griffin acted in reliance on that promise, which resulted in injustice[.]" ECF No. [45] at 14.

## II.  LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "Once a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir. 1991). At that juncture, "the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex*, 477 U.S. at 324).

At the summary judgment stage, the court "may not weigh conflicting evidence to resolve disputed factual issues[.]" *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d 1320, 1327 (S.D. Fla. 2016) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007)). However, the mere existence "of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion[.]" *Id.*

"When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant." *Adega v. State Farm Fire & Cas. Ins. Co.*, No. 07-cv-20696, 2009 WL 3387689, at *3 (S.D. Fla. Oct. 16, 2009). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Purcell v. City of Fort Lauderdale*, 753 F. Supp. 3d 1308, 1324 (S.D. Fla. 2024) (quoting *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)).

## III. DISCUSSION

A plaintiff bringing a cause of action for promissory estoppel requires proof:

> (1) that the plaintiff detrimentally relied on a promise made by the defendant, (2) that the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of the plaintiff or a third person, and (3) that injustice can be avoided only by enforcement of the promise against the defendant.

*W.R. Townsend Contracting, Inc. v. Jensen Civ. Const., Inc.,* 728 So. 2d 297, 302 (Fla. 1st DCA 1999) (citing *W.R. Grace & Co. v. Geodata Services, Inc.*, 547 So. 2d 919, 924 (Fla. 1989)).

Claims based on promissory estoppel must also "be based on promises that are definite and substantial in nature." *Polo N. Country Club, Inc. v. Wells Fargo Bank, N.A.*, No. 9:16-cv-80432, 2016 WL 11819825, at *3 (S.D. Fla. June 24, 2016) (quoting *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1349-50, n. 7 (S.D. Fla. 1999) *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000)).

Florida's statute of frauds, which applies to causes of action for promissory estoppel, "requires contracts that cannot be performed within a year to be in writing." *OJ Com., LLC v. Ashley Furniture Indus., Inc.*, 817 F. App'x 686, 690 (11th Cir. 2020). The statute of frauds also

"bars enforcement of an oral contract that was intended by the parties to last longer than a year, even though the contract could have been terminated for cause within a year." *All Brand Importers, Inc. v. Tampa Crown Distribs., Inc.*, 864 F.2d 748, 749 (11th Cir. 1989).

Before analyzing the parties' respective motions for summary judgment, the Court must clarify which alleged oral promises form the basis of Griffin's promissory estoppel claim. In MSG's Motion, it describes the alleged promises[2] in two phases: first, in September 2021, MSG "agreed to give [Griffin] a *permanent* promotion and increase in salary in exchange for his *permanent* relocation from Australia to Miami." ECF No. [43] at 2. Second, in October 2022, MSG "agreed to cover certain expenses associated with [Griffin's] relocation." *Id.* However, Griffin states that his "promissory estoppel claim consists of one single promise[:] Kozko's promise to Griffin to relocate him from Australia to the U.S. so that Griffin could work in MSG's Miami office as Director of Technology." ECF No. [53] at 10.

Griffin's description of Kozko's promise in response to MSG's Motion is broader than what Griffin alleged in the Complaint. In the Complaint, Griffin alleged that on September 8, 2021, Kozko and Griffin orally agreed to terms of a "Relocation Agreement" which included: (1) Griffin's promotion to Director of Technology; (2) a base salary of $240,000 per year; (3) an annual bonus of $70,000; and (4) visa sponsorship for Griffin and his wife. ECF No. [1] ¶¶ 8-10; *see also* ECF No. [45] at 11-12. According to the Complaint, Kozko did not agree to cover any additional expenses associated with Griffin's move to Miami until October 21, 2022. ECF No. [1] ¶ 27. On that date, Griffin alleges that he provided Kozko with a "spreadsheet with [his] losses up to that point" and Kozko "agreed that MSG would compensate Griffin for his loss, stating: 'Submit these expenses and the remainder I'll give you as a bonus for getting *NASCAR Heat 5* out.'" *Id.*

---

[2] MSG maintains that it did not make either promise. ECF No. [43] at 2, 5.

10

Kozko also agreed to pay for a new immigration firm to prepare visa applications for Griffin and his wife because, by October 21, 2022, Griffin had confirmed that his original immigration attorney, Katsman, was mistaken as to certain requirements for obtaining an L-1 visa. *Id.* ¶ 26. Although MSG argues the Complaint "does not specify how many oral promises were supposedly made," ECF No. [43] at 4, the Complaint was sufficiently clear in alleging that, on September 8, 2021, Kozko and Griffin orally agreed to the terms of the Relocation Agreement and on October 21, 2022, Kozko stated MSG "would compensate Griffin for his loss" and "pay for a new immigration firm . . . to prepare visa applications for Griffin and his wife." ECF No. [1] ¶¶ 8-10, 27. Although MSG cites additional promises referenced in Griffin's deposition, "any attempt to add new facts at summary judgment is . . . improper if it presents a new theory of recovery under a previously asserted right." *MSPA Claims 1, LLC v. Covington Specialty Ins. Co.*, 548 F. Supp. 3d 1269, 1278 (S.D. Fla. 2021), *aff'd sub nom*. *MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*, 60 F.4th 1314 (11th Cir. 2023). Even if Griffin stated in his deposition that, on September 8, 2021, MSG orally promised him "medical care," "financial guarantees until [he] obtained a credit rating," and "[a]ccommodation costs until [he] obtained his visa[,]" ECF No. [43] at 5, Griffin is the "master[] of his claims" and he did not choose to include those promises in the Complaint. *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234 (11th Cir. 2013). Therefore, the Court will not consider any promises outside of the Complaint as part of the promissory estoppel claim.

### a. September 8, 2021 Oral Promises

MSG states that the September 8, 2021 promises are barred by the statute of frauds because they could not be—nor were they intended to be—performed within a year. ECF No. [43] at 6. Those promises, MSG argues, "accompanied a *permanent* relocation, *permanent* promotion, and

permanent *increase* in compensation." *Id.* As an initial matter, the only promise MSG allegedly made regarding Griffin's "relocation" was that it would "sponsor the visas for Griffin and his wife provided they use the services of MSG's immigration attorney, Mark Katsman." ECF No. [1] ¶ 10. Critically, Griffin does not allege that MSG breached this specific promise. As the Court stated in its previous order, "[t]here are no facts to support that MSG did not fulfill its promise to sponsor and pay the attorneys to handle the visa process for Griffin and his wife." ECF No. [22] at 10-11. Griffin argues that, because the Court made these statements "in evaluating Griffin's breach of oral contract claims" they "are not relevant to establish the injustice element for promissory estoppel, which does not require the same express repudiation that the element of breach requires." ECF No. [53] at 14. However, Griffin fails to address how he detrimentally relied on MSG's promise to provide visa sponsorship for him and his wife. It is undisputed that MSG introduced Griffin to Katsman to assist Griffin with applying for his visa and Griffin was not required to pay for Katsman's services. ECF No. [42] ¶¶ 15-16. Katsman communicated with Griffin regarding his visa options and Griffin stated he preferred to pursue the L-1 visa option because it provided Griffin a quicker path for a green card. *Id.* ¶¶14, 15, 21. After Griffin became frustrated with Katsman because he believed Katsman had given him incorrect advice, Griffin sent Kozko an engagement letter and wire instructions to retain the services of a new immigration firm, which Griffin chose to replace Katsman as his immigration counsel. *Id.* ¶¶ 41-42. MSG paid the new immigration firm's full retainer fee January 9, 2023. *Id.* ¶ 43. Griffin attempts to tie Katsman's mistake to MSG, stating "a significant reason for Griffin's inability to acquire a visa is the false advice offered by MSG's self-provided attorney, Katsman." ECF No. [53] at 14. However, the Court has already pointed out that "Katsman is not a party to this case, and the underlying allegations fail to show how MSG's actions breached its promises to sponsor and pay for Griffin's

immigration attorneys." ECF No. [22] at 11; *see also Dawkins v. Fulton Cnty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013) ("To show detrimental reliance, the plaintiff must generally show that the *defendant's* actions caused her to change her position for the worse.") (emphasis added). Because Griffin has not offered any evidence to contradict MSG's showing that it fulfilled its promise to provide visa sponsorship for Griffin and his wife, that promise cannot form the basis of a promissory estoppel claim.

Regarding the remaining three promises, MSG argues that it "complied with each term of the promise." ECF No. [43] at 9. "Griffin admitted to receiving the $240,000 base compensation." *Id.* (citing Griffin Tr. 119:12-17). He also admitted that he agreed to a lower bonus and "as an incentive to accept the lower amount . . . [MSG] split the payment into two amounts so [he] could receive one much earlier on." Griffin Tr. 119:12-120:5. Lastly, Griffin stated he was given the position of Director of Technology, and the role was "substantially consistent" with what he had envisioned at the time of the promise. Griffin Tr. 123:5-124:3. Griffin does not refute that he received the base compensation, agreed to the lower bonus in exchange for receiving half of the bonus sooner, and was given the position of Director of Technology. Therefore, those promises cannot form the basis of a promissory estoppel claim.

Even if Griffin could refute MSG's evidence that it fulfilled its promises, there is ample evidence to support MSG's argument that the parties intended their agreement to extend beyond a year and, therefore, the remaining three oral promises are unenforceable under the statute of frauds. It is undisputed that Kozko stated he had "asked [Griffin] to come and . . . mov[e] here permanently." ECF No. [44] ¶ 9 (quoting ECF No. [44-1] at 19). Griffin testified that he believed he was relocating to Miami permanently. Griffin Tr. 68:11-13; 68:23-25; 74:21-25. Griffin contends that those statements were "inconclusive, as they were hopeful statements, based on his

belief, not certainty, that he could be employed by MSG for more than one year. This belief [wa]s entirely conditioned on neither Griffin nor MSG terminating the agreement in accordance with the at-will status of Griffin's employment." ECF No. [53]. However, as MSG points out, Florida's statute of frauds "bars enforcement of an oral contract that was intended by the parties to last longer than a year, even though the contract could have been terminated for cause within a year." *Butterworth v. Lab'y Corp. of Am. Holdings*, 581 F. App'x 813, 819 (11th Cir. 2014).

Griffin distinguishes the case law cited by MSG, noting that the contract at issue in *Butterworth* was terminable for cause, whereas Griffin's contract was at will. ECF No. [53] at 11-12. Indeed, some courts have stated that an oral employment agreement that is terminable at will, even if it is otherwise for an indefinite period, does not fall under the statute of frauds. *See Cabanas v. Womack & Bass, P.A.*, 706 So. 2d 68, 69 (Fla. 3d DCA 1998) ("Contracts for employment which are terminable at will by either party for an indefinite period of duration do not fall under the statute of frauds."); *MacIntyre v. Lender Processing Servs. Inc.,* No. 3:13-cv-89, 2014 WL 12689881, at *4 (M.D. Fla. Apr. 29, 2014) ("[E]ven if the intent of the parties was to continue the Agreement for an indefinite period of time, the 'at-will' provision removes the Agreement from the purview of the statute of frauds.") (citing *Carbanas*, 706 So. 2d at 69). However, the analysis in *Cabanas* weighs against Griffin.

In *Cabanas*, the Florida Third District Court of Appeals determined that summary judgment was improper "because nothing in the record support[ed] the conclusion that Cabanas was hired to perform work which would require performance for a period of time exceeding one year." 706 So. 2d at 69. Although the Court stated in dicta that the at-will provision removed the agreement from the statute of frauds, the analysis was based on the fact that the "firm orally promised Cabanas that after completing six months of probation he would receive a $5000 raise

14

and a leased car at the firms expense" and "as a bonus, ten percent of billings over $50,000 generated by Cabanas in the year, at the time the monies were collected." *Id.* Unlike here, the promises were all inherently time-limited, a fact which spoke to the parties' intention.

Although Griffin emphasizes that it was "possible" that the promises made to him would be completed within one year, Griffin's own admissions illustrate that his intention[3] was to remain employed for more than one year. ECF No. [53] at 13. "Under Florida law, the intent of the parties with regard to the time of performance is the key factor in determining whether an oral agreement is enforceable." *Marcus v. Garland, Samuel & Loeb, P.C.*, 441 F. Supp. 2d 1227, 1232 (S.D. Fla. 2006). In addition to stating that he expected to move to the United States permanently, Griffin signed a 15-month lease in Miami, with Kozko as the guarantor, supporting the conclusion that both parties anticipated that the employment relationship would last at least 15 months. Griffin Tr. 70:24-72:5. 74:7-24.

Griffin alleges, for the first time, in his Response to MSG's Motion, that "the election for the 15-month [lease] period was a decision based on costs, rather than intended length of stay, because the 15-month lease was $1,000 cheaper than the 12-month option." ECF No. [53] at 11. However, even if Griffin chose the 15-month lease solely because it was cheaper than a 12-month lease, Griffin has still failed to provide any evidence refuting MSG's clear evidence that the intent of both parties was for Griffin's employment to last longer than a year. Therefore, even if MSG had failed to fulfill its three remaining oral promises, they are unenforceable under the statute of frauds.

---

[3] In his Response to MSG's Motion, Griffin attempts to distinguish his "intent" from his "hope[]" and "belief . . . that he could be employed by MSG for more than a year." ECF No. [53] at 13. However, that distinction merely speaks to the fact that MSG maintained the ability to terminate the contract at will. It does not cast doubt on the parties' intent.

### b. October 21, 2022 Oral Promise

According to the Complaint, on October 12, 2022, Griffin informed Kozko "of the losses that he had suffered because of MSG's failure to complete Griffin's transfer to Miami." ECF No. [1] ¶ 24. In response, Kozko "asked Griffin to share the calculation of Griffin's losses with him." *Id.* Kozko only arguably promised to reimburse Griffin for the expenses he incurred as a result of his relocation to Miami on October 21, 2022 when Kozko and Griffin "met to review the spreadsheet with Griffin's losses up to that point." *Id.* ¶ 27. Then, Griffin alleges, Kozko "agreed that MSG would compensate Griffin for his loss, stating: 'Submit these as expenses and the remainder I'll give you as a bonus for getting *NASCAR Heat 5* out." *Id.* On January 11, 2023, Griffin alleges that Kozko "reneged on his prior agreement for MSG to pay for Griffin's losses due to MSG's failure to complete Griffin's relocation." *Id.* ¶ 36. MSG argues that, in the three months between when Kozko made the promise and reneged, "Griffin did not change anything in his situation in reliance o[n] the promise, nor did he suffer a detrimental change of position." ECF No. [43] at 12.

MSG points out that, when asked what he did in reliance on Kozko's promise to cover Griffin's losses, Griffin responded "I don't recall." ECF No. [43] at 11 (quoting Griffin Tr. 128:20-129:23). Although Griffin's statement that he did not recall what he did in reliance on the October 21, 2022 promise would be "insufficient to refute record evidence unequivocally establishing the matter," *Gregory v. Miami-Dade Cnty.,* No. 13-cv-21350, 2015 WL 12001281, at *5 (S.D. Fla. Aug. 21, 2015) (quoting *Pellon v. Business Representation Int'l., Inc.*, 528 F. Supp. 2d 1306, 1311 (S.D. Fla. 2007), MSG is correct that "the record is devoid of any substantial objective evidence of reliance." ECF No. [43] at 12. Griffin only alleges he suffered losses in reliance on the October 21, 2022 promise for the first time in response to MSG's Motion. ECF No. [53] at 15. Griffin

16

argues that he "continued to accumulate losses, in reliance on the promise by Kozko to reimburse these losses. This includes payment of his lease, which could not be broken without costs of $20,000 in two months' rent and a $9,600 fee for breaking the lease." ECF No. [53] at 15. However, at the time MSG made the alleged promise to reimburse Griffin, Griffin "was already in Florida and even after the January 11, 2023 conversation [he] stayed for seven more months, until August 16, 2023, in Miami." ECF No. [43] at 11-12. The fact that Griffin remained in Miami, months after MSG repudiated the October 21, 2022 promise, provides further support that, absent any promise for reimbursement, Griffin intended to stay in Miami permanently. Griffin Tr. 74:21-25. Griffin has also provided no evidence to support his argument that he would have terminated his lease sooner had he known he would not be reimbursed.

Indeed, Griffin's own notes from his January 11, 2023 conversation with Kozko cast doubt on the nature of the October 21, 2022 promise. In response to Griffin's request for a timeframe in which he would receive the "agreed compensation," Kozko stated "[y]ou're asking for stuff we never agreed on. We never agreed it would be [the] company's liability to cover these items. Why would you do this?" ECF No. [42-43] at 21. Griffin's notes reflect that, on October 21, 2022, he requested a total of $94,152.73 in reimbursement.[4] *Id.* at 17. Kozko responded that Griffin should submit his "lease expenses" for reimbursement and that "the remainder" Kozko would "give [Griffin] as a bonus for getting NASCAR Heat 5." *Id.* On November 1, 2022, Griffin "[s]ubmitted [his] lease expense claim" and two weeks later he "[r]eceived [the] lease reimbursement from MSG for AUD $55,685.47."[5] *Id.* at 18, 19. On January 14, 2023, Kozko "proposed 3 bonuses

---

[4] Griffin's notes also reflect that, on October 12, 2022, he told Kozko that his total "approximate loss in US dollars" was "about $95k." ECF No. [42-43] at 17. It is unclear at what point Griffin told Kozko that he was seeking $326,668 in reimbursement. *See* ECF No. [45] at 13; ECF No. [44-1] at 108.

[5] In 2022, the yearly average exchange rate for the Australian Dollar was 1.442. IRS, *Yearly Average Currency Exchange Rates*, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates (last visited May 6, 2025). Therefore, the lease reimbursement of $55,685.47 AUD was the equivalent of approximately $38,616.83 in USD in 2022.

totaling US $250,000 with a fourth bonus to be discussed." *Id.* at 22. Therefore, although Griffin claims Kozko repudiated this original promise, Griffin's own notes suggest that he offered Griffin significantly more in compensation than what was requested on October 21, 2022. *Id.*

Griffin also argues that Kozko's October 21, 2022 promise "to reimburse Griffin's losses was done in substitution of the original promise. Therefore, Kozko's actions are closer to a proposed settlement of a potential dispute related to the original promise rather than an entirely separate promise." [53] at 10. To the extent Griffin now argues that his "promissory estoppel claim consists of one single promise," to "relocate" Griffin from Australia to the United States so that he could "work in MSG's Miami office as Director of Technology," that is not what he alleged in his Complaint. *Id.* Even if Griffin had alleged in his Complaint that the October 21, 2022 promise was made in substitution of the September 8, 2021 promise, it would not change the Court's analysis. Griffin would still have to provide evidence that he detrimentally relied on the October 21, 2022 promise, and he has failed to do so. Accordingly, MSG's Motion is granted. Viewing the evidence in the light most favorable to Griffin, there is no genuine dispute as to any material fact and MSG is entitled to judgment as a matter of law on Griffin's sole claim. Based on the Court's analysis, Griffin's Motion is denied.

## IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. MSG's Motion for Summary Judgment, **ECF No. [43],** is **GRANTED**;
2. Griffin's Motion for Summary Judgment, **ECF No. [45]**, is **DENIED**;
3. The above-styled case is **DISMISSED WITH PREJUDICE**;
4. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**;

Case No. 24-cv-21929-BLOOM/Elfenbein

5. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida on May 7, 2025.

*/s/ Beth Bloom*

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record